# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Corning Incorporated** | |
| **Plaintiffs (Complainant)** | |
| **v.** | **Civil Action No. Misc. _____** |
| **Caihong Display Devices Co., Ltd.** **Xianyang CaiHong Optoelectronics Technology Co., Ltd.** | |
| **Defendants (Respondents)** | |

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE
## (LETTER ROGATORY)

The United States District Court for the District of Columbia presents its compliments to the Appropriate Judicial Authority in Japan, and respectfully requests international judicial assistance to obtain evidence to be used in an administrative proceeding before the United States International Trade Commission in Investigation No. 337-TA-1433, *Certain Glass Substrates for Liquid Crystal Displays, Products Containing the Same, and Methods for Manufacturing the Same*. The hearing in this matter is scheduled for December 8–12, 2025 in Washington, D.C., United States. This Court has authority to submit this Letter Rogatory under 28 U.S.C. §§ 1651 and 1781(b)(2).

This Court requests the assistance described herein as necessary in the interests of justice. Specifically, this Court requests the international judicial assistance of the Appropriate Judicial Authority of Japan, by the proper and usual process of Japan's courts, to compel the below-named third party to produce documents requested in **Attachment A** and to be examined under oath through the person(s) most knowledgeable about the topics in **Attachment B**:

1

**AGC Inc.**
**1-5-1, Marunouchi**
**Chiyoda-ku**
**Tokyo 100-8405**
**Japan**

Based on the representations made by Respondents Caihong Display Devices Co., Ltd. ("Caihong Display") and Xianyang CaiHong Optoelectronics Technology Co., Ltd. ("CHOT") (collectively, "Respondents" or "Defendants/Respondents"), this Court believes that justice cannot be served between the parties unless the evidence requested herein is made available by the Appropriate Judicial Authority of Japan for use in an investigation being conducted by the U.S. International Trade Commission into whether Respondents unlawfully import into the United States, sell for importation into the United States, and sell within the United States after importation certain glass substrates for liquid crystal displays, products containing the same, and methods for manufacturing the same. This Court believes that AGC Inc. is in possession of unique documents and things and has unique knowledge regarding material facts that are highly relevant for the proper prosecution of the above-referenced administrative proceeding. This information is necessary and cannot be obtained without the assistance of the Appropriate Judicial Authority of Japan.

In light of the foregoing, this Court respectfully requests that the Appropriate Judicial Authority of Japan give this matter urgent attention in order that the evidence requested herein may be obtained before the period for fact discovery concludes in this investigation on August 8, 2025, and is available for use at the hearing.

## I.    FACTS

The name of the proceeding for which the discovery is requested is *In the Matter of Certain Glass Substrates for Liquid Crystal Displays, Products Containing the Same, and Methods for*

*Manufacturing the Same*, Investigation No. 337-TA-1433 ("the Investigation"). The Plaintiff is

the Complainant in the Investigation:

> Corning Incorporated
> One Riverfront Plaza
> Corning, NY 14831
> (607) 974-9000

The Complainant is represented by:

> John Thorne
> Evan T. Leo
> Gregory G. Rapawy
> Joseph S. Hall
> Thomas W. Traxler
> Jacob E. Hartman
> Ana N. Paul
> Bethan R. Jones
> Matthew J. Wilkins
> Hannah D.C. DePalo
> Eric J. Maier
> D. Chanslor Gallenstein
> Ashle J. Holman
> Nataliia Gillespie
> Daren G. Zhang
> Rachel T. Anderson
> Shunhe Wang
> Jahvonta A. Mason
> KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
> 1615 M Street NW
> Suite 400
> Washington, DC 20036
> Telephone: (202) 326-7900
> Email: CORNINGITC@lists.kellogghansen.com
>
> Christine E. Lehman
> REICHMAN JORGENSEN LEHMAN &
> FELDBERG LLP
> 1909 K Street, NW
> Suite 800
> Washington, DC 20036
> Telephone: (202) 894-7310

Jeffrey H. Lerner
Sturgis M. Sobin
Ashley Joyner Chavous
Brian G. Bieluch
Maureen F. Browne
Daniel W. Cho
Jessica C. Hill
Megan P. Keane
Tobias Y.H. Ma
Ranganath Sudarshan
Ashley M. Winkler
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000

(Counsel for Corning Incorporated)

The Defendants are Respondents in the Investigation:

Caihong Display Devices Co., Ltd.
Area A, China-Korea Industrial Park
Qindu District, Xianyang City
Shaanxi Province, 712023, China
+86 029-33132653

Xianyang CaiHong Optoelectronics Technology Co., Ltd.
No. 1, Gaoke Yilu
Qindu District, Xianyang City
Shaanxi Province, 71200, China
+86 029-33132878

Other Respondents to this Investigation are:

HKC Corporation Ltd.
HKC Industrial Park
1 Gongye 2nd Road
Shilong Community, Shiyan Street
Baoan District, Shenzhen City
Guangdong Province, 518108, China
+86 0755-36905666

HKC Overseas Ltd.
Unit 8 28/F W50
50 Wong Chuk Hang Road
Hong Kong 999077
+852 2564-2862

Hisense USA Corporation
7310 McGinnis Ferry Road
Suwanee, GA 30024
(888) 935-8880

Vizio, Inc.
39 Tesla
Irvine, CA 92628
(949) 428-2525

LG Electronics USA, Inc.
111 Sylvan Avenue
Englewood Cliffs, NJ 07632
(800) 243-0000

TCL China Star Optoelectronics Technology Co., Ltd.
9-2 Tangming Avenue
Guangming New District, Shenzhen City
Guangdong Province, 518132, China
+86 0755-86908888

TTE Technology, Inc.
189 Technology Drive
Irvine, CA 92618
(877) 300-9509

The Respondents are represented by:

Paul F. Brinkman, P.C.
Karthik Ravishankar
Alexandra Obiol
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200
Caihong-1433-ITC@kirkland.com

Russell E. Levine, P.C.
Christian E. Huehns
Tiffany Hu
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Nichole DeJulio
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

David A. Levin
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone: (310) 552-4200
Facsimile: (310) 552-5900

Fan Chen
Yi Zhang
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Tiffany M. Knapp
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 385-7500
Facsimile: (617) 385-7501

Yun Zhang
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Stephen Smith
Samuel Whitt
Rachel Preston
Cole Merritt
COOLEY LLP
1299 Pennsylvania Ave., N.W., Suite 700
Washington, D.C. 20004
Caihong_Cooley_ITC@cooley.com

Adam Gershenson
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116

Matthew Brigham
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304

(Counsel for Respondents Caihong Display Devices Co., Ltd. and Xianyang
CaiHong Optoelectronics Technology Co., Ltd.)

Deanna Tanner Okun
Daniel F. Smith
Lauren E. Peterson
Sean M. Wesp
Polsinelli P.C.
1401 Eye Street N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 626-8320
Email: hkc-1433-itc@polsinelli.com

Hao Tan
Shen Wang
Pete Curtin
Yu Di
Yue (Alyssa) Yang
Jacob Skebba
Arch & Lake LLP
203 N. La Salle Street #2100
Chicago, IL 60601
Email: hkc-337-ta-1441@archlakelaw.com

(Counsel for HKC Corporation Ltd. and HKC Overseas Ltd.)

Paul C. Goulet
Steven M. Anzalone
Steven E. Adkins
Jeffrey Q. Li
FISHERBROYLES, LLP
1200 G Street N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 669-9630
(301) 968-0800, (202) 669-9630
(703) 618-25031

Adam K. Whiting
FISHERBROYLES, LLP
228 Hamilton Avenue, Third Floor
Palo Alto, CA 94301
Telephone: (650) 275-4869

Kevin D. Jablonski
FISHERBROYLES, LLP
701 Fifth Avenue, Suite 4200
Seattle, WA 98104
Telephone: (206) 235-8125

Scott Nielson
FISHERBROYLES, LLP
222 South Main Street, 5th Floor
Salt Lake City, UT 84101
Telephone: (801) 660-4400

(Counsel for Respondent Hisense USA Corporation)

Lisa M. Kattan
Thomas C. Martin
Christopher Hong
Michael Kachmarik
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, DC 20001

Kurt Pankratz
Jean Choi
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201

Eric J. Faragi
Zhengmao "Frank" Zhu
Boyang Zhang
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10012
Telephone: 202.639.7701
Email: dlbakerbotts1433inv@bakerbotts.com

(Counsel for Respondents Vizio, Inc. and LG Electronics USA, Inc.)

Donald R. McPhail
Eric W. Schweibenz
John S. Kern
Alexander B. Englehart
John F. Presper
MERCHANT & GOULD P.C.
1900 Duke Street, Suite 600
Alexandria, Virginia 22314
Telephone: (703) 684-2500
Fax: (612) 332-9081

Paige S. Stradley
MERCHANT & GOULD P.C.
1801 California St., Unit 3300
Denver, CO 80202
Telephone: (303) 357-1670
Fax: (612) 332-9081
E-Mail: MG-ITC1433@merchantgould.com

(Counsel for Respondents TCL China Star Optoelectronics Technology Co., Ltd. and TTE Technology, Inc.)

Other parties to the Investigation include:

R. Whitney Winston
Thomas L. Halkowski
Investigative Attorneys, Office of Unfair Import Investigations
U.S. International Trade Commission
500 E Street SW, Suite 401
Washington, DC 20436
Telephone: (202) 205-2221
Email: Whitney.Winston@usitc.gov
Email: Thomas.Halkowski@usitc.gov

The Investigation is an administrative proceeding conducted by the United States International Trade Commission ("the ITC") under Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("Section 337"), based on a Complaint filed by Corning Incorporated ("Complainant" or "Corning") on December 18, 2024 (**Attachment C1**), and a supplement to the Complaint filed on January 7, 2025 (**Attachment C2**). Section 337 prohibits importing goods into the United States for which unfair methods of competition or unfair acts have been used. The ITC instituted the Investigation based on Corning Incorporated's Complaint on January 17, 2025, with publication of the Notice of Investigation in the Federal Register. Upon institution, the Investigation was assigned to Administrative Law Judge Monica Bhattacharyya to preside over prehearing matters, conduct an evidentiary hearing, and issue an initial determination on the merits. The initial determination is subject to possible review by the ITC, with a right to appeal to the United States Court of Appeals for the Federal Circuit.

The Complaint alleges trade secret misappropriation and patent infringement of U.S. Patent Nos. 8,627,684 ("the '684 patent") and 9,512,025 ("the '025 patent") (collectively, "Asserted Patents"). The Complaint also alleges patent infringement of U.S. Patent No. 7,851,394 ("the '394 patent"), but the ITC has since issued an Initial Determination terminating the Investigations with respect to all asserted claims of the '394 patent. The Complaint further alleges that the respondents to the Investigation manufacture, sell for importation, import, and/or sell after importation articles containing accused products, which include certain glass substrates for liquid crystal displays and products containing the same. The relief sought by Corning Incorporated is an exclusion order barring importation of the accused products into the U.S.

Respondents allege that there is no trade secret misappropriation and that the Asserted Patents are (a) not infringed; and (b) invalid and/or unenforceable under at least 35 U.S.C. §§ 102,

103, and/or 112. Respondents assert other defenses as well, including without limitation, that Corning's claims and/or requested relief are barred by the doctrines of patent misuse, patent tying, and/or unclean hands. Among the subject areas to be explored during discovery in this case are Complainant's attempts to suppress and intimidate competition through intellectual property litigation, and otherwise unreasonable and anticompetitive negotiations, agreements, conditions, and/or restrictions, as well as documents and information related to prior art.

Respondents seek foreign discovery from AGC Inc. because Respondents believe that AGC Inc. is in possession of information relevant to this Investigation. AGC Inc. is an LCD glass substrate manufacturer. AGC Inc. uses a float glass process to manufacture glass, whereas Corning uses a fusion draw process. Corning has previously initiated litigation against AGC Inc. for intellectual property related to strengthened cover glass technology. Respondents believe that AGC Inc. was and/or is subject to Corning's attempts to suppress and intimidate competition by litigation, and thus, anticompetitive activities. Information of Corning's anticompetitive activities, including information relating to litigation by Corning and agreements, proposals, or negotiations between Corning and AGC, as well as information of AGC's LCD glass market share and sales are directly relevant to Respondents' patent misuse, patent tying, and unclean hands defenses. Moreover, as stated on its website, AGC Inc. began producing float glass in 1966 and glass substrates for TFT-LCDs in 1995. AGC Inc.'s history with glass manufacturing suggests that it likely possesses information related to prior art, which is relevant to Respondents' patent invalidity defense. Additionally, information relating to Corning's manufacturing process is directly relevant to the trade secret allegations and Respondents' defenses thereof. AGC Inc. may therefore possess relevant information and documents with respect to at least Respondents' patent misuse, patent tying, unclean hands, and patent invalidity defenses.

Further, Respondents believe that the requested information, or its substantial equivalent could not be obtained without undue hardship by alternative means because the documents and knowledgeable witnesses are in Japan, which is beyond the ITC's subpoena powers. Respondents are also requesting identical information from AGC America, Inc. ("AGC America") through a subpoena application. Nevertheless, because of the uncertainty of whether AGC America possesses and will produce all of the requested information, Respondents request a Letter Rogatory to AGC Inc. Should AGC America have in its possession and actually produces the requested information, Respondents will withdraw the Letter Rogatory as to AGC Inc.

Accordingly, this request is in the interest of justice.

## II.     DISCOVERY REQUESTED

It is respectfully requested that the Appropriate Judicial Authority of Japan compel AGC Inc. to produce documents responsive to the requests for production in **Attachment A** to this Letter Rogatory. It is additionally requested that the Appropriate Judicial Authority of Japan compel AGC Inc. to make available for examination under oath the person(s) most knowledgeable to provide testimony regarding the deposition topics set forth in **Attachment B**. The requested documents and deposition testimony will provide important evidence related to the above proceeding. The Complaint is **Attachment C1** and the Supplement to the Complaint is **Attachment C2** to this Letter Rogatory.

The Court understands the confidential nature of the documents and testimony requested from AGC Inc. There is a protective order in this case to protect the confidentiality of any documents that AGC Inc. produces and any testimony that AGC Inc. provides. The protective order is **Attachment D** to this Letter Rogatory. The Ground Rules for the ITC Investigation No. 337-TA-1433 is **Attachment E**.

Certified Japanese translation of each attachment is provided in **Exhibit 3**.

12

III.    **SPECIAL METHODS AND PROCEDURES REQUESTED TO BE FOLLOWED**

To the extent permitted by the applicable laws of Japan, this Court respectfully requests that the Appropriate Judicial Authority of Japan require that the following methods and procedures be followed in connection with the deposition and document production requested herein.

With regard to the production of documents identified in **Attachment A**, in the event that any document called for by these requests is withheld in whole or in part on the basis of any applicable privilege, it is requested that AGC Inc. furnish a privilege log that identifies each document for which any privileges is claimed and that provides, with respect to each document, the following information:

1.    The date the document was created and last modified;

2.    The subject matter of the document;

3.    The person(s) who prepared the document;

4.    All persons to whom the document was distributed, shown, or explained;

5.    The document's present custodian; and

6.    The nature of the privilege asserted.

Additionally, it is respectfully requested that each document described in **Attachment A** be produced or provided for inspection and copying in its entirety, without abbreviation or redaction, as maintained in the ordinary course of business, at least ten (10) days before the deposition.

With regard to the deposition, it is respectfully requested that an appropriate judicial official of Japan direct that the witness be duly sworn in accordance with the applicable procedures of Japan, and that the testimony be taken and transcribed by a qualified court reporter and videographer chosen by Respondents' representatives. It is further requested that:

1.     AGC Inc. be required to designate one or more knowledgeable officers, directors, managing agents, employees, or other person(s) to testify on behalf of AGC Inc.;

2.     AGC Inc. be required to identify the person or persons who will testify pursuant to this request and the matter or matters about which each person will testify;

3.     The examination be conducted orally;

4.     The parties' legal representative or their designees, interpreters, and an Official Court Reporter and Videographer be permitted to be present during the examination;

5.     There be excluded from the examination all persons other than those individuals permitted under bullet 4 and any official of the court of Japan or staff of the United States embassy and/or consulate required to be present during such proceedings;

6.     The Official Court Reporter and Videographer be permitted to record verbatim the examination;

7.     The Official Court Reporter and Videographer be permitted to record the examination by audiovisual means;

8.     The attorneys from the law firms of Kirkland & Ellis LLP and Cooley LLP, acting as legal representatives of Respondents, or their designees, be permitted to conduct the examination; or, if a judicial officer is conducting the examination, the parties' legal representatives or their designees be permitted to submit questions to that officer for presentation to the witness and that the other parties to the litigation be permitted to attend the deposition and examine the witness(es) on the topics listed in Attachment B;

9.     The attorneys conducting the examination be permitted to ask questions regarding the topics in **Attachment B**;

10.    Ten (10) hours be allotted for the examination of each witness who requires a translator, and seven (7) hours be allotted for the examination of each English-speaking witness;

11.    The witnesses be examined as soon as practicable; and

12.    The documents be provided to AGC Inc. no later than ten (10) business days before the deposition at a convenient location to be determined.

14

Finally, it is requested that the individuals identified below be furnished as soon as practicable with a copy of the executed Letter Rogatory, and be informed as soon as practicable of the time and place for the examination of the witness:

> Paul F. Brinkman, P.C.
> Kirkland & Ellis LLP
> 1301 Pennsylvania Ave, N.W.
> Washington, D.C. 20004
> Telephone: (202) 389-5000
> Facsimile: (202) 389-5200
> E-Mail: Caihong-1433-ITC@kirkland.com

## IV.    URGENCY

A response is requested by July 7, 2025 or as soon as practicable. The reason for such urgency is that under Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, investigations in the United States International Trade Commission must be completed "at the earliest practicable time." The hearing for this investigation is set to begin on December 8, 2025. Expedient treatment of this request will allow the parties and the witness to arrange a mutually agreeable date for testimony and avoid disruption to the witness' business or personal plans.

## V.    RECIPROCITY

The United States District Court for the District of Columbia is willing to provide similar assistance to judicial authorities of Japan.

## VI.    REIMBURSEMENT FOR COSTS

To the extent that there are expenses associated with providing assistance in response to this Letter Rogatory, the fees and costs will be borne by Respondents. Requests for reimbursement may be submitted to Respondents' counsel via email to: Caihong-1433-ITC@kirkland.com or via U.S. mail to:

Paul F. Brinkman, P.C.
Kirkland & Ellis LLP
1301 Pennsylvania Ave, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200

| Date of Request: | Signature and Seal of Requesting Authority: |
|---|---|
| _____of_____, 2025 | The Honorable_____<br>United States District Court Judge<br>U.S. District Court for the District of Columbia<br>333 Constitution Ave., N.W.<br>Washington, D.C. 20001<br>United States of America |

# ATTACHMENT A

## DOCUMENTS AND THINGS TO BE PRODUCED BY AGC INC.

With reference to the Definitions and Instructions provided further below, requests for production include:

### REQUEST FOR PRODUCTION NO. 1:

Documents sufficient to identify the manufacturing processes You used to make LCD glass from 2005 to the present.

### REQUEST FOR PRODUCTION NO. 2:

All Documents and Communications sent to You by Corning alleging, asserting, and/or otherwise contending that You have, are, and/or will be violating any Corning intellectual property right, including by misappropriating any Corning trade secret and/or infringing any Corning patent, and any subsequent Documents and Communications referring or relating to such allegations, assertions, and/or contentions, including Documents and Communications reflecting the resolution of such allegations, assertions, and/or contentions.

### REQUEST FOR PRODUCTION NO. 3:

All Documents and Communications relating to any litigations, proposals, negotiations, agreements, licenses (including cross licenses), settlements, joint ventures, term sheets, letters of intent, and/or memoranda of understanding between You and Corning, including minutes of all operational and board meetings of any such joint ventures and any Documents relating to disputes that arose relating to such agreements, the operation of such joint ventures, settlements, licenses, and/or memoranda of understanding, including but not limited to litigation documents, negotiations, dispute resolution documents, licenses, or settlements related to the litigations between You and Corning.

### REQUEST FOR PRODUCTION NO. 4:

All Documents and Communications relating to any negotiations, proposals, or agreements between Corning and You or Your affiliates relating or referring to pricing, output, purchaser, and/or non-compete restrictions, and/or royalties.

### REQUEST FOR PRODUCTION NO. 5:

All agreements and Communications between You and Corning relating to Caihong Display Glass, LCD glass panels manufactured with Caihong Display Glass, Caihong Display, This Investigation, or the decision to not include you as a respondent in This Investigation.

### REQUEST FOR PRODUCTION NO. 6:

All Documents and things identifying, relating, or referring to any Prior Art to the Asserted Patents and/or any Related Patents You are aware of.

1

**REQUEST FOR PRODUCTION NO. 7:**

All Documents and things relating to the manufacturing process for Corning Glass or the manufacturing equipment used to make Corning Glass, including any materials sent to you by Corning or any materials obtained or prepared by You during any audit of Corning facilities.

**REQUEST FOR PRODUCTION NO. 8:**

Documents sufficient to show Your market share for LCD glass, including by geographic region, between January 1, 2005 to January 1, 2021.

**REQUEST FOR PRODUCTION NO. 9:**

All Documents and Communications between You and CSOT relating or referring to Caihong Display Glass, LCD glass panels manufactured with Caihong Display Glass, and Caihong Display, including but not limited to Documents and Communications between You and CSOT relating or referring to the sale and purchase of Your LCD Glass, Your sales volume of LCD Glass, and Caihong Display and/or Caihong Display Glass.

## DEFINITIONS

1.      "Caihong" or "Caihong Display" means Caihong Display Devices Co. Ltd. ("彩虹显示器件股份有限公司"), the Respondent. When identifying "Caihong" or "Caihong Display" in the underlying facts and/or documents in relation to answering the requested document productions, the Chinese characters "彩虹显示器件股份有限公司" or, if applicable, its abbreviations should be used.

2.      "Complainant" or "Corning" means Complainant Corning Incorporated.

3.      "You," "Your," "Yours" or "AGC" means AGC Inc.

4.      "Asserted Patent(s)" means U.S. Patent No. 8,627,684 and U.S. Patent No. 9,512,025. The term "Asserted Patents" includes each patent individually and all combinations and sub-combinations of the patents collectively.

5.      "Caihong Display Glass" means glass manufactured by Caihong Display.

6.      "Corning Glass" means glass manufactured by Corning.

7.      "Complaint" means the Complaint Under Section 337 of the Tariff Act of 1930 underlying this ITC Investigation No. 337-TA-1433, filed by Corning with the Secretary's Office of the United States International Trade Commission on December 18, 2024, as well as any supplements thereto or amended version thereof. *See* EDIS Doc. ID 839509.

8.      "Corning ITC Investigation," "This ITC Investigation," or "This Investigation," means the ITC Investigation No. 337-TA-1433 proceeding at the United States International Trade Commission, entitled "In the Matter of Certain Glass Substrates for Liquid Crystal Displays, Products Containing the Same, and Methods for Manufacturing the Same."

9.      "Document" and "Communication" includes everything within the meaning and scope of those terms as used in the Commission's Rules of Practice and Procedure ("Commission Rules"), the Administrative Law Judge's Ground Rules ("Ground Rules"), the Federal Rules of Civil Procedure, and the Federal Rules of Evidence.

10.      "CSOT" means TCL China Star Optoelectronics Technology Co., Ltd. and its direct parent (if any) and any domestic or foreign divisions, departments, subsidiaries or current or former offices, directors, employees, or agents thereof, as well as any firms, corporations, and other entities acting in joint venture with CSOT's predecessor companies or predecessors in interest, affiliates, successors, and assigns and all of its current and former officers, directors, owners, shareholders, employees, contractors, agents, attorneys, and representatives thereof.

11.      "CSOT Glass" means glass manufactured by CSOT.

12.      "Employee" includes both current and former employees.

13.      "Entity" or "Entities" means any Person, corporation, company, partnership, sole proprietorship, firm, board, joint venture, association, organization, trust, governmental body, agency authority, commission, or any other juristic Person, business unit, or collective

organization, and any legal, governmental, organizational, or political subdivision thereof. The acts of an Entity shall include the acts of its directors, officers, owners, members, employees, agents, attorneys, and all other representatives acting on the Entity's behalf.

14.    "Person" or "Persons" means any natural individual or individuals.

15.    "Prior Art" has the same meaning as it has in pre-AIA and AIA 35 U.S.C. §§ 102 and/or 103. This meaning includes any patent, printed publication, prior knowledge, prior use, prior sale or offer for sale, or other act or event defined in pre-AIA and AIA 35 U.S.C. §§ 102 and/or 103, taken alone or in combination.

16.    "Product(s)" means a machine, manufacture, apparatus, device, instrument, mechanism, appliance, process, method, or assemblage of components or parts (either individually or collectively) which are designed to function together electrically, mechanically, chemically, or otherwise, to achieve a particular function or purpose, including those offered for sale, sold, or under development.

17.    "Related Patent(s)" means any or all U.S. and non-U.S. patents and any or all U.S. and non-U.S. patent applications that disclose, discuss, address, or claim, expressly or inherently, technology relating to any alleged invention disclosed or claimed by the Asserted Patents, including any patents or patent applications (including all published and unpublished pending and abandoned applications) from or through which the Asserted Patents claim priority, any patents or patent applications (including all published and unpublished pending and abandoned applications) that claim priority from or through the Asserted Patents, any patents or patent applications (including all published and unpublished pending and abandoned applications) that claim priority to a patent or patent application to which the Asserted Patents also claim priority, and any foreign

4

counterpart patents or patent applications (including all published and unpublished pending and abandoned applications).

18.    "Thing" means any tangible object other than a Document.

19.    The singular form of each word shall include the plural, and the plural shall include the singular.

20.    Any pronoun shall be construed to refer to the masculine, feminine, or neuter gender as is most appropriate in each case.

21.    The words "and," "or," and "and/or" shall be construed conjunctively or disjunctively, whichever maximizes the scope of each request in which they are used.

22.    The words "any" and "all" shall be construed to mean "any and all."

23.    The words "each" and "every" shall be construed to mean "each and every."

24.    The words "include" and "including" and every variant thereof shall be construed to mean "including, without limitation" so as to give the broadest possible meaning to requests and definitions containing those words.

## INSTRUCTIONS

1.    When producing documents, indicate the number of the request to which the documents are responsive.

2.    These requests for production are not limited as to time period unless stated.

3.    Definitions and terminology used herein are used for convenience and do not intend or imply any particular technical meaning or meaning for any term or phrase of any patent.

4.    The present tense of any verb includes the simple past, past perfect, simple future, and future perfect tenses. For example, "use" includes "used," "will use," "had used," and "will have used."

5

5.      If any part of any request for production is objected to, set forth the basis for your objection and respond to all parts of the request for production to which you do not object.

6.      These Requests shall apply to all documents and things in your possession, custody or control at the present time, or coming into your possession, custody or control prior to the close of fact discovery in this Investigation. If you know of the existence, past or present, of any documents or things requested below, but are unable to produce such documents or things because they are not presently in your possession, custody or control, you shall so state and shall identify such documents or things, and the person who has possession, custody or control of the documents or things.

7.      If, after conducting a reasonable investigation, a full production cannot be made for any of these requests for production, state that such is the case and produce to the fullest extent possible, stating what responsive documents and things are available, what documents and things cannot be provided, why the documents and things are unavailable, and what efforts were made to obtain the unavailable documents and things.

8.      If you object to or disagree with any of the definitions set forth in these Requests, or if you do not understand any term used in these Requests, explain in detail the nature of your disagreement with the definition, or lack of understanding of the term, and provide your definition of the term.

9.      If no documents are responsive to a particular Request, you are to state in your response that no responsive documents exist.

10.      In the event that any document called for by these Requests has been destroyed or discarded, that document is to be identified by stating: (i) the date the document was created; (ii) the subject matter of the document; (iii) the person(s) who prepared the document; (iv) all

recipient(s) of the document; (v) the date of destruction, manner of destruction, and reason for destruction; (vi) the persons who were authorized to carry out such destruction; and (vii) whether any copies of the document presently exist and, if so, the name of the custodian of each copy of the document.

11.    If any of the documents are considered "Confidential Business Information," as that term is defined in the Protective Order attached as Attachment D, such documents should be produced subject to the terms and provisions of the Protective Order.

12.    In the event any document is withheld on a claim of attorney-client privilege, attorney work-product immunity, or any other privilege from disclosure, provide a privilege log stating: (1) the date that the document was created; (2) the author(s)/ sender(s); (3) the recipient(s), including copy recipients; and (4) the general subject matter of the document. The sender(s) and recipient(s) shall be identified by position and entity (corporation or firm, etc.) with which they are employed or associated. If the sender or the recipient is an attorney or a foreign patent agent, he or she shall be so identified. For each document, the type of privilege claimed must also be stated, together with a certification that all elements of the claimed privilege have been met and have not been waived with respect to each document.

13.    To the extent you contend any of the requested documents and things are subject to any third party confidentiality obligations, you must identify the documents being withheld under any such claims along with the identity of the relevant third party and the nature of the confidentiality obligation, immediately seek permission from any such third party to produce the relevant information to Respondents in this Investigation, and provide Respondents with the list of third parties, along with their contact information, for any permissions allegedly withheld.

14.     These requests seek all responsive documents in their original language, and if such original language is not English, these requests also seek all English-language translations that may exist for any such documents.

15.     Each Request seeks production of any document requested therein in its entirety, without abbreviation or expurgation, including all attachments, or other matters affixed thereto. To the extent documents, including but not limited to design, accounting, financial and sales data, are maintained in both hard copy and some other form, including but not limited to computer, electronic, magnetic and optical media of all kinds, provide both forms.

16.     Documents from any single file should be produced in the same order as they were found in such file. If copies of documents are produced, such copies must be legible and bound or stapled in the same manner as the original.

17.     Documents produced in a form other than hard copy must be produced in the media in which they are found. Documents produced in any computer, electronic, magnetic or optical media should include a unique hard copy label containing an index of the materials and an identification of the format in which the documents are stored on such media.

18.     If you find the meaning of any term in these document requests to be unclear, you must assume a reasonable meaning, state what the assumed meaning is, and produce documents on the basis of that assumed meaning.

# ATTACHMENT B

## TOPICS FOR THE DEPOSITION OF AGC INC.

With reference to the Definitions and Instructions provided in Attachment A, topics for deposition include:

**TOPIC NO. 1:**

The documents and things, including the subject matter and authenticity, produced in response to the requests in Attachment A.

**TOPIC NO. 2:**

The manufacturing processes You used to make LCD glass from 2005 to the present.

**TOPIC NO. 3:**

Communications sent to You by Corning alleging, asserting, and/or otherwise contending that You have, are, and/or will be violating any Corning intellectual property right, including by misappropriating any Corning trade secret and/or infringing any Corning patent, and any subsequent Communications referring or relating to such allegations, assertions, and/or contentions, including Communications reflecting the resolution of such allegations, assertions, and/or contentions.

**TOPIC NO. 4:**

Communications relating to any litigations, proposals, negotiations, agreements, licenses (including cross licenses), settlements, joint ventures, term sheets, letters of intent, and/or memoranda of understanding between You and Corning, including minutes of all operational and board meetings of any such joint ventures and disputes that arose relating to such agreements, the operation of such joint ventures, settlements, licenses, and/or memoranda of understanding, including but not limited to proposals, negotiations, dispute resolution documents, licenses, or settlements related to the litigations between You and Corning.

**TOPIC NO. 5:**

Communications relating to any negotiations, proposals, or agreements between Corning and You or Your affiliates relating or referring to pricing, output, purchaser, and/or non-compete restrictions, and/or royalties.

**TOPIC NO. 6:**

Agreements and communications between You and Corning relating to Caihong Display Glass, LCD glass panels manufactured with Caihong Display Glass, Caihong Display, This Investigation, and/or Your inclusion or lack of inclusion as a respondent in This Investigation.

**TOPIC NO. 7:**

The Prior Art to the Asserted Patents and/or any Related Patents You are aware of.

1

**TOPIC NO. 8:**

Your knowledge of the manufacturing process for Corning Glass or the manufacturing equipment used to make Corning Glass, including knowledge based on any materials sent to you by Corning or any materials obtained or prepared by You during any audit of Corning facilities.

**TOPIC NO. 9:**

Your market share for LCD glass, including by geographic region, between January 1, 2005 to January 1, 2021.

**TOPIC NO. 10:**

Communications between You and CSOT relating or referring to Caihong Display Glass, LCD glass panels manufactured with Caihong Display Glass, and Caihong Display, including but not limited to Communications between You and CSOT relating or referring to the sale and purchase of Your LCD Glass, Your sales volume of LCD Glass, and Caihong Display and/or Caihong Display Glass.

# ATTACHMENT C1

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE

1615 M STREET, N.W.

SUITE 400

WASHINGTON, D.C. 20036-3215

(202) 326-7900

FACSIMILE:

(202) 326-7999

December 18, 2024

*Via Electronic Filing*

The Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, D.C. 20436

Re:   *Certain Glass Substrates for Liquid Crystal Displays, Products Containing the Same, and Methods for Manufacturing the Same*, Investigation No. 337-TA-____

Dear Secretary Barton:

Enclosed for filing on behalf of Complainant Corning Incorporated are documents in support of Corning's request that the Commission commence an investigation pursuant to Section 337 of the Tariff Act of 1930, as amended. A request for confidential treatment of the Confidential Complaint and Confidential Exhibits 8, 9, 152, and 153 is included with this submission.

In accordance with the Commission's modified filing requirements, 85 Fed. Reg. 15798 (Mar. 19, 2020) ("Temporary Procedures"), Corning's submission via EDIS includes the following documents:

1.   One (1) electronic copy of the verified Non-Confidential Complaint, pursuant to Commission Rule 210.8(a)(l)(i);

2.   One (1) electronic copy of the non-confidential exhibits to the Complaint, pursuant to Commission Rule 210.8(a)(l)(i);

3.   One (1) electronic copy of the verified Confidential Complaint, pursuant to Commission Rule 210.8(a)(l)(ii);

4.   One (1) electronic copy of the confidential exhibits to the Complaint, pursuant to Commission Rules 201.6(c) and 210.8(a)(l)(ii);

5.   One (1) electronic copy of a letter and certification requesting confidential treatment for the information contained in the Confidential Complaint and

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Lisa R. Barton
December 18, 2024
Page 2

Confidential Exhibits 8, 9, 152, and 153 to the Complaint, pursuant to Commission Rules 201.6(b) and 210.5(d); and

6.     One (1) electronic copy of the Statement on the Public Interest with respect to the remedial orders Complainant seeks in the Complaint, pursuant to Commission Rule 210.8(b).

In accordance with 19 C.F.R. § 210.12(a) and (c), the following documents are submitted within the exhibits or appendices to this patent-based complaint:

- One (1) electronic certified copy of U.S. Patent Nos. 7,851,394, 8,627,684, and 9,512,025, included with the Complaint as Exhibits 1-3, and their respective assignment records included with the Complaint as Exhibits 4-6.

- One (1) electronic certified copy of the U.S. Patent and Trademark Office prosecution history for U.S. Patent Nos. 7,851,394, 8,627,684, and 9,512,025, included with the Complaint as Appendices A-C.

- One (1) electronic copy of the technical references cited in the prosecution history for U.S. Patent Nos. 7,851,394, 8,627,684, and 9,512,025, included with the Complaint as Appendices D-F.

Complainant confirms that it will serve copies of the non-confidential versions of the Verified Complaint and all associated exhibits upon the institution of this investigation on the proposed Respondents and all other appropriate entities consistent with 19 C.F.R. part 201 (including 19 C.F.R. § 201.16) and the Temporary Procedures.

Non-substantive language indicating limitations on distribution, such as copyright notices, have been redacted in headers and footers of exhibits and appendices to avoid issues when submitting to EDIS. No substantive content of any document has been redacted, except as set forth in the letter and certification requesting confidential treatment.

Please contact me should you have any questions concerning this submission.

Respectfully submitted,

John Thorne

Enclosures

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215

(202) 326-7900
FACSIMILE:
(202) 326-7999

December 18, 2024

*Via Electronic Filing*

The Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, D.C. 20436

      Re:    *Certain Glass Substrates for Liquid Crystal Displays, Products Containing the Same, and Methods for Manufacturing the Same*, Investigation No. 337-TA-____

Dear Secretary Barton:

      Complainant Corning Incorporated by counsel, hereby requests, pursuant to 19 C.F.R. § 201.6, confidential treatment of the confidential business information contained in the Confidential Complaint and Confidential Exhibits 8, 9, 152, and 153 thereto.

      Confidential treatment is sought for the Confidential Complaint, which contains certain discussion of confidential information from sealed settlement agreements, sensitive details about plants and facilities, and the Corning investments relied upon for the domestic industry requirement and trade secrets claim.

      Confidential treatment is sought for Confidential Exhibits 8, 152, and 153, which are exhibits that contain details about Corning's trade secrets.

      Confidential treatment is sought for Confidential Exhibit 9, which is an exhibit detailing the Corning investments relied upon for the domestic industry requirement.

      Confidential information is contained within bold red brackets.

      The information described above qualifies as confidential information pursuant to 19 C.F.R. § 201.6 because:

      a.    it is not available to the public;

      b.    unauthorized disclosure of such information could cause substantial harm to the competitive position of Corning or Respondents; and

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Lisa R. Barton
December 18, 2024
Page 2

        c.      its disclosure could impair the Commission's ability to obtain information necessary to perform its statutory function.

Non-substantive language indicating limitations on distribution, such as copyright notices, have been redacted in headers and footers of other exhibits and appendices to avoid issues when submitting to EDIS. No substantive content of any document has been redacted, except as set forth in this request for confidential treatment.

Please contact me should you have any questions concerning this submission.

                 Respectfully submitted,

                 John Thorne

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN GLASS SUBSTRATES FOR LIQUID CRYSTAL DISPLAYS, PRODUCTS CONTAINING THE SAME, AND METHODS FOR MANUFACTURING THE SAME** | Investigation No. 337-TA-___ |

## COMPLAINANT'S STATEMENT ON THE PUBLIC INTEREST

In support of its Complaint filed herewith, Complainant Corning Incorporated hereby submits this public interest statement, as required by 19 C.F.R. § 210.8(b). As discussed below, the remedy sought against Caihong Display Devices Co., Ltd., d/b/a Irico Display Devices Co., Ltd. ("Irico Display");[1] Hisense USA Corporation; HKC Corporation Ltd.; HKC Overseas Ltd.; LG Electronics U.S.A., Inc.; TCL China Star Optoelectronics Technology Co., Ltd.; TTE Technology, Inc., d/b/a TCL North America; VIZIO, Inc.; and Xianyang CaiHong Optoelectronics Technology Co., Ltd. (collectively, "Respondents") will not have an adverse effect on the public health or welfare, competitive conditions in the United States economy, production of like or directly competitive articles in the United States, or U.S. consumers. Instead, the remedy sought will promote the public interest in protecting intellectual property and encouraging innovation.

The Accused Products in this Investigation are glass substrates for liquid crystal displays ("LCDs"), manufactured by Irico, that infringe one or more of the asserted patents, are made

---

[1] This public interest statement refers to Respondent Caihong Display Devices Co., Ltd., and its predecessors, affiliates, and subsidiaries collectively as "Irico," and to Respondent Caihong Display Devices Co., Ltd. specifically as "Irico Display."

1

using misappropriated trade secrets, or both ("Irico LCD Glass"), and display panels and electronic devices containing the same, including TVs, monitors, notebook and laptop computers, and tablets. Respondent Irico Display makes and sells for importation the Irico LCD Glass. The remaining Respondents manufacture, sell for importation, import, or sell within the United States after importation the display panels and electronic devices containing the Irico LCD Glass.

The requested remedial orders, which would exclude the Accused Products, are not contrary to the public interest. The Commission has long recognized the public interest in enforcing intellectual property rights. *See, e.g., Certain Two-Handle Centerset Faucets & Escutcheons, & Components Thereof*, Inv. No. 337-TA-422, Comm'n Op. at 9 (June 26, 2000); *Certain Indus. Automation Sys. & Components Thereof Including Control Sys., Controllers, Visualization Hardware, Motion & Motor Control Sys., Networking Equip., Safety Devices, & Power Supplies*, Inv. No. 337-TA-1074, Comm'n Op. at 12-13 (Apr. 8, 2019).

In this Investigation, the only potentially relevant public interest inquiry is whether the exclusion of the Irico LCD Glass and products containing the same would have an adverse effect on the public interest factors in Section 337. Corning respectfully submits that it would not.

### Rule 210.8(b)(1) Explanation of how the articles potentially subject to the requested remedial orders are used in the United States.

The LCD glass substrates that would be subject to the remedial orders are incorporated into LCD panels, which are themselves incorporated into televisions, monitors, notebook and laptop computers, and tablets (collectively, "Consumer Electronics Products"). Those LCD panels are generally sold abroad and incorporated into finished Consumer Electronics Products. Those products are then imported by certain Respondents from outside the United States and sold to customers such as electronics retailers and other purveyors of consumer electronics.

2

Certain Respondents also may be importing LCD panels from outside the United States and selling them to customers, such as television manufacturers.

> **Rule 210.8(b)(2) Identification of any public health, safety, or welfare concerns relating to the requested remedial orders.**

No public health, safety, or welfare concerns would be at issue in this Investigation. The Accused Products comprise subsidiary components of Consumer Electronics Products and the Consumer Electronics Products themselves. Such products do not implicate public health, safety, or welfare concerns. *See, e.g., Certain Elec. Devices Including Streaming Players, Televisions, Set Top Boxes, Remote Controllers, & Components Thereof*, Inv. No. 337-TA-1200, Comm'n Op. at 40 (Nov. 10, 2021) (excluding infringing media streaming products, including televisions, "do[es] not implicate any public health, national security or welfare, or other public interest concerns"). The Accused Products are neither designed nor used for any specific use that implicates the public health, safety, or welfare. *See, e.g., Certain Optoelectronic Devices for Fiber Optic Commc'ns, Components Thereof, & Prods. Containing the Same*, Inv. No. 337-TA-860, Comm'n Op. at 40-43 (Apr. 17, 2014); *Certain Personal Transporters, Components Thereof, & Manuals Therefor*, Inv. No. 337-TA-935, Comm'n Op. at 16 (Mar. 10, 2016).

> **Rule 210.8(b)(3) Identification of like or directly competitive articles that Complainant, its licensees, or third parties make which could replace the subject articles if they were to be excluded.**

Corning designs glass substrates for LCDs incorporated into consumer products sold to customers in the United States. Corning is the pioneer in making these substrates and is recognized as the leading manufacturer of glass substrates for LCDs at issue in this Investigation. Corning is also the only company headquartered in the United States that produces LCD glass substrates. Corning's own LCD glass substrates could replace Irico LCD Glass in all downstream infringing products in the United States, including those made, sold, and imported

3

by the other Respondents. Other companies' noninfringing glass substrates for LCDs, while not providing the advantages of the Corning products, would also remain available. As to the infringing Consumer Electronics Products themselves, the market for such products in the United States is highly competitive, and provides sufficient substitutes for those Accused Products.

Furthermore, remedial orders would not harm domestic competitive production because the Accused Products are principally manufactured overseas. *See Certain Digit. Televisions & Certain Prods. Containing Same & Methods of Using Same*, Inv. No. 337-TA-617, Comm'n Op. at 15 (Apr. 10, 2009) (an exclusion order that affects foreign manufacturing locations "will not adversely affect domestic production" of the target digital televisions and dismissing concerns of shortages where others can supply substitutes).

> **Rule 210.8(b)(4) Identification of whether the Complainant, its licensees, and/or third parties have the capacity to replace the volume of articles subject to the requested remedial orders in a commercially reasonable time in the United States.**

As noted in the previous section, Corning is the leading manufacturer of LCD glass substrates. Corning would have the ability to expand its manufacturing capacity and support technicians sufficiently to replace the volume of articles that would be subject to the requested remedial orders in a commercially reasonable time.

> **Rule 210.8(b)(5) Identification of how the requested remedial orders would impact consumers.**

The requested remedial orders would not adversely affect U.S. consumers. As noted above, there are alternative suppliers and sufficient substitutes for all of the Accused Products. Those substitutes could replace the excluded products and meet consumer demand.

## CONCLUSION

If the Commission grants the requested remedial orders, the public interest in protecting Corning's valid and enforceable intellectual property rights will be served. In addition, the

Accused Products are not necessary to any health or welfare need, and an adequate supply of substitute devices will be available through Corning and other companies' noninfringing LCD glass. As such, the strong public interest in protecting Corning's intellectual property rights outweighs any potential adverse impact on the public.

Date:  December 18, 2024                Respectfully submitted,

John Thorne
Evan T. Leo
Gregory G. Rapawy
Joseph S. Hall
Thomas W. Traxler
Jacob E. Hartman
Bethan R. Jones
Hannah D.C. DePalo
Ashle J. Holman
Daren G. Zhang
Kyle C. Bailey
Shunhe Wang
Jahvonta A. Mason
KELLOGG, HANSEN, TODD, FIGEL &
    FREDERICK, P.L.L.C.
1615 M Street NW
Suite 400
Washington, DC 20036
Tel.: (202) 326-7900
Email: CORNINGITC@lists.kellogghansen.com

Christine E. Lehman
REICHMAN JORGENSEN LEHMAN &
    FELDBERG LLP
1909 K Street, NW
Suite 800
Washington, DC 20036
Tel.: (202) 894-7310
Email: CORNINGITC@lists.kellogghansen.com

*Counsel for Complainant Corning Incorporated*

PUBLIC VERSION

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of | |
| **CERTAIN GLASS SUBSTRATES FOR LIQUID CRYSTAL DISPLAYS, PRODUCTS CONTAINING THE SAME, AND METHODS FOR MANUFACTURING THE SAME** | Investigation No. 337-TA-____ |

COMPLAINT OF CORNING INCORPORATED
UNDER SECTION 337 OF THE TARIFF ACT OF 1930

COMPLAINANT

Corning Incorporated
One Riverfront Plaza
Corning, NY 14831
Tel.: (607) 974-9000

COUNSEL FOR COMPLAINANT

John Thorne
Evan T. Leo
Gregory G. Rapawy
Joseph S. Hall
Thomas W. Traxler
Jacob E. Hartman
Bethan R. Jones
Hannah D.C. DePalo
Ashle J. Holman
Daren G. Zhang
Kyle C. Bailey
Shunhe Wang
Jahvonta A. Mason
KELLOGG, HANSEN, TODD, FIGEL &
    FREDERICK, P.L.L.C.
1615 M Street, NW
Suite 400
Washington, DC 20036
Tel.: (202) 326-7900

PROPOSED RESPONDENTS

Caihong Display Devices Co., Ltd.,
    d/b/a Irico Display Devices Co., Ltd.
Area A, China-Korea Industrial Park
Qindu District, Xianyang City
Shaanxi Province, 712023, China
Tel.: +86 029-33132653

Hisense USA Corporation
7310 McGinnis Ferry Road
Suwanee, GA 30024
Tel.: (888) 935-8880

HKC Corporation Ltd.
HKC Industrial Park
1 Gongye 2nd Road
Shilong Community, Shiyan Street
Baoan District, Shenzhen City
Guangdong Province, 518108, China
Tel.: +86 0755-36905666

HKC Overseas Ltd.
Unit 8 28/F W50
50 Wong Chuk Hang Road
Hong Kong 999077
Tel.: +852 2564-2862

**PUBLIC VERSION**

Christine E. Lehman
REICHMAN JORGENSEN LEHMAN &
    FELDBERG LLP
1909 K Street, NW
Suite 800
Washington, DC 20036
Tel.: (202) 894-7310

LG Electronics U.S.A., Inc.
111 Sylvan Avenue
Englewood Cliffs, NJ 07632
Tel.: (800) 243-0000

TCL China Star Optoelectronics
    Technology Co., Ltd.
9-2 Tangming Avenue
Guangming New District, Shenzhen City
Guangdong Province, 518132, China
Tel.: +86 0755-86908888

TTE Technology, Inc.,
    d/b/a TCL North America
189 Technology Drive
Irvine, CA 92618
Tel.: (877) 300-9509

VIZIO, Inc.
39 Tesla
Irvine, CA 92628
Tel.: (949) 428-2525

Xianyang CaiHong Optoelectronics
    Technology Co., Ltd.
No. 1, Gaoke Yilu
Qindu District, Xianyang City
Shaanxi Province, 71200, China
Tel.: +86 029-33132888

PUBLIC VERSION

## TABLE OF CONTENTS

TABLE OF EXHIBITS ................................................................................... vi

TABLE OF APPENDICES ............................................................................ xxi

I.    INTRODUCTION ............................................................................... 1

II.   COMPLAINANT ............................................................................... 6

III.  RESPONDENTS ................................................................................ 7

IV.   THE TECHNOLOGY AND PRODUCTS AT ISSUE .................................... 10

      A.    Fusion Draw Machine ............................................................... 11

            1.    Corning's Development of the Technology .......................... 12

            2.    Background of the Technology ........................................ 16

      B.    EAGLE XG Glass .................................................................... 22

V.    UNLAWFUL AND UNFAIR ACTS – TRADE SECRET MISAPPROPRIATION ......... 26

      A.    Trade Secrets at Issue ............................................................. 26

      B.    Irico's Wrongful Taking of the Trade Secrets .............................. 29

            1.    Irico's Entry into the LCD Glass Business ......................... 29

            2.    Irico's Misappropriation of Corning's Trade Secrets ........... 29

                  a.    PicVue's Unauthorized Acquisition of Corning's Trade Secrets ........... 31

                  b.    Irico's Misappropriation of the Trade Secrets Originally Obtained by PicVue ......... 33

                  c.    Irico's Misappropriation of Corning's Trade Secrets Taken from Samsung Corning Precision Glass Co. .......... 34

                  d.    Irico's Misappropriation of Corning's Trade Secrets Provided by FORMER CORNING EMPLOYEE 1. ......... 37

      C.    Irico's Use of the Trade Secrets ............................................... 39

            1.    Irico's Use of the Trade Secrets To Develop Fusion Draw Technology ......... 39

            2.    Irico's Continued Use of the Trade Secrets in Its Current Fusion Draw Technology .......... 41

i

**PUBLIC VERSION**

D.   Downstream Respondents' Use of the Trade Secrets ....................................43

    1.   Irico's Close Relationship with Its Customers....................................44

    2.   Irico Designs Its LCD Glass To Meet Each Customer's Specific Product Specifications..................................................................45

    3.   Information Available to the Downstream Respondents Concerning Irico's Trade Secret Misappropriation ............................47

    4.   Corning's Notification to Downstream Respondents of Irico's Trade Secret Misappropriation ...............................................49

B.   Related Litigation ...............................................................................51

    1.   Corning's Legal Action Against Irico.................................................52

    2.   Corning's Legal Actions Against Dongxu, Kang, Park, and Choi ...................52

    3.   Corning's Legal Actions Against Potential Suppliers to Irico and Dongxu................................................................................54

VI.   UNLAWFUL AND UNFAIR ACTS – PATENT INFRINGEMENT ......................57

A.   Identification of the Patents and Ownership by Corning...........................57

    1.   The '394 Patent ................................................................................57

    2.   The '684 Patent ................................................................................58

    3.   The '025 Patent ................................................................................58

B.   Nontechnical Description of the Patents...............................................59

C.   Foreign Counterparts to the Patents....................................................62

D.   Related Litigation and Agency Proceedings..........................................62

E.   Licenses ...........................................................................................64

F.   Patent Infringement ..........................................................................64

    1.   Irico Display (LCD Glass Manufacturer/Seller)....................................66

        a.   The '394 Patent...................................................................67

        b.   The '684 Patent...................................................................67

        c.   The '025 Patent...................................................................68

ii

PUBLIC VERSION

2.     CHOT, CSOT, and HKC (Panel Makers) ............................................. 69

    a.     CHOT ........................................................................................ 69

        i.     The '394 Patent ............................................................ 70

        ii.    The '684 Patent ............................................................ 70

        iii.   The '025 Patent ............................................................ 71

    b.     CSOT ........................................................................................ 72

        i.     The '394 Patent ............................................................ 73

        ii.    The '684 Patent ............................................................ 73

        iii.   The '025 Patent ............................................................ 74

    c.     HKC .......................................................................................... 74

        i.     The '394 Patent ............................................................ 75

        ii.    The '684 Patent ............................................................ 76

        iii.   The '025 Patent ............................................................ 77

3.     Hisense, LG, TCL, and VIZIO (TV and Display Manufacturers) ................... 77

    a.     Hisense ..................................................................................... 77

        i.     The '394 Patent ............................................................ 78

        ii.    The '684 Patent ............................................................ 79

        iii.   The '025 Patent ............................................................ 79

    b.     LG ............................................................................................ 80

        i.     The '394 Patent ............................................................ 81

        ii.    The '684 Patent ............................................................ 81

        iii.   The '025 Patent ............................................................ 82

    c.     TCL .......................................................................................... 83

        i.     The '394 Patent ............................................................ 83

        ii.    The '684 Patent ............................................................ 84

PUBLIC VERSION

|       |       | iii.  | The '025 Patent | 85 |

|       | d.    | VIZIO |  | 85 |

|       |       | i.    | The '394 Patent | 86 |

|       |       | ii.   | The '684 Patent | 86 |

|       |       | iii.  | The '025 Patent | 87 |

VII.    SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE ................................ 88

    A.    Irico Display ................................ 88

    B.    CHOT ................................ 89

    C.    CSOT ................................ 91

    D.    HKC ................................ 92

    E.    Hisense ................................ 93

    F.    LG ................................ 95

    G.    TCL ................................ 96

    H.    VIZIO ................................ 96

VIII.   HARMONIZED TARIFF SCHEDULE ITEM NUMBERS ................................ 97

IX.     THE DOMESTIC INDUSTRY ................................ 97

    A.    Technical Prong ................................ 97

    B.    Economic Prong ................................ 98

        1.    Section 337(a)(1)(A) ................................ 98

        2.    Sections 337(a)(1)(B), 337(a)(2), and Section 337(a)(3) ................................ 101

X.      INJURY TO DOMESTIC INDUSTRY ................................ 102

XI.     REQUEST FOR GENERAL EXCLUSION ORDER ................................ 108

    A.    A General Exclusion Order Is Necessary To Prevent Circumvention of a Limited Exclusion Order ................................ 108

    B.    Additional Relief Requested ................................ 115

        1.    Limited Exclusion Order ................................ 115

PUBLIC VERSION

2.    Cease and Desist Order ...................................................................115

XII.  RELIEF REQUESTED ...................................................................116

PUBLIC VERSION

## TABLE OF EXHIBITS

### Exhibits

| Exhibit | Document |
|---|---|
| 1 | Certified copy of United States Patent No. 7,851,394 |
| 2 | Certified copy of United States Patent No. 8,627,684 |
| 3 | Certified copy of United States Patent No. 9,512,025 |
| 4 | Certified copy of Assignment Record of U.S. Patent No. 7,851,394 |
| 5 | Certified copy of Assignment Record of U.S. Patent No. 8,627,684 |
| 6 | Certified copy of Assignment Record of U.S. Patent No. 9,512,025 |
| 7 | Declaration of Professor Steve W. Martin |
| 8 | CONFIDENTIAL Declaration of Shawn R. Markham |
| 9 | CONFIDENTIAL Declaration of Gautam Kudva Regarding Domestic Industry |
| 10 | Licensees of the Asserted Patents |
| 11 | Table Identifying Foreign Counterparts of the Asserted Patents and Foreign Patent Applications That Have Been Denied, Abandoned, or Withdrawn |

***Trade Secrets***

| | |
|---|---|
| 12 | Plea Agreement, *United States v. Jonathan Sanders*, No. 6:06-CR-06005-CJS (W.D.N.Y. Jan. 17, 2016) (Dkt. No. 9) ("Sanders Plea Agreement") |
| 13 | Plea Agreement, *United States v. Yeong C. Lin*, No. 6:07-CR-06083-CJS (W.D.N.Y. June 12, 2007) (Dkt. No. 23) ("Lin Plea Agreement") |
| 14 | Plea Agreement, *United States v. Danny Ray Price*, No. 6:06-CR-06073-CJS (W.D.N.Y. May 3, 2006) (Dkt. No. 3) ("Price Plea Agreement") |
| 15 | Certified translation of January 22, 2009 Decision by Seoul Southern District Court, Case No. 2008Godan3057 (excluding attachments) |

PUBLIC VERSION

| Exhibit | Document |
| --- | --- |

16     Translations of Korean news articles about the January 22, 2009 Decision by Seoul Southern District Court, Case No. 2008Godan3057

- https://www.fnnews.com/print/200902221512385327
- https://n.news.naver.com/mnews/article/print/003/0002538241
- https://n.news.naver.com/mnews/article/print/011/0001993745

17     Certified translation of February 8, 2012 Decision by Daejeon District Court, Case No. 2011Gahap7899 (excluding attachments)

18     Certified translation of June 26, 2013 Decision by Daejeon District Court, Case No. 2011Gahap7882 (excluding appendices)

19     Translations of Korean news articles about the June 26, 2013 Decision by Daejeon District Court, Case No. 2011Gahap7882

- https://www.sedaily.com/News/NewsView/NewsPrint?Nid=1HT1TPJD3Y
- https://n.news.naver.com/mnews/article/print/001/0006337399

20     Irico Group Electronics Co. Ltd., Interim Report 2007 (Sept. 2007), *available at* https://www.hkexnews.hk/listedco/listconews/sehk/2007/0911/ltn20070911154.pdf ("Irico 2007 Interim Report")

21     Irico Group Electronics Co. Ltd., Annual Report 2007 (Apr. 2008), *available at* https://www.hkexnews.hk/listedco/listconews/sehk/2008/0429/ltn20080429526.pdf ("Irico 2007 Annual Report")

22     Irico Group Electronics Co. Ltd., Annual Report 2008 (Apr. 2009), *available at* https://www1.hkexnews.hk/listedco/listconews/sehk/2009/0420/ltn20090420421.pdf ("Irico 2008 Annual Report")

23     Irico Group Electronics Co. Ltd., Annual Report 2010 (Apr. 2011), *available at* https://www1.hkexnews.hk/listedco/listconews/sehk/2011/0411/ltn20110411882.pdf ("Irico 2010 Annual Report")

24     Irico Group Electronics Co. Ltd., Annual Report 2011 (Apr. 2012), *available at* https://www.hkexnews.hk/listedco/listconews/sehk/2012/0417/ltn20120417370.pdf ("Irico 2011 Annual Report")

25     Irico Group Electronics Co. Ltd., Annual Report 2012 (Apr. 2013), *available at* https://www1.hkexnews.hk/listedco/listconews/sehk/2013/0429/ltn20130429554.pdf ("Irico 2012 Annual Report")

PUBLIC VERSION

| Exhibit | Document |
|---|---|
| 26 | Zhang Shaowen, Vice President of Irico, The Latest Development and Supply of Glass Substrate of Irico, 2008 China Optoelectronics & Display Expo (Shenzhen) (May 24, 2008) |
| 27 | Certified Translation of Declaration of Song-Geun Park (Mar. 6, 2009) (excluding appendix) |
| 28 | Certified Translation of Supplemental Declaration of Song-Geun Park (Mar. 6, 2009) (excluding appendices) |
| 29 | May 27, 2016 email from Informer to Corning |

*Claim Charts*

| | |
|---|---|
| 30 | Claim charts showing infringement of the '394 Patent by the Irico Accused Products, the CHOT Accused Products, and the Hisense Accused Products |
| 31 | Claim charts showing infringement of the '684 Patent by the Irico Accused Products, the CHOT Accused Products, and the Hisense Accused Products |
| 32 | Claim chart showing infringement of the '025 Patent by the Irico Accused Products, the CHOT Accused Products, and the Hisense Accused Products |
| 33 | Claim charts showing infringement of the '394 Patent by the Irico Accused Products, the HKC Accused Products, and the Hisense Accused Products |
| 34 | Claim charts showing infringement of the '684 Patent by the Irico Accused Products, the HKC Accused Products, and the Hisense Accused Products |
| 35 | Claim chart showing infringement of the '025 Patent by the Irico Accused Products, the HKC Accused Products, and the Hisense Accused Products |
| 36 | Claim charts showing infringement of the '394 Patent by the Irico Accused Products, the HKC Accused Products, and the LG Accused Products |
| 37 | Claim charts showing infringement of the '684 Patent by the Irico Accused Products, the HKC Accused Products, and the LG Accused Products |
| 38 | Claim chart showing infringement of the '025 Patent by the Irico Accused Products, the HKC Accused Products, and the LG Accused Products |
| 39 | Claim charts showing infringement of the '394 Patent by the Irico Accused Products, the CSOT Accused Products, and the TCL Accused Products |
| 40 | Claim charts showing infringement of the '684 Patent by the Irico Accused Products, the CSOT Accused Products, and the TCL Accused Products |

PUBLIC VERSION

| Exhibit | Document |
|---------|----------|
| 41 | Claim chart showing infringement of the '025 Patent by the Irico Accused Products, the CSOT Accused Products, and the TCL Accused Products |
| 42 | Claim charts showing infringement of the '394 Patent by the Irico Accused Products and the VIZIO Accused Products |
| 43 | Claim charts showing infringement of the '684 Patent by the Irico Accused Products and the VIZIO Accused Products |
| 44 | Claim chart showing infringement of the '025 Patent by the Irico Accused Products and the VIZIO Accused Products |

### *Irico Display*

| | |
|---|---|
| 45 | Irico webpage, http://www.cecchco.com/ (downloaded Dec. 2, 2024) |
| 46 | Machine translation of Irico webpage, http://www.cecchco.com/ (Front Page) (downloaded Dec. 2, 2024) |
| 47 | Irico webpage, http://www.cecchco.com/关于我们 (downloaded Dec. 2, 2024) |
| 48 | Machine translation of Irico webpage, http://www.cecchco.com/关于我们 (About Us: Company Profile) (downloaded Dec. 2, 2024) |
| 49 | Irico webpage, http://www.cecchco.com/关于我们/发展历程 (downloaded Dec. 2, 2024) |
| 50 | Machine translation of Irico webpage, http://www.cecchco.com/关于我们/发展历程 (About Us: Development Path) (downloaded Dec. 2, 2024) |
| 51 | Irico webpage, http://www.cecchco.com/product/32.html (downloaded Dec. 2, 2024) |
| 52 | Machine translation of Irico webpage, http://www.cecchco.com/product/32.html (Product Center: Product Description) (downloaded Dec. 2, 2024) |
| 53 | Irico webpage, http://www.cecchco.com/产品中心/营销网络 (downloaded Dec. 2, 2024) |
| 54 | Machine translation of Irico webpage, http://www.cecchco.com/产品中心/营销网络 (Product Center: Marketing Network) (downloaded Dec. 2, 2024) |
| 55 | Irico webpage, http://www.cecchco.com/66.html (downloaded Dec. 2, 2024) |

PUBLIC VERSION

| Exhibit | Document |
|---|---|
| 56 | Machine translation of Irico webpage, http://www.cecchco.com/66.html (*Rainbow Glass Co., Ltd.'s New Substrate Glass Production Line in Xianyang Was Successfully Ignited and Put into Production* (Mar. 21, 2024)) (downloaded Dec. 2, 2024) |
| 57 | Irico webpage, http://www.cecchco.com/81.html (downloaded Dec. 2, 2024) |
| 58 | Machine translation of Irico webpage, http://www.cecchco.com/81.html (*Rainbow Glass Co., Ltd.'s New Substrate Glass Production Line in Xianyang Was Successfully Ignited and Put into Production* (July 23, 2024)) (downloaded Dec. 2, 2024) |
| 59 | Caihong Display Devices Co., Ltd., Non-Public Offering Stock Plan (Oct. 22, 2015), *available at* https://static.sse.com.cn/disclosure/listedinfo/announcement/c/2015-10-23/600707_20151023_1.pdf |
| 60 | Translation of excerpt from Caihong Display Devices Co., Ltd., Non-Public Offering Stock Plan (Oct. 22, 2015), *available at* https://static.sse.com.cn/disclosure/listedinfo/announcement/c/2015-10-23/600707_20151023_1.pdf |
| 61 | Caihong Display Devices Co., Ltd., Announcement on the Reply to the Inquiry Letter from the Shanghai Stock Exchange Regarding the Post-Review of the Company's 2016 Annual Report (Apr. 20, 2017), *available at* http://static.sse.com.cn/disclosure/listedinfo/announcement/c/2017-04-21/600707_20170421_1.pdf ("Irico Apr. 20, 2017 Announcement") |
| 62 | Translation of excerpts from Irico Apr. 20, 2017 Announcement |
| 63 | Caihong Display Devices Co., Ltd., 2023 Annual Report (Apr. 2024), *available at* http://static.sse.com.cn/disclosure/listedinfo/announcement/c/new/2024-04-20/600707_20240420_ZMAE.pdf ("Irico 2023 Annual Report") |
| 64 | Translation of excerpts from Irico 2023 Annual Report |
| 65 | Caihong Display Devices Co., Ltd., Announcement on Expected Gains in Semi-Annual Performance for 2024 (July 10, 2024), *available at* http://static.sse.com.cn/disclosure/listedinfo/announcement/c/new/2024-07-10/600707_20240710_ILZA.pdf ("Irico July 10, 2024 Announcement") |
| 66 | Translation of Irico July 10, 2024 Announcement |

PUBLIC VERSION

| Exhibit | Document |
|---|---|
| 67 | Caihong Display Devices Co., Ltd., 2024 Semi-Annual Report (Aug. 2024), *available at* https://static.sse.com.cn/disclosure/listedinfo/announcement/c/new/2024-08-29/600707_20240829_5DXH.pdf ("Irico 2024 Semi-Annual Report") |
| 68 | Translation of excerpts from Irico 2024 Semi-Annual Report |
| 69 | Certified translation of Irico Patent CN 207619260 U (A stable flat glass quality control system) |
| 70 | Certified translation of Irico Patent CN 208907080 U (A heater device for substrate glass forming device) |
| 71 | Certified translation of Irico Patent Application CN 102765869 A (A platinum heating device for flat glass manufacturing) |
| 72 | Certified translation of Irico Patent Application CN 111072267 A (A glass substrate leveling device, equipment and method) |

### *CHOT*

| | |
|---|---|
| 73 | Correspondence with CHOT |

- Notice letter to CHOT (July 25, 2024)
- Email response from CHOT (Aug. 8, 2024)

| | |
|---|---|
| 74 | Panelook.com webpages showing CHOT panel (Model No. CV500U2-L01) for sale to North American customers (downloaded Dec. 2, 2024) |

- https://www.panelook.com/CV500U2-L01_CHOT_50.0_CELL_overview_48740.html
- https://www.panelook.com/CV500U2-L01_CHOT_50_CELL_parameter_48740.html
- https://www.panelook.com/CV500U2-L01_CHOT_50_CELL_inventory_48740.html
- https://www.panelook.com/CV500U2-L01_CHOT_50_CELL_supplier_48740.html

| | |
|---|---|
| 75 | Panelook.com webpage, *Panel Application Index*, https://www.panelook.com/modelsearch.php?op=application (downloaded Dec. 2, 2024) |
| 76 | Panelook.com webpage, *Why Buy Panel Here*, https://www.panelook.com/help.php?op=whybuy (downloaded Dec. 2, 2024) |

PUBLIC VERSION

| Exhibit | Document |
|---------|----------|

77    Panelook.com webpage, *Why Sell Panel Here*,
https://www.panelook.com/help.php?op=whysell (downloaded Dec. 2, 2024)

78    Alibaba.com webpages showing CHOT panel (Model No. CV500U2-L01) for sale
to U.S. customers from the following suppliers (downloaded Dec. 2, 2024)

- Guangzhou Boyue Electronics Co., Ltd.
- Guangzhou Oceanis Intelligent Technology Co., Ltd.
- Guangzhou Panyu Dashi Jinhaoxin Electronic Firm
- Guangzhou Wokuang Electronic Technology Co., Ltd.
- Guangzhou Zhexin Technology Co., Ltd.
- Hangwei Technology (Guangzhou) Co., Ltd.
- Hangzhou JDY Electronic Technology Co., Ltd.
- Hongqi Technology (Guangzhou) Co., Ltd.

79    Importation records for CHOT

80    Amazon.com webpage advertising Philips 34-inch monitor manufactured by TPV
Technology, https://www.amazon.com/PHILIPS-34E1C5600HE-UltraWide-QHD-
Built/dp/B0BQQ7H8TZ?th=1 (downloaded Dec. 2, 2024)

### *CSOT*

81    Notice letter to CSOT (July 25, 2024)

82    CSOT, *2023 Sustainability Report*,
https://www.tclcsot.com/template/pc/skin/hxgd/file.pdf ("CSOT 2023 Annual ESG
Report")

83    Panelook.com webpages showing CSOT panel (Model No. ST3151B07-1) for sale
to North American customers (downloaded Dec. 2, 2024)

- https://www.panelook.com/ST3151B07-1_CSOT_32.0_CELL_overview_
54554.html
- https://www.panelook.com/ST3151B07-1_CSOT_32.0_CELL_parameter_
54554.html
- https://www.panelook.com/ST3151B07-1_CSOT_32.0_CELL_inventory_
54554.html

PUBLIC VERSION

| Exhibit | Document |
|---|---|

84     Alibaba.com webpages showing CSOT panel (Model No. ST3151B07-1) for sale to U.S. customers from the following suppliers (downloaded Dec. 2, 2024)

- Guangzhou Boyue Electronics Co., Ltd.
- Guangzhou Qiangfeng Electronics Co., Ltd.
- Shenzhen Ailiyu International Import and Export Co., Ltd.
- Shenzhen Chuangyeda Electronic Co., Ltd.

85     Importation records for CSOT

***HKC***

86     Notice letter to HKC (July 25, 2024)

87     HKC webpage, *Semiconductor Display Panel*, https://www.hkcglobal.net/semiconductor.html (downloaded Dec. 2, 2024)

88     HKC, *Annual ESG Report 2022*, https://www.hkcglobal.net/upload/download/2023-11/6566fb47d45e1.pdf ("HKC 2022 Annual ESG Report")

89     Panelook.com webpages showing HKC panel (Model No. PT320CT01-1) for sale to North American customers (downloaded Dec. 2, 2024)

- https://www.panelook.com/PT320CT01-1_HKC_32.0_CELL_overview_44161.html
- https://www.panelook.com/PT320CT01-1_HKC_32.0_CELL_parameter_44161.html
- https://www.panelook.com/PT320CT01-1_HKC_32.0_CELL_inventory_44161.html
- https://www.panelook.com/PT320CT01-1_HKC_32.0_CELL_supplier_44161.html

90     Alibaba.com webpages showing HKC panel (Model No. PT320CT01-1) for sale to U.S. customers from the following suppliers (downloaded Dec. 2, 2024)

- Guangzhou Boyue Electronics Co., Ltd.
- Guangzhou Oceanis Intelligent Technology Co., Ltd.
- Guangzhou Wokuang Electronic Technology Co., Ltd.
- Hongyuan Group (Shenzhen) Co., Ltd.
- Shenzhen Ailiyu International Import and Export Co., Ltd.

PUBLIC VERSION

| Exhibit | Document |
|---|---|

91  Panelook.com webpages showing HKC panel (Model No. PT320CT01-3) for sale to North American customers (downloaded Dec. 2, 2024)

- https://www.panelook.com/PT320CT01-3_HKC_32.0_CELL_overview_52360.html
- https://www.panelook.com/PT320CT01-3_HKC_32.0_CELL_parameter_52360.html
- https://www.panelook.com/PT320CT01-3_HKC_32.0_CELL_inventory_52360.html

92  Alibaba.com webpages showing HKC panel (Model No. PT320CT01-3) for sale to U.S. customers from the following suppliers (downloaded Dec. 2, 2024)

- Guangzhou Bodan Trading Co., Ltd.
- Guangzhou Oceanis Intelligent Technology Co., Ltd.

93  Panelook.com webpages showing HKC panel (Model No. PT430GT01-5) for sale to North American customers (downloaded Dec. 2, 2024)

- https://www.panelook.com/PT430GT01-5_HKC_43_CELL_overview_60804.html
- https://www.panelook.com/PT430GT01-5_HKC_43_CELL_parameter_60804.html
- https://www.panelook.com/PT430GT01-5_HKC_43_CELL_inventory_60804.html
- https://www.panelook.com/PT430GT01-5_HKC_43_CELL_supplier_60804.html

94  Alibaba.com webpages showing HKC panel (Model No. PT430GT01-5) for sale to U.S. customers from the following suppliers (downloaded Dec. 2, 2024)

- Guangzhou Boyue Electronics Co., Ltd.
- Guangzhou Qiangfeng Electronics Co., Ltd.
- Guangzhou Wokuang Electronic Technology Co., Ltd.
- Guangzhou Xiongshi Technology Co., Ltd.
- Hangwei Technology (Guangzhou) Co., Ltd.
- Hangzhou JDY Electronic Technology Co., Ltd.
- Shenzhen Ailiyu International Import and Export Co., Ltd.

95  Importation records for HKC

PUBLIC VERSION

| Exhibit | Document |
|---|---|
| 96 | Amazon.com webpage advertising Philips 23.8-inch monitor manufactured by TPV Technology, https://www.amazon.com/241V8L-Frameless-included-Replacement-Warranty/dp/B0BHV3CXNT?th=1 (downloaded Dec. 2, 2024) |

### *Hisense*

| | |
|---|---|
| 97 | Photographs of box label, product labels, and product for Hisense 32" TV (Model No. 32A4K) showing importation and HKC panel (Model Nos. PT320CT01-3 and PT320CT01-1) |
| 98 | Photographs of box label, product labels, and product for Hisense 32" TV (Model No. 32A45K) showing importation and HKC panel (Model Nos. PT320CT01-3 and PT320CT01-1) |
| 99 | Photographs of box label, product label, and product for Hisense 40" TV (Model No. 40H4030F) showing importation |
| 100 | Photographs of box label, product labels, and product for Hisense 50" TV (Model No. 50R6G) showing importation and CHOT panel (Model No. CV500U2-L01) |
| 101 | Receipt and delivery confirmation for Hisense 32" TV (Model No. 32A4K) |
| 102 | Receipt and delivery confirmation for Hisense 32" TV (Model No. 32A45K) |
| 103 | Receipt and delivery confirmation for Hisense 40" TV (Model No. 40H4030F) |
| 104 | Receipt and delivery confirmation for Hisense 50" TV (Model No. 50R6G) |
| 105 | Notice letter to Hisense (Aug. 21, 2024) |
| 106 | Hisense webpage for Hisense 32" TV (Model No. 32A4K), https://www.hisense-usa.com/products/32-a4-series-hisense-google-tv-32a4k-hisense (downloaded Dec. 2, 2024) |
| 107 | Hisense specification sheet for Hisense 32" TV (Model No. 32A4K), https://files.hisense-usa.com/download/f256489c75ac6ab0 (downloaded Dec. 2, 2024) |
| 108 | Hisense warranty for Hisense 32" TV (Model No. 32A4K), https://files.hisense-usa.com/download/f2565e0f7539af89 (downloaded Dec. 2, 2024) |
| 109 | Hisense webpage for Hisense 32" TV (Model No. 32A45K), https://www.hisense-usa.com/televisions/32-a4-series-hisense-google-tv-32a45k-hisense (downloaded Dec. 2, 2024) |

PUBLIC VERSION

| Exhibit | Document |
|---|---|
| 110 | Hisense warranty for Hisense 32" TV (Model No. 32A45K), https://files.hisense-usa.com/download/f256632a2abb4b15 (downloaded Dec. 2, 2024) |
| 111 | Hisense webpage for Hisense 40" TV (Model No. 40H4030F), https://www.hisense-usa.com/televisions/40-fhd-roku-smart-led-tv-40h4030f (downloaded Dec. 2, 2024) |
| 112 | Hisense specification sheet for Hisense 40" TV (Model No. 40H4030F), https://files.hisense-usa.com/download/f2564c003f54d63f (downloaded Dec. 2, 2024) |
| 113 | Hisense warranty for Hisense 40" TV (Model No. 40H4030F), https://files.hisense-usa.com/download/f2565e736c249efa (downloaded Dec. 2, 2024) |
| 114 | Hisense webpage for Hisense 50" TV (Model No. 50R6G), https://www.hisense-usa.com/televisions/50r6g-50-led-4k-uhd-hisense-smart-roku-tv-2020 (downloaded Dec. 2, 2024) |
| 115 | Hisense specification sheet for Hisense 50" TV (Model No. 50R6G), https://assets.hisense-usa.com/assets/ProductDownloads/288/3c21b63fcc/Release-R6-55R6G-spec-sheet-V20201014.pdf (downloaded Dec. 2, 2024) |
| 116 | Hisense warranty for Hisense 50" TV (Model No. 50R6G), https://files.hisense-usa.com/download/f2565e7228112dcf (downloaded Dec. 2, 2024) |
| | *LG* |
| 117 | Photographs of box labels, product label, and product for LG 43" TV (Model No. 43UT7590PUA) showing importation and HKC panel (Model No. PT430GT01-5) |
| 118 | Photographs of box labels, product label, and product for LG 55" TV (Model No. 55UQ7570PUJ) showing importation |
| 119 | Receipt and delivery confirmation for LG 43" TV (Model No. 43UT7590PUA) |
| 120 | Receipt and delivery confirmation for LG 55" TV (Model No. 55UQ7570PUJ) |
| 121 | Correspondence with LG<br><br>• Notice letter to LG (Aug. 21, 2024)<br>• Email response from LG (Aug. 23, 2024)<br>• Letter to LG (Oct. 7, 2024)<br>• Email responses from LG (Sept. 2, 2024 & Oct. 25, 2024) |

PUBLIC VERSION

**Exhibit   Document**

122   LG webpages for LG 43" TV (Model No. 43UT7590PUA) (downloaded Dec. 2,
      2024)

      - https://www.lg.com/us/tvs/lg-43ut7590pua-4k-uhd-tv
      - https://www.lg.com/us/tvs/lg-43ut7590pua-4k-uhd-tv#pdp_where

123   LG webpage for LG 43" TV (Model No. 43UT7590PUA product support,
      https://www.lg.com/us/support/product/lg-43UT7590PUA.AUS (downloaded Dec.
      2, 2024)

124   LG owner's manual for LG 43" TV (Model No. 43UT7590PUA), https://gscs-
      b2c.lge.com/downloadFile?fileId=efs6lfiuq63xyQ7bhk6fwg (downloaded Dec. 2,
      2024)

125   LG warranty for LG 43" TV (Model No. 43UT7590PUA),
      https://www.lg.com/us/PDF/warranty/he/TV/tv_warranty_3840TWL056F.pdf
      (downloaded Dec. 2, 2024)

126   LG webpages for LG 55" TV (Model No. 55UQ7570PUJ) (downloaded Dec. 2,
      2024)

      - https://www.lg.com/us/tvs/lg-55uq7570puj-4k-uhd-tv
      - https://www.lg.com/us/tvs/lg-55uq7570puj-4k-uhd-tv#pdp_where

127   LG webpage for LG 55" TV (Model No. 55UQ7570PUJ) product support,
      https://www.lg.com/us/support/product/lg-55UQ7570PUJ.AUSQ (downloaded Dec.
      2, 2024)

128   LG owner's manual for LG 55" TV (Model No. 55UQ7570PUJ), https://gscs-
      b2c.lge.com/downloadFile?fileId=ltQ7I9fZjtJo9dgtms3c8g (downloaded Dec. 2,
      2024)

129   LG warranty for LG 55" TV (Model No. 55UQ7570PUJ)

PUBLIC VERSION

| Exhibit | Document |
|---|---|
| | ***TCL*** |
| 130 | Photographs of box labels, product label, and product for TCL 32" TV (Model No. 32S357) showing importation and CSOT panel (Model No. ST3151B07-1) |
| 131 | Receipt and delivery confirmation for TCL 32" TV (Model No. 32S357) |
| 132 | Notice letter to TCL (Aug. 21, 2024) |
| 133 | TCL webpage for TCL 32" TV (Model No. 32S357), https://www.tcl.com/us/en/products/home-theater/3-series/tcl-32-class-3-series-fhd-led-smart-roku-tv-32s357 (downloaded Dec. 2, 2024) |
| 134 | TCL, Quick Start Guide for TCL 32" TV (Model No. 32S357), https://www.tcl.com/usca/content/dam/tcl/product/home-theater/3-series/download/s331-s353-s355-s35-qsg/3-Series%20Quick%20Start%20Guide.pdf (downloaded Dec. 2, 2024) |
| 135 | TCL warranty for TCL 32" TV (Model No. 32S357), https://www.tcl.com/us/en/warranty/tv-warranty (downloaded Dec. 2, 2024) |
| 136 | TCL, *Our Story*, https://www.tcl.com/us/en/about-us/our-story# |
| | ***VIZIO*** |
| 137 | Photographs of box label, product labels, and product for VIZIO 40" TV (Model No. D40f-J09) showing importation |
| 138 | Receipt and delivery confirmation for VIZIO 40" TV (Model No. D40f-J09) |
| 139 | Correspondence with VIZIO<br><br>• Notice letter to VIZIO (Aug. 22, 2024)<br>• Email responses from VIZIO (Aug. 26, 2024 & Sept. 9, 2024)<br>• Email response from VIZIO (Oct. 15, 2024) |
| 140 | VIZIO webpage for VIZIO 40" TV (Model No. D40f-J09), https://www.vizio.com/en/tv/d-series/D40f-J09 (downloaded Dec. 2, 2024) |
| 141 | VIZIO user manual for VIZIO 40" TV (Model No. D40f-J09), https://cdn.vizio.com/user-manual/PDF/2021/TV/2022_D-Series-UM.pdf (downloaded Dec. 2, 2024) |
| 142 | VIZIO warranty for VIZIO 40" TV (Model No. D40f-J09), https://www.vizio.com/en/terms/warranty-and-returns (downloaded Dec. 2, 2024) |

PUBLIC VERSION

| Exhibit | Document |
|---------|----------|
| | ***Technical Domestic Industry*** |
| 143 | Corning webpage, *The Glass Stack*, https://www.corning.com/worldwide/en/products/display-glass/the-glass-stack.html |
| 144 | Corning webpage, *Corning® EAGLE XG® Slim Glass Substrates*, https://www.corning.com/worldwide/en/products/display-glass/products/eagle-xg-slim.html |
| 145 | Corning EAGLE XG product information sheet, https://www.corning.com/media/worldwide/cdt/documents/EAGLE_XG_Glass_PI_Sheet.pdf |
| 146 | Corning EAGLE XG product information sheet (2021), https://www.corning.com/media/worldwide/cdt/documents/EAGLE%20XG_PI%20Sheet_2021.pdf |
| 147 | Corning, *Corning® EAGLE XG® Glass Substrates:  Innovation Timeline*, https://www.corning.com/media/worldwide/cdt/documents/Corning_EXG_Timeline_2020.pdf |
| 148 | Corning webpage, *How It Works:  Corning's Fusion Glass Manufacturing Process*, https://www.corning.com/worldwide/en/innovation/the-glass-age/science-of-glass/how-it-works-cornings-fusion-process.html |
| 149 | Corning webpage, *How to Make Glass Out of Thin Air* (Oct. 2022), https://www.corning.com/worldwide/en/the-progress-report/vital-voices/profile-shawn-markham |
| 150 | Corning webpage, *How Display Glass Is Made*, https://www.corning.com/worldwide/en/products/display-glass/how-it-works.html |
| 151 | Claim charts showing technical domestic industry for the '394 Patent |
| 152 | CONFIDENTIAL Claim chart showing technical domestic industry for the '684 Patent |
| 153 | CONFIDENTIAL Claim chart showing technical domestic industry for the '025 Patent |

PUBLIC VERSION

| Exhibit | Document |
|---------|----------|

*Avenues to Circumvent a Limited Exclusion Order*

154     Alibaba.com webpages showing LCD TVs with customizable logos for sale to U.S. customers from the following suppliers (downloaded Nov. 25, 2024)

- Chongqing Donghe Bosen Import and Export Trading Co., Ltd.
- Guangdong Huishi Chuangxin Trading Co., Ltd.
- Guangdong Kuai Intelligent Technology Co., Ltd.
- Guangdong Rixian Technology Co., Ltd.
- Guangdong Tianxiang Technology Co., Ltd.
- Guangdong Waigaa Electronics Co., Ltd.
- Guangdong Yashikang Electrical Appliances Co., Ltd.
- Guangzhou City Hong Xian Electronics Co., Ltd.
- Guangzhou Gold&Lucky Electronics Technology Co., Ltd.
- Guangzhou Hongxun Electronic Co., Ltd.
- Guangzhou Huisong Electric Appliance Co., Ltd.
- Guangzhou Jujing Electronics Co., Ltd.
- Guangzhou Lucky Star Electronics Products Factory
- Guangzhou Panyu Zhongtuo Electronics Factory
- Guangzhou Weier Haina Electronic Co., Ltd.
- Guangzhou Xunsheng Technology Co., Ltd.
- Guangzhou Yitai Electronics Co., Ltd.
- Miriyon Electronics (Shenzhen) Co., Ltd.
- Shenyang Invan Billions Technology Co., Ltd.
- Shenzhen BQKK Technology Co., Ltd.
- Shenzhen Zhongnan Hi-Tech Co., Ltd.

PUBLIC VERSION

## Physical Exhibits

| Physical Exhibit | Description |
| --- | --- |
| 1 | Corning, *Corning EAGLE XG® Glass: 25 Billion Square Feet Sold* (2020), https://www.corning.com/media/worldwide/cdt/videos/Display%20Short%20Master%20-%204K%20-%20Re-Edit%20v2%20-%20Watermark.mp4 (2:51 video) |
| 2 | Corning Incorporated, *Corning EAGLE XG Glass Substrates*, https://www.youtube.com/watch?v=z5Nqq810Dz4&list=PL200E85E6CFF8AA63 (2:19 video) |
| 3 | Corning Incorporated, *The Story of Corning® EAGLE XG® Slim Glass Substrates*, https://www.youtube.com/watch?v=Ye103fUW-Yc (3:07 video) |
| 4 | Corning Incorporated, *Corning's Fusion Glass Manufacturing Process*, https://www.youtube.com/watch?v=Zig7vHjyVk8 (2:19 video) |
| 5 | Corning Incorporated, *Behind the Screens: How Display Glass Works*, https://www.youtube.com/watch?v=xpUOjsEgtkM (2:49 video) |

## TABLE OF APPENDICES

| Appendix | Document |
| --- | --- |
| A | Certified Prosecution History of United States Patent No. 7,851,394 |
| B | Certified Prosecution History of United States Patent No. 8,627,684 |
| C | Certified Prosecution History of United States Patent No. 9,512,025 |
| D | Copies of U.S. Patents and Published Patent Applications Cited in the Prosecution Histories of United States Patent Nos. 7,851,394; 8,627,684; and 9,512,025 |
| E | Copies of Foreign Patent Documents Cited in the Prosecution Histories of United States Patent Nos. 7,851,394; 8,627,684; and 9,512,025 |
| F | Copies of Other References Cited in the Prosecution Histories of United States Patent Nos. 7,851,394; 8,627,684; and 9,512,025 |

**PUBLIC VERSION**

## I.    INTRODUCTION

1.    Complainant Corning Incorporated ("Corning") files this Complaint pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, to prevent importation into the United States, sale for importation, and sale within the United States after importation of display glass that infringes Corning's patents, and to prevent unfair methods of competition and unfair acts in the importation and sale of display glass that is manufactured using Corning's misappropriated trade secrets.

2.    Respondent Caihong Display Devices Co., Ltd. ("Irico")[1] was historically a maker of cathode ray tubes ("CRTs") used in TVs and computer monitors.  Over time, CRTs became obsolete:  liquid crystal displays ("LCDs") and other newer technologies have replaced them in every application.  Irico sought to follow the industry and become a manufacturer of the glass used in LCDs.  But Irico did not make the investments or spend the time needed to develop the complex technology for manufacturing LCD glass.  Instead, it procured confidential documents it knew had been stolen from Corning.  Those stolen documents contained proprietary equipment designs and operational know-how related to Corning's "fusion draw process" – a method for making LCD glass that Corning developed and innovated through years of research and development.  Five of the individuals involved in stealing the documents have been prosecuted criminally in the United States and Korea and admitted to their involvement in the thefts. *See infra* ¶¶ 82-84, 98-100.

3.    Corning has spent decades and approximately one billion dollars developing its fusion draw process.  Corning continues to spend more than ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[1] This Complaint refers to Respondent Caihong Display Devices Co., Ltd., and its predecessors, affiliates, and subsidiaries collectively as "Irico," and to Respondent Caihong Display Devices Co., Ltd. specifically as "Irico Display."

PUBLIC VERSION

annually to further hone and improve this technology.  Other companies have tried to emulate

Corning's success legitimately by developing their own fusion draw techniques.  But those

efforts have been costly and slow.  For example, Corning's competitor Nippon Electric Glass Co.

("NEG") trailed Corning by at least ten years in developing fusion draw technology, even though

NEG had decades of experience in making LCD glass using other methods.  To this day, NEG's

process is still less efficient and less profitable.  Irico, however, began producing LCD glass

using Corning's fusion draw process within just two years of beginning development, despite, on

information and belief, having no prior experience in making LCD glass.

4.      Irico's misappropriation of Corning's intellectual property did not stop with the

theft of Corning's proprietary equipment designs and operational know-how.  Although some of

Corning's innovative technologies are maintained as closely held secrets, Corning has sought

and obtained patents, both U.S. and foreign, on some of its fusion draw-related inventions.

Those include chemical compositions and methods for making LCD glass with minimal defects

and without the use of certain heavy metals like arsenic and antimony that some customers

disfavor.  Irico infringes those patents.  By using Corning's patented compositions and methods,

Irico now makes LCD glass that can compete with Corning's flagship product, EAGLE XG, the

world's most widely used display glass.  Irico does not have a license or any other right to use

Corning's patent-protected technologies.

5.      Because of its misappropriation and infringement of Corning's trade secrets and

patents, Irico's LCD glass business has grown swiftly.  Irico already has built more than ten

production lines that make LCD glass using Corning's trade secrets.  By taking Corning's

intellectual property and avoiding the very substantial costs of independent development, Irico

competes against Corning with far lower costs than any law-abiding competitor would face.

PUBLIC VERSION

Using this wrongfully gained advantage, Irico is significantly undercutting Corning's prices for LCD glass.

6.      Irico is now rapidly expanding its capacity for manufacturing LCD glass.  It recently obtained approval for and is executing plans that will more than double its capacity. Although Irico's primary market for its LCD glass previously was China, Corning has recently discovered that Irico glass is now being used in products being imported into the United States. The volume of imported Irico glass will massively increase when Irico's new capacity comes online.  As cheap glass made by Irico using stolen and misappropriated Corning intellectual property further floods the market and undercuts Corning's prices, Corning will be forced to cut back significantly on its domestic activities related to its LCD glass business, including the ██████████████████████ that it spends on U.S.-based research, development, and engineering, and on its U.S.-based manufacturing and engineering work to make fusion draw machines.

7.      Corning seeks relief under Section 337 to prevent the unlawful importation and sale of Irico's LCD glass and products containing such glass.  The unlawfully imported glass was produced using trade secrets that were stolen from Corning (collectively, the "Trade Secrets"), and infringes one or more claims of three Corning patents:  U.S. Patent Nos. 7,851,394 ("the '394 patent"), 8,627,684 ("the '684 patent"), and 9,512,025 ("the '025 patent") (collectively, the "Asserted Patents").  The following table summarizes the asserted claims for infringement:

| Patent | Independent Claims | Dependent Claims |
|--------|--------------------|------------------|
| '394   | 1, 5, 8            | 6, 9-10          |
| '684   | 1, 7               | 2, 4, 10-12      |
| '025   | 15                 | 16-20            |

**Table 1.  Asserted Claims for Infringement**

3

PUBLIC VERSION

8.      EAGLE XG Glass is produced using Corning trade secrets.  It practices each of the Asserted Patents.  One of the patents – the '394 patent – describes the innovative compositions used to achieve the unique properties of the EAGLE XG Glass (the "Composition Patent").  Two other patents – the '684 and '025 patents – describe methods used to produce EAGLE XG Glass (collectively, the "Method Patents").  The misappropriated Trade Secrets provide additional critical details for efficiently producing glass that meets the exacting technical requirements achieved by EAGLE XG Glass.

9.      The proposed Respondents are Caihong Display Devices Co., Ltd., d/b/a Irico Display Devices Co., Ltd.; Hisense USA Corporation; HKC Corporation Ltd.; HKC Overseas Ltd.; LG Electronics U.S.A., Inc.; TCL China Star Optoelectronics Technology Co., Ltd.; TTE Technology, Inc., d/b/a TCL North America; VIZIO, Inc.; and Xianyang CaiHong Optoelectronics Technology Co., Ltd. (collectively, "Respondents").  As shown below, each Respondent imports, sells for importation, or sells after importation LCD glass or articles containing such glass that infringe one or more claims of the Asserted Patents, and each Respondent imports or sells LCD glass or articles containing such glass manufactured using Corning's misappropriated Trade Secrets.

10.     Exhibits 1-3 are certified copies of each of the Asserted Patents.  Exhibits 4-6 are certified copies of the recorded assignments for each of the Asserted Patents, which show that Corning owns all right, title, and interest in each.

11.     Appendices A-C are certified copies of the prosecution histories of each Asserted Patent.  Appendices D-F contain the technical references cited in the prosecution histories.

12.     Corning has facilities and employees in the United States where it makes the machinery, develops the technologies, and provides support for the production of EAGLE XG

4

PUBLIC VERSION

glass. For example, Corning designs and builds much of the high-precision machinery used to produce EAGLE XG Glass at a manufacturing facility in Erwin, New York, near its headquarters in Corning, New York. And Corning does the research and development work that produced EAGLE XG and continues to produce improvements to EAGLE XG at a nearby research facility in Erwin. Those facilities and employees constitute an industry within the United States that Respondents' unfair methods of competition and unfair acts in the importation and sale of articles threaten to destroy or substantially injure.

13.     Corning's facilities and employees in the United States also constitute an industry within the United States with respect to articles protected by the Asserted Patents, including significant investments in the United States in plant and equipment, significant employment in the United States of labor and capital, and substantial investment in the United States in the exploitation of the Asserted Patents, including research, development, and engineering.

14.     Corning seeks a general exclusion order barring the importation into the United States, sale for importation into the United States, or sale within the United States after importation of any glass substrates for LCDs, and display panels and electronic devices (including TVs, monitors, notebook and laptop computers, and tablets) containing the same, or manufactured using methods for manufacturing the same (i) that infringe, literally or under the doctrine of equivalents, one or more claims of the Asserted Patents or (ii) that are made with or using the Trade Secrets. In the alternative, Corning seeks a limited exclusion order barring the importation into the United States, sale for importation into the United States, or sale within the United States after importation of any glass substrates for LCDs, and display panels and electronic devices (including TVs, monitors, notebook and laptop computers, and tablets) containing the same, or manufactured using methods for manufacturing the same (i) that

5

PUBLIC VERSION

infringe, literally or under the doctrine of equivalents, one or more claims of the Asserted Patents

or (ii) that are made using, use, or otherwise unfairly benefit from the misappropriation of any of

the Trade Secrets by Respondents; their affiliates, parents, subsidiaries, successors, assigns; or

any person or entity in privity with the foregoing.[2]

15.    Corning also seeks a cease-and-desist order directing each Respondent to cease

and desist from importing, marketing, advertising, demonstrating, warehousing inventory for

distribution, offering for sale, selling, distributing, repairing, servicing, testing, licensing, or

using glass substrates for LCDs and products containing the same, that infringe, literally or under

the doctrine of equivalents, certain claims of the Asserted Patents or that are made using, use, or

otherwise unfairly benefit from the misappropriation of any of the Trade Secrets.  Additionally,

Corning requests the imposition of a bond during the period of Presidential review of the

Commission's remedial orders.

## II.    COMPLAINANT

16.    Complainant Corning is a New York corporation with its principal place of

business and corporate headquarters at One Riverfront Plaza, Corning, New York 14831.

17.    Corning and its affiliates have been leading innovators in glass and materials

science for more than 170 years.  Corning and its affiliates have developed numerous category-

defining products that have transformed industries and enhanced people's lives, including the

glass casing for Edison's lightbulb, glass windows on the Friendship 7 spacecraft for John

Glenn's historic orbit of the earth and for the Apollo 11 spacecraft used in the first moon landing,

Pyrex glass for cooking, fiber optic glass for the Internet, Valor Glass for pharmaceuticals,

Gorilla Glass for smartphones, and LCD glass for televisions and computer monitors.  Corning is

---

[2] Except where context requires otherwise, this Complaint uses the term "or" inclusively
to indicate that either or both listed alternatives are or should be true.

PUBLIC VERSION

a four-time winner of the National Medal of Technology – the highest honor the United States

confers for achievements related to technological progress.  Corning is the only developer of

LCD glass based in the United States.

**III.    RESPONDENTS**

18.    Respondent Caihong Display Devices Co., Ltd., d/b/a Irico Display Devices Co.,

Ltd. ("Irico Display"), is organized under the laws of China and has a principal place of business

at Area A, China-Korea Industrial Park, Qindu District, Xianyang City, Shaanxi Province,

712023, China.  As discussed further below, testing of TVs purchased in the United States

demonstrate that Irico Display sells for importation LCD glass that it manufactures using

Corning's misappropriated trade secrets and that infringe the Asserted Patents.  This infringing

glass is then incorporated into certain TVs that are imported into the United States or sold within

the United States after importation.  Respondent Irico Display is the parent company of

Respondent Xianyang CaiHong Optoelectronics Technology Co., Ltd. ("CHOT"), which makes

LCD panels using Irico glass.  Irico Display reports that it has formed the world's only "substrate

+ panel" business.

19.    Respondent CHOT is organized under the laws of China and has a principal place

of business at No. 1, Gaoke Yilu, Qindu District, Xianyang City, Shaanxi Province, 71200,

China.  As discussed further below, testing of a representative TV purchased in the United States

demonstrates that CHOT manufactures and sells for importation LCD panels containing glass

that infringes the Asserted Patents and that was manufactured using Corning's misappropriated

trade secrets.  These CHOT LCD panels are incorporated into certain TVs that are imported into

the United States or sold within the United States after importation.  Respondent CHOT is a

subsidiary of Respondent Irico Display.

PUBLIC VERSION

20.    Respondent Hisense USA Corporation ("Hisense") is a Georgia corporation with its principal place of business at 7310 McGinnis Ferry Road, Suwanee, Georgia 30024. As discussed further below, testing of representative TVs purchased in the United States, Hisense's website, product literature, and product labels demonstrate that Hisense sells for importation, imports, or sells after importation certain TVs that contain LCD glass, manufactured by Irico, which infringes the Asserted Patents and was manufactured using Corning's misappropriated trade secrets.

21.    Respondent HKC Corporation Ltd. ("HKC Corporation") is organized under the laws of China and has a principal place of business at HKC Industrial Park, 1 Gongye 2nd Road, Shilong Community, Shiyan Street, Baoan District, Shenzhen City, Guangdong Province, 518108, China.[3]  HKC Corporation is the parent company of Respondent HKC Overseas Ltd. (collectively, "HKC"). On information and belief, both companies import into the United States, sell for importation, or sell within the United States after importation the HKC Accused Products. As discussed further below, testing of representative TVs purchased in the United States demonstrate that HKC manufactures and sells for importation LCD panels containing glass, manufactured by Irico, which infringes the Asserted Patents and that was manufactured using Corning's misappropriated trade secrets. These HKC LCD panels are incorporated into certain TVs that are imported into the United States or sold within the United States after importation.

22.    Respondent HKC Overseas Ltd. ("HKC Overseas") is organized under the laws of Hong Kong and has its principal place of business at Unit 8 28/F W50, 50 Wong Chuk Hang

_____

[3] On information and belief, HKC Corporation Ltd. is the same entity that is abbreviated "HKC Co., Ltd." *See, e.g.*, HKC, *About Us*, https://www.hkcglobal.net/about.html; HKC, *Contact Us*, https://www.hkcglobal.net/contact.html.

PUBLIC VERSION

Road, Hong Kong 999077.  HKC Overseas is a subsidiary of Respondent HKC Corporation.  On information and belief, both companies import into the United States, sell for importation, or sell within the United States after importation the HKC Accused Products.  As discussed further below, testing of representative TVs purchased in the United States demonstrate that HKC manufactures and sells for importation LCD panels containing glass, manufactured by Irico, which infringes the Asserted Patents and that was manufactured using Corning's misappropriated trade secrets.  These HKC LCD panels are incorporated into certain TVs that are imported into the United States or sold within the United States after importation.

23.     Respondent LG Electronics U.S.A., Inc. ("LG") is a Delaware corporation with its principal place of business at 111 Sylvan Avenue, Englewood Cliffs, New Jersey, 07632.  As discussed further below, testing of representative TVs purchased in the United States demonstrate that LG sells for importation, imports, or sells after importation certain TVs that contain LCD glass, manufactured by Irico, which infringes the Asserted Patents and was manufactured using Corning's misappropriated trade secrets.

24.     Respondent TCL China Star Optoelectronics Technology Co., Ltd. ("CSOT") is organized under the laws of China and has a principal place of business at 9-2 Tangming Avenue, Guangming New District, Shenzhen City, Guangdong Province, 518132, China.  As discussed further below, testing of a representative TV purchased in the United States demonstrates that CSOT manufactures and sells for importation LCD panels containing glass, manufactured by Irico, which infringes the Asserted Patents and that was manufactured using Corning's misappropriated trade secrets.  Upon information and belief, these CSOT LCD panels are incorporated into certain TVs that are imported into the United States or sold within the United States after importation.  Respondent CSOT is a subsidiary of Respondent TCL.

PUBLIC VERSION

25.    Respondent TTE Technology, Inc., d/b/a TCL North America ("TCL") is a Delaware corporation with its principal place of business at 189 Technology Drive, Irvine, California 92618.  As discussed further below, testing of a representative TV purchased in the United States, TCL's website, product literature, and product labels demonstrate that TCL sells for importation, imports, or sells after importation certain TVs that contain LCD glass, manufactured by Irico, which infringes the Asserted Patents and was manufactured using Corning's misappropriated trade secrets.

26.    Respondent VIZIO, Inc. ("VIZIO") is a California corporation with its principal place of business at 39 Tesla, Irvine, California 92628.  As discussed further below, testing of a representative TV purchased in the United States, VIZIO's website, product literature, and product labels demonstrate that VIZIO sells for importation, imports, or sells after importation certain TVs that contain LCD glass, manufactured by Irico, which infringes the Asserted Patents and was manufactured using Corning's misappropriated trade secrets.

## IV.    THE TECHNOLOGY AND PRODUCTS AT ISSUE

27.    Pursuant to Commission Rule 210.12(a)(12), the technology at issue and the products at issue are glass substrates for LCDs, and display panels and electronic devices containing the same, including TVs, monitors, notebook and laptop computers, and tablets (collectively, the "Accused Products").  The scope of this Investigation covers glass substrates for LCDs, and display panels and electronic devices containing the same, including TVs, monitors, notebook and laptop computers, and tablets, and methods for manufacturing the same.

28.    The glass substrate at issue in this Investigation performs a critical role in the function of an LCD.  Each LCD comprises two glass substrates – a thin-film transistor (TFT) substrate that forms the foundation for the transistor array, and the color filter (CF) substrate that supports the color resist for each individual pixel.  Sandwiched between these glass substrates is

PUBLIC VERSION

the liquid crystal material itself.  The glass substrates are a critical feature of the LCD and have

stringent customer requirements.  For example, the glass must have a coefficient of thermal

expansion roughly the same as silicon; the glass must be free of alkali in order to prevent ion

migration into the TFT layer; the glass must have high dimensional stability with near perfect

uniformity of flatness, smoothness, and thickness; the glass must have excellent thermal and

chemical stability so that it can withstand the harsh conditions of LCD manufacture; the glass

must be free of even microscopic inclusions and bubbles that can create optical distortions in the

display; and the glass must be free of toxic heavy metals that would otherwise assist in achieving

many of these attributes.  An immense amount of investment in glass composition research and

manufacturing process development is required to achieve all these features within a glass sheet

that is no thicker than a business card, yet may be as tall and as wide as two king-size beds.



**A.    Fusion Draw Machine**

29.    As described below, the Trade Secrets, Composition Patent, and Method Patents

relate to Corning's technology used in its fusion draw process for making LCD glass.

PUBLIC VERSION

### 1.    Corning's Development of the Technology

30.    In the 1960s, two Corning engineers – Stuart Dockerty and Clint Shay – invented

an improved fusion draw process to produce glass substrates.  In simple terms, the fusion draw

process (also known as the "overflow process" or "fusion downdraw process") involves pouring

molten glass into an "isopipe," a V-shaped brick that has a trough on top and comes to a point at

the bottom (or the "root").  As the molten glass overfills the trough, it flows evenly down the two

sides and merges (or "fuses") into an elastic glass ribbon at the root of the isopipe.  The ribbon is

then drawn downward by its edges.  In the process, it cools and solidifies into a glass sheet in

midair.  The below graphic illustrates the general concept of the isopipe[4] (left) and Dockerty's

patented design filed in 1964 (right):

---

[4] This illustration does not reflect all the design features of the isopipe.

PUBLIC VERSION



31.    Initially, the fusion draw process was intended to make glass for automobile windshields, but it was not commercially successful for that purpose.  In the 1970s, the fusion draw process was used to make photosensitive glass for sunglasses.

32.    In the early 1980s, Corning discovered that the fusion draw process could be used to make glass for LCDs.  LCD glass must be exceptionally flat, smooth, free of defects, and stable under thermal and mechanical stress.  The fusion draw process offers great advantages in making glass that meets these exacting requirements.

33.    The major advantage of the fusion draw process is that it does not require additional grinding or polishing to make LCD glass.  In the fusion draw process, the front and back exterior surfaces of the glass never touch the forming equipment.  Instead, the portions of

13

PUBLIC VERSION

the molten glass that touch the isopipe are buried in the interior of the glass and fuse together, leaving the surface contact-free. Because the surfaces are formed in the air and never touch the forming equipment, the resulting glass is pristine and flat. As a result, the fusion draw process "provides the best surface quality of currently known forming processes."[5]

34.     Another method for making glass substrate, the float process, was developed in the 1950s primarily for making window glass, and was later modified for use in making LCD glass.[6] Compared to the fusion draw process, the float process is less expensive but yields inferior glass. The float process involves delivering molten glass onto a flat surface comprised of melted tin metal. As the molten glass floats on the tin, it solidifies and forms a glass sheet. In the float process, one side of the glass surface touches the tin while the other side is exposed to a contaminated "atmosphere comprising, among other things, particles of glass and partially oxidized tin that rain down on the glass surface."[7] Glass sheets made by the float process must be polished and ground to achieve the quality and flatness necessary for LCDs. This back-end processing adds manufacturing costs and can introduce new defects to the surface of the glass.

35.     In the 1980s, Corning was the first company to make LCD glass using the fusion draw process.

---

[5] Matt Dejneka & T.J. Kiczenski, *Display Glass*, in Springer Handbook of Glass § 45.4.3 (2019).

[6] AGC Inc., formerly known as Asahi Glass Co., Ltd., began producing TFT-LCD glass substrate using the float process around 1995. *See* AGC Inc., *Our Story*, https://www.agc.com/en/company/history/index.html.

[7] Adam Ellison & Iván A. Cornejo, *Glass Substrates for Liquid Crystal Displays*, 1 Int'l J. of Applied Glass Sci. 87, 90 (2010).

PUBLIC VERSION

36.     Since that time, Corning or its former equity venture, Samsung Corning Precision

Materials Co., Ltd. (which Corning has since fully acquired),[8] has led the introduction of each

new generation size of LCD glass substrate.  "Generation" is an industry term that refers to the

size of the panel manufacturer's platform:  the larger the generation size, the larger the sheet of

glass the platform can process.  Larger generation sizes enable panel makers to manufacture

multiple display panels using a single sheet of glass and to manufacture panels for bigger

electronic devices, such as big-screen LCD TVs.  Smaller generation sizes are used for smaller

devices, such as computer monitors, handsets, and electronic notebooks.  Table 2 gives the

approximate size and introduction date of each generation that Corning has introduced into the

market:

| Generation Size | Approximate Year Introduced | Approximate Sheet Size |
|:---:|:---:|:---:|
| 1 | 1989 | 300 x 400 mm |
| 2 | 1994 | 370 x 470 mm |
| 3 | 1996 | 550 x 670 mm |
| 4 | 2000 | 680 x 880 mm |
| 5 | 2002 | 1100 x 1250 mm |
| 6 | 2003 | 1500 x 1800 mm |
| 7 | 2004 | 1870 x 2200 mm |
| 7.5 | 2005 | 1950 x 2250 mm |
| 8 | 2006 | 2160 x 2460 mm |
| 8.5 | 2007 | 2200 x 2500 mm |
| 10 | 2009 | 2880 x 3130 mm |
| 10.5 | 2017 | 2940 x 3370 mm |

**Table 2.  Glass Size by Generation**

---

[8] In 2014, Corning fully acquired Samsung Corning Precision Materials Co., Ltd.  *See* Corning Incorporated, *Corning Completes Acquisition of Samsung Corning Precision Materials* (Jan. 15, 2014), https://www.corning.com/in/en/about-us/news-events/news-releases/2014/01/news_center_news_releases_2014_2014011501.html.

PUBLIC VERSION

A single Generation 10.5 sheet covers an area larger than two king-size beds and has a thickness of around 0.5mm.

37.     Corning's leadership in developing fusion draw technology is the result of substantial investment in research, development, and engineering.  Between 1990 and 2008 alone (the time period leading up to and including the theft of the Trade Secrets), Corning spent *at least* ██████████ on research, development, and engineering associated with its LCD manufacturing technology.  That amount does not include the investments that Corning made to invent and develop the technology prior to 1990.  Corning did not have its first profitable year in its LCD glass business until 1998, and ████████████████████████████████ ██████████.

38.     Through its investment in research, development, and engineering, Corning has developed complex, proprietary technology for making LCD glass using the fusion draw process, including the Trade Secrets and Method Patents.

### 2.     Background of the Technology

39.     The fusion draw process has a front, "hot-end" process, where the glass substrate is made from raw materials, and a back, "cold-end" process, where the glass substrate is finished and prepared for shipment to customers.

40.     The hot-end process has four main stages:

a.  ***Batch***:  In this initial stage, raw materials are weighed and mixed to achieve a particular glass composition and quality.

b.  ***Melting***:  The raw ingredients are melted in a furnace (or "tank"), creating molten glass.

c.  ***Delivery***:  The molten glass moves from the tank to the isopipe.  Along the way, the molten glass undergoes several processes to remove gas bubbles (a

PUBLIC VERSION

method called "fining"), to reduce the temperature of the molten glass, and to achieve consistency of composition. The technology disclosed in the Composition Patent, among other things, improves the fining of the glass to eliminate bubbles during the delivery process, which may otherwise cause inclusions or imperfections in the glass.

d. **_Forming_**: The molten glass then enters and overfills the trough of the isopipe, merging into a glass ribbon at the root. As the glass ribbon descends from the root of the isopipe, "edge rolls" grasp the ribbon by its edges to maintain its width, and "pulling rolls" pull it down vertically from the isopipe. As the ribbon is drawn downward, it cools and solidifies into a glass sheet in midair.

41.    The below schematic from the '684 patent illustrates the general concept of the hot-end process. It does not reflect all the parts or design features of the process or the Trade Secrets.



FIG. 3

PUBLIC VERSION

42.     The Trade Secrets and Method Patents relate to the technology used in the forming process. The equipment used in the forming process is known as the "fusion draw machine." The fusion draw machine is a vertical machine that is comprised of the following sections, each of which contains many components that work together to form the glass sheet:

a.  **Muffle:** The muffle is the uppermost section of the fusion draw machine and houses the isopipe. It is specially designed to maintain a stable, uniform thermal environment for the glass as it flows through and over the isopipe. As the molten glass reaches the lower part of the isopipe near the root, the equipment is designed to start cooling the glass in a carefully controlled manner.

b.  **Muffle Doors:** The muffle doors are located at the bottom of the muffle, just below the root of the isopipe. The glass ribbon passes through the muffle doors as it descends from the root of the isopipe. The muffle doors are designed to continue cooling the glass in a controlled manner as it transitions from the molten state to the solid state.

c.  **Edge Rolls:** As the glass ribbon descends from the root of the isopipe, it contracts laterally, resulting in a loss of width (a phenomenon known as "width attenuation"). To minimize width attenuation, edge rolls located close to the root of the isopipe grab the edges of the glass ribbon as it descends.

d.  **Transition:** The transition section is between the muffle doors and annealer and pulling machines. In this section, the glass ribbon cools to a solid or elastic state.

PUBLIC VERSION

    e.   **Annealer and Pulling Machines:** The annealer and pulling machines are below the transition. The pulling machines involve sets of pulling rolls that contact the glass at its edges and pull it down vertically from the isopipe. The rate of the pulling rolls contributes to the thickness of the finished sheet.

    f.   **Bottom of Draw:** Situated below the annealer and pulling machines, the bottom of draw is the section where individual sheets are cut from the glass ribbon and these sheets then exit the fusion draw machine.

43.    The below schematic from the '684 patent illustrates the general concept of the forming process. It does not reflect all the parts or design features of the fusion draw machine or the Trade Secrets.



FIG. 5B

44.    After completing the forming process, the edges of the glass sheet that touched the edge rolls and pulling rolls are removed. Then, the glass sheet undergoes additional processing during the cold-end process, such as cutting, edge grinding, cleaning, quality inspection, and packaging, before it is delivered to customers.

PUBLIC VERSION

45.     Throughout the fusion draw process, many variables can affect glass quality and must be measured and controlled with precision.  These variables include, but are not limited to, the operating temperature of the various components, the viscosity of the molten glass, sheet flatness (or "warp"), stress and distortion, thickness variation, and risk of contamination from particles or foreign residue.  The molten glass, for example, reaches temperatures of up to 1750°C.  To manage this and the many other variables that arise in the process, the fusion draw equipment contains numerous intricate, interrelated design features and process parameters that work together in a controlled and synergistic fashion.  Because of the number of variables and complexity of the fusion draw equipment, a defect may not be discovered until months into production, and the source of the defect could lie almost anywhere in the process, making it time-consuming and expensive to identify and troubleshoot.

46.     The technical complexity requires companies to invest significant time and resources to develop fusion draw technology.  In a 2017 offering circular, Dongxu[9] – a Chinese company that worked with Irico to misappropriate Corning's Trade Secrets and now makes LCD glass itself – recognized that LCD "[g]lass substrate production requires high standards for key production equipment" and "*[n]ew entrants will need to undergo a long period of research and development and experience accumulation before mastering the capability of key equipment*

---

[9] This Complaint uses the term "Dongxu" to refer to Dongxu Group Co., Ltd. (also known as Tunghsu Group Co., Ltd.) and its predecessors in interest, affiliates, parents, and subsidiaries.

PUBLIC VERSION

*production*."[10]  As Dongxu observed, an LCD "[g]lass substrate production line requires large initial investment and also long equipment commissioning time to reach full capacity."[11]

47.     Because of the complexity of the technology, only a few companies have successfully produced LCD glass using the fusion draw process.  On information and belief, Nippon Electric Glass Co. ("NEG") and AvanStrate Inc. (formerly "NH Techno Glass Corporation") are the only companies besides Corning that have independently developed fusion draw technology to make LCD glass.  On information and belief, NEG and AvanStrate took a substantial amount of time to develop the technology and produce commercially acceptable LCD glass using it.  In fact, AvanStrate needed to obtain a license to use Corning's patented fusion technology in or around 2000.

48.     NEG had nearly three decades of experience in making LCD glass using other methods before it successfully developed its fusion draw technology.  According to its website,[12] NEG started producing LCD glass in the 1970s using a "redrawing process."  NEG then began producing LCD glass using a "continuous redrawing process" in the late 1980s and a "slot down draw process" in the early 1990s.  Even with this experience, NEG was not able to begin producing LCD glass using the fusion draw process until 2000 – more than a decade after Corning.  After that, NEG still trailed Corning in introducing higher generation sizes.

---

[10] Tunghsu Group Co., Ltd., Offering Circular: Tunghsu Venus Holdings Limited 7.0% Senior Guaranteed Notes Due 2020, at 80 (Dec. 21, 2017) (emphasis added), https://links.sgx.com/FileOpen/Tunghsu%20Venus%20Holdings%20Limited%20-%20Offering%20Circular%20(December%2021,%202017)-new.ashx?App=Prospectus&FileID=33395. "Tunghsu" is another term for Dongxu.

[11] *Id.*

[12] *See* NEG, *History of Glass Manufacturing Process & Main Products*, https://www.neg.co.jp/en/rd/topics/history-transition/.

49.    Irico and Dongxu developed fusion draw technology to manufacture LCD glass only after they worked together to misappropriate Corning's Trade Secrets, as referenced above and described further below.  On information and belief, Irico and Dongxu have since used their ill-gotten technical knowledge, derived from misappropriating Corning's Trade Secrets, to assist other Chinese-based entities in developing fusion draw technology.

**B.    EAGLE XG Glass**

50.    EAGLE XG Glass is the culmination of decades of Corning's leadership in LCD glass, which includes vast research and development investments enabling iterative advancements that over time increased the capabilities of the manufacturing process and the quality of the resultant product.  Corning's Code 7059 was the first alkali-free substrate for LCD displays, which Corning initially made using its slot draw process.  At the time Corning introduced Code 7059, LCDs were migrating from watches and calculators to monochrome active matrix liquid crystal displays (AMLCDs), especially those used in portable computers.  The need for larger and larger displays for such applications in turn drove the need for distortion-free substrate glass that was very difficult to achieve using the slot draw process.  Thus, Corning began manufacturing Code 7059 glass using the fusion draw process in 1984.

51.    The fusion process yielded larger sheet sizes, which enabled panel makers to make larger displays and to place two or more smaller displays on a single sheet.  Code 7059 was susceptible to distortion at the elevated temperatures required for such applications, however, and thus in 1994 Corning introduced Code 1737, a lower density alkali-free substrate that significantly reduced sheet distortion during LCD processing.  The lower density of Code 1737 also enabled lower panel weight, which in turn benefited the weight of portable electronic devices.  Code 1737 was fined with arsenic.  Fabrication of LCDs creates waste streams that include the display glass itself, and so the need arose to eliminate arsenic from Code 1737.  In

PUBLIC VERSION

1997, Corning introduced Code 1737G, an alkali-free substrate with properties very similar to its predecessor, but fined with antimony rather than arsenic.

52.    In 2000, in response to requests by LCD manufacturers for still lower-density glass than Code 1737, Corning introduced EAGLE2000, an alkali-free glass with significantly lower density than any other substrate on the market at the time.  Corning obtained several patents for the inventions that enabled EAGLE2000 Glass, including U.S. Patent No. 6,319,867 to Chacon et al., issued November 20, 2001 ("Chaçon patent").  The low density of EAGLE2000 enabled lower weight panels, and its low coefficient of thermal expansion enabled still larger substrate dimensions.  By this time, LCD panel makers expected substrate glass to contain no internal defects greater than 100 microns in size, including bubbles.  However, EAGLE2000 required the use of arsenic (about 0.3 mol% $As_2O_3$) to eliminate bubbles of this size.

53.    Due to growing concerns about the presence of arsenic in EAGLE2000, particularly as a component of the waste streams resulting from display fabrication, Corning's customers (especially in Japan) advised that they wanted a more environmentally friendly solution than EAGLE2000, and indicated that they would stop purchasing EAGLE2000.

54.    Beginning in approximately 2001, Adam Ellison of Corning began experimenting with ways to achieve the advantages of the already novel EAGLE2000 Glass without intentional additions of arsenic or antimony.  Prior experiments had suggested that Corning could replace the arsenic with a combination of tin oxide and bromine without sacrificing glass quality.  When Ellison performed lab melts using that composition, however, the glass he made was unusable because it contained excessive bubbles.  Furthermore, while bromine was batched at a level of approximately 1% by weight (1 wt%), its retention in the glass was quite low, about 0.05 wt%.  The effluent from producing such glass was highly acidic, corroding air handling equipment and

23

PUBLIC VERSION

creating an acidic waste stream, both of which would have contributed to significant manufacturing and waste management costs.

55.    As discussed in the specification of the Chacon patent, the liquidus viscosity of the glass composition used to create EAGLE2000 is strongly influenced by the ratio of alkaline earth oxides (RO) to aluminum oxide ($Al_2O_3$) on a mole percentage (mol%) basis ($RO/Al_2O_3$). The Chacon specification teaches that the $RO/Al_2O_3$ ratio "should be held in the range 0.9 to 1.2," and that "most preferably, this range should be $0.92 < RO/Al_2O_3 < 0.96$ to obtain the highest liquidus viscosity." The claims of Chacon specify a $RO/Al_2O_3$ ratio of 0.92 to 0.96 – less than 1.

56.    After Ellison's initial attempts to remove arsenic from EAGLE2000 resulted in unusable glass, he recalled observing in prior lab experiments that when the $RO/Al_2O_3$ ratio was greater than or equal to 1, the glasses were clear of bubbles. When the ratio was less than 1, by contrast, lab melts had numerous bubbles. Therefore, during his experiments to improve EAGLE2000, Ellison proposed changing the composition of EAGLE2000 by increasing the $RO/Al_2O_3$ ratio to greater than or equal to 1.

57.    Ellison's experiments showed that changing the composition of glass to a $RO/Al_2O_3$ ratio greater than or equal to 1 resulted in far fewer bubbles. When $RO/Al_2O_3$ was 1 or greater, the very first melt produced during raw material dissolution formed at lower temperature than when $RO/Al_2O_3$ was less than 1. Any bubbles in this early melt would inflate and become more buoyant than bubbles created at a later, higher temperature, thereby enabling them to clear the glass in less time.

58.    Ellison's experiments also revealed that the level of magnesium oxide (MgO) in the composition needed to be at least 1.0 in mol%, as compared to about 0.2 mol% in

24

PUBLIC VERSION

EAGLE2000. The higher concentration of MgO in the batch accelerates digestion of sand, the raw material source of silica ($SiO_2$). Silica is the most abundant oxide component in all commercial display glasses. It resists chemical corrosion and is typically the last raw material to go completely into solution during glass melting. The interface between a sand grain and surrounding molten material can serve as a template to nucleate bubbles. Even after the sand grain is completely dissolved, a bubble will remain. Because such bubbles tend to be small and to form very late in the melting process, they can be difficult to remove in a subsequent fining step. Ellison's realization was that 1-3 mol% MgO greatly accelerated sand dissolution, preventing such late-stage bubbles.

59.     Increasing $RO/Al_2O_3$ on its own tends to increase the density and coefficient of thermal expansion of a display substrate. However, Ellison found that increased concentration of MgO relative to calcium oxide, strontium oxide, and barium oxide enabled low coefficient of thermal expansion and low density in glasses with $RO/Al_2O_3$ ratio of 1 or greater. Although MgO had been thought to increase liquidus temperature and thus decrease liquidus viscosity, which would interfere with compatibility with the fusion process, Ellison found that for compositions with $RO/Al_2O_3$ between 1 and 1.2, this was not the case.

60.     Ellison's discoveries – increasing the $RO/Al_2O_3$ ratio and increasing the baseline use of MgO – proved a major breakthrough that reduced defects by an order of magnitude without the intentional use of arsenic. His work took three to four years and required hundreds of experimental melts. The labor and facility costs of those experimental melts averaged about $3 million every six months (not including raw materials costs).

61.     In 2006, Corning introduced its new substrate product, EAGLE XG. "EAGLE" stands for "Enhanced Attribute Glass for Large-Area Electronics." The "XG" stands for "Extra

PUBLIC VERSION

Green." EAGLE XG's glass composition contains no heavy metals, reducing the environmental impact of downstream manufacturing. When introduced in 2006, EAGLE XG Glass was the first heavy-metal-free TFT LCD glass on the market. EAGLE XG was first introduced in Generation 6 sizes in 2Q 2006, in Generation 7.5 sizes in 3Q 2006, and Generation 8.5 sizes in 1Q 2007. In 2007, EAGLE XG Glass substrates received two major industry honors from the Society for Information Display: Advanced Display of the Year and Display Component of the Year. In 3Q 2008, Corning led the industry once again by introducing EAGLE XG Glass in new Generation 10 sizes – covering an area larger than two king-size beds. In 2010, Corning introduced yet another industry first: EAGLE XG Slim Glass. Earlier generations of EAGLE XG Glass were 0.7 mm thick; EAGLE XG Slim Glass was 0.3 mm thick, thinner than a bedsheet. In 1Q 2014, Corning further reduced the thickness of EAGLE XG Slim Glass to 0.25 mm, thinner than a business card. In 2017, Corning began manufacturing Generation 10.5 of EAGLE XG Glass.

62.    EAGLE XG Glass offers incredible flatness and dimensional stability, all while being amazingly defect-free. Through these properties, EAGLE XG Glass enables manufacturers of display panels to provide thinner, lighter, and more environmentally friendly products. This has made EAGLE XG Glass the industry standard among the world's leading panel makers. Corning has sold more than 25 billion square feet of EAGLE XG Glass – enough to pave the Great Wall of China 25 times, or cover nearly 390,000 football fields.

## V.    UNLAWFUL AND UNFAIR ACTS – TRADE SECRET MISAPPROPRIATION

### A.    Trade Secrets at Issue

63.    The trade secrets at issue – collectively, the "Trade Secrets" – relate to the fusion draw machine, including the isopipe, muffle, muffle doors, edge rolls, transition, and pulling machines. The Trade Secrets involve Corning's (a) confidential information related to the design of the fusion draw machine, including nonpublic details concerning the geometry, dimensions,

PUBLIC VERSION

location, parts, and materials of various components, and (b) confidential know-how information related to the operation and manufacture of the fusion draw machine. Corning owns all of the Trade Secrets.

64.    Each of the Trade Secrets is valuable to Corning. Each has provided and still provides Corning with significant economic value. The Trade Secrets are critical to the proper functioning of the fusion draw machine and producing high quality, commercially desirable glass for LCDs on a more cost-effective basis than Corning's competitors. Corning's use of the Trade Secrets gives it a significant advantage over its competitors.

65.    Corning invested much time and great expense to develop and refine its Trade Secrets. As described above, its fusion draw technology is the result of years of intensive research and development by Corning, including over ████████████████ (and substantially more if adjusted to today's dollars) between 1990 and 2008 alone. Over more than a decade of work, Corning's employees devoted years of research and development to develop the Trade Secrets, all conducted with strict secrecy.

66.    Before their misappropriation, the Trade Secrets were not known or readily ascertainable to Corning's competitors. Corning's specific and unique enhancements, variations, and modes of implementing the fusion draw technology have been closely held within Corning since their origination. Corning limits the personnel authorized to know and access the Trade Secrets. Corning's third-party vendors, suppliers, and distributors who had a need to know the Trade Secrets were required to sign and comply with strict confidentiality agreements and implement and maintain prescribed security measures before they were given access to any of this sensitive information. Corning has audited suppliers of critical equipment to ensure compliance with its confidentiality requirements.

PUBLIC VERSION

67.    Corning implemented, and continues to implement, reasonable measures to maintain the secrecy or confidentiality of the Trade Secrets. These efforts have included requiring Corning's research and development employees to sign non-disclosure and confidentiality agreements mandating that they neither disclose nor use any Corning trade secrets outside the scope of their employment with Corning. Those non-disclosure and confidentiality obligations continue to be in effect even after an employee ceases to work for the company. All Corning employees with access to Corning's fusion draw technology received, and still today receive, training in trade-secret security as part of their initial orientation, and receive additional, ongoing training on security best practices on an annual basis.

68.    Throughout the relevant time period, all Corning facilities have been secured by locked doors that could be opened only by magnetic cards possessed by employees. Access to Corning facilities has been monitored at all times by TV cameras that, in turn, have been monitored by security guards. Visits to Corning facilities are strictly limited, in both who can enter the building and what areas they can access. Visitors must pre-register and be admitted by a security guard; and following admission, they must be accompanied by a Corning employee. Visitors must also sign a non-disclosure agreement before entering Corning facilities and may not bring cameras (including smartphones) into the facility.

69.    Throughout the relevant time period, Corning has limited the number of hard copies of the Trade Secrets and restricted the number of individuals who were permitted to print or access the hard copies. Electronic access to the Trade Secrets is also restricted based on the type of information, with access to highly confidential information limited to employees with a need to know or strong business purpose. Drawings include a legend that identifies the drawings as the "proprietary" property of Corning.

PUBLIC VERSION

B.    **Irico's Wrongful Taking of the Trade Secrets**

1.    **Irico's Entry into the LCD Glass Business**

70.    Historically, Irico was a major producer of color picture tubes – a form of CRTs – for TV sets and related components.  By the early 2000s, the demand for LCD and other flat panel display devices overtook the demand for CRT devices.  Irico therefore determined that it needed to "switch[] from the traditional colour picture tubes ('CPT') to the booming flat panel display ('FPD') devices and its related components."  Ex. 21 at 2 (Irico 2007 Annual Report).

71.    As part of that business shift, in or around mid-2006, Irico initiated a project to manufacture LCD glass.  In January 2007, Irico began constructing its first production line to manufacture Generation 5 (not Generation 1) LCD glass in Xianyang, Shaanxi Province, China. The production line relied on the fusion draw process, a technology that, on information and belief, Irico had never before possessed much less practiced.

72.    To address Irico's underlying weakness, Dongxu invested in Irico's LCD glass-manufacturing project and helped Irico develop its fusion draw equipment, including its forming technology.  Among other things, Dongxu employees provided on-site assistance to Irico employees at the Xianyang facility.  As described below, Dongxu also worked with Irico to misappropriate Corning's trade secrets, which were implemented and referenced during the development of Irico's fusion draw technology.

2.    **Irico's Misappropriation of Corning's Trade Secrets**

73.    While developing its LCD glass production line, Irico knowingly obtained and used stolen Corning documents containing proprietary information related to Corning's fusion draw technology.  These documents included the Trade Secrets described above.  Irico obtained these documents from multiple sources.

29

PUBLIC VERSION

74.    *First*, during the period from 1999 to 2000, an employee of Corning's plant in Harrodsburg, Kentucky, took Corning equipment drawings and parts lists and provided them without authorization to representatives of a Taiwanese company called PicVue.[13] The U.S. individuals involved in this theft were prosecuted by authorities in the United States and admitted to their roles in misappropriating Corning's trade secrets. Irico, in collaboration with Dongxu, later purchased this stolen information from a former PicVue employee when it was developing its fusion draw line at the Xianyang facility in 2007.

75.    *Second*, during the period from 2007 to 2008, an employee at a Samsung Corning Precision Glass Co. ("SCP") plant in South Korea provided confidential Corning documents to a former colleague who was working for Dongxu at Irico's Xianyang facility. The former colleague then provided a subset of the materials to Irico and Dongxu officials, including documents that contained Corning's know-how for operating fusion draw machines. Korean authorities prosecuted two of the individuals involved in these thefts, and they likewise admitted to their roles in misappropriating Corning's trade secrets.

76.    *Third*, Irico obtained confidential information related to Corning's fusion draw technology, including the fusion draw machine, from a mathematical modeler who worked at Corning from 2004 to 2008 ("FORMER CORNING EMPLOYEE 1"). FORMER CORNING EMPLOYEE 1 accessed the information in or around 2007, before separating from Corning early the following year. Corning has since received a tip from an anonymous informer confirming that FORMER EMPLOYEE 1 provided Corning's confidential technical drawings and operational know-how information to Irico.

---

[13] For ease of reference, the term "PicVue" collectively describes PicVue Electronics, Ltd., its subsidiary PicVue OptoElectronics International, Inc., and their affiliates.

PUBLIC VERSION

a.    **PicVue's Unauthorized Acquisition of Corning's Trade Secrets**

77.    PicVue was a Taiwanese company that supplied LCD panels for handheld electronic devices like personal digital assistants (or "PDAs"). In the late 1990s, PicVue sought to enter the market for TFT-LCD glass and began attempting to develop fusion draw technology to manufacture LCD glass.

78.    In or around 2000, PicVue obtained copies of Corning's confidential technical drawings containing trade secrets related to Corning's fusion draw technology. An employee at Corning's Harrodsburg, Kentucky plant, Jonathan Sanders, had taken the drawings without authorization and sold them to a PicVue consultant, Yeong Lin, through an acquaintance of Lin's named Danny Ray Price. After Lin received copies of the drawings, PicVue engineers took digital pictures of them at his office in California. PicVue engineers took the pictures of the drawings back to Taiwan on a disk. PicVue then used the pictures of Corning's drawings to create computer-aided design ("CAD") files with PicVue's name on them.

79.    Corning discovered the misappropriation of its trade secrets in 2001 when PicVue sought to order materials from one of Corning's suppliers and shared the drawings with the supplier in the process. The supplier recognized the similarity of the drawings to Corning's drawings and alerted Corning.

80.    In June 2002, Corning sued PicVue (specifically, PicVue Electronics, Ltd., and PicVue OptoElectronics International, Inc.) and Eglasstrek GmbH in the Western District of New York (W.D.N.Y.) for misappropriation of trade secrets and copyright infringement. PicVue retaliated by filing a complaint with the Taiwan Fair Trade Commission in March 2004, alleging that Corning had engaged in anticompetitive and unfair trade practices. That action was dismissed.

PUBLIC VERSION

81.     Following three years of litigation in the W.D.N.Y. lawsuit, in July 2005, Corning and PicVue entered into a settlement agreement.  "As part of the settlement, Picvue . . . agreed to respect Corning's proprietary rights in fusion draw technology for manufacturing flat panel display glass and fairly compensate Corning for any past wrongdoing."[14] ███████████████ ████████████████████████████████████████████████████████████████ █████████████████ Corning and Eglasstrek also entered into a settlement agreement.  As a result of the settlements, the district court issued final judgments that ended the litigation.

82.     Meanwhile, the U.S. Attorney's Office for the Western District of New York prosecuted Sanders, Lin, and Price for their roles in the theft of Corning's trade secrets:

    a.  In October 2005, Sanders was charged with conspiring to participate in the theft of Corning's trade secrets.  In January 2006, he pleaded guilty to conspiracy to commit trade secret theft.  In April 2006, he was sentenced to 48 months of imprisonment.

    b.  In October 2005, Lin was charged with conspiring to participate in the theft of Corning's trade secrets.  In June 2007, he pleaded guilty to conspiracy to commit trade secret theft.  In February 2011, he was sentenced to 30 months of imprisonment.

    c.  In May 2006, Price was charged with, and pleaded guilty to, misprision of a felony.  In July 2011, he was sentenced to 2 years of probation.

---

[14] Corning Incorporated, *Corning and Picvue Settle Lawsuit Regarding Misappropriation of Proprietary Information* (Oct. 20, 2005), https://www.corning.com/worldwide/en/about-us/news-events/news-releases/2005/10/news_center_news_releases_2005_2005102001.html.

PUBLIC VERSION

83.    True and correct copies of Sanders's, Lin's, and Price's plea agreements are Exhibits 12-14.  In paragraph 6 of each plea agreement, Sanders, Lin, and Price admitted to the basic facts concerning their roles in the conspiracy to take Corning's trade secrets and provide them to PicVue without authorization.

84.    Without the trade secrets, PicVue was never successful in manufacturing commercially acceptable LCD glass and filed for bankruptcy in 2006.

### b.    Irico's Misappropriation of the Trade Secrets Originally Obtained by PicVue

85.    In or around 2007, as Irico was attempting to develop fusion draw technology, one or more Irico officials met with PICVUE EMPLOYEE 1, a former researcher in PicVue's technology department.  Despite the settlement agreement between Corning and PicVue, PICVUE EMPLOYEE 1 still had access to a copy of the files containing the misappropriated Corning trade secrets.  After negotiating with PICVUE EMPLOYEE 1, Irico obtained a copy of the files at some point in 2007.

86.    When Irico received the files, the drawings were in the form of CAD files with PicVue's name on them.  Although the drawings had PicVue's name on them, they were based on Corning's technical drawings and reflected Corning's trade secrets.  Irico had one or more individuals copy the drawings onto new CAD files that contained Irico's company logo.  This obfuscated PicVue as the source of the drawings and gave the false appearance that Irico had developed them.

87.    Irico knew – or, at minimum, had reason to know – that the documents provided by PICVUE EMPLOYEE 1 contained Corning's trade secrets and that PicVue had wrongfully obtained them.  Among other things, PicVue's misappropriation of Corning's trade secrets was

well known in the industry. Corning's lawsuit against PicVue and the U.S. prosecutions of Sanders, Lin, and Price were the subject of widespread media attention.

88.    The PicVue files that Irico procured primarily involved drawings and parts lists related to Corning's forming equipment for manufacturing Generation 5 LCD glass, including information about the muffle, pulling machines, isopipe, edge rolls, and pulling rolls. Using the drawings, Irico ordered equipment and technical services to set up its fusion draw machine.

<b>c.    Irico's Misappropriation of Corning's Trade Secrets Taken<br>from Samsung Corning Precision Glass Co.</b>

89.    SCP was an equity venture between Samsung and Corning that manufactured LCD glass in Korea primarily in support of the Korean market, notably the Samsung Group. SCP was licensed to use Corning's trade secrets.

90.    From around September 1986 to March 1998, Seong-Geun Park, a Korean national, worked at an affiliate of SCP, Samsung Corning Co., Ltd. Starting in August or September 2007, Park began working for Dongxu. Shortly thereafter, from around October 2007 to August 2008, Park worked at Irico on secondment. His work at Irico involved providing support for electrical equipment related to the fusion draw equipment.

91.    While on secondment at Irico, Park approached a former colleague, Jae-Young Choi, who was employed in the Electric Engineering Group at SCP. Park requested, and Choi provided, confidential SCP documents covering numerous aspects of Corning's fusion draw process for manufacturing LCD glass substrate.

92.    The documents related to, among other things, the batch/melting, forming, and bottom of draw/transition processes for fusion draw technology from Generations 6 to 8. They included information about how to operate the fusion draw equipment, electric schematics, and CAD drawings of equipment. Park saved these SCP files on his laptop and provided, at

PUBLIC VERSION

minimum, more than two dozen of them to Irico and Dongxu, including documents containing information about how to operate the fusion draw equipment.

93.    Dongxu knew or had reason to know that Park had improperly obtained trade secrets from someone at SCP.  Park informed his boss, Chang-Seok Kang, the vice president and head of the LCD division at Dongxu, that he had been receiving assistance from Choi and provided Kang with SCP documents that he received from Choi.  Park even introduced Kang to Choi.  Kang invited Choi to Beijing, where Park introduced him to the president of Dongxu.  When Park was on secondment to Irico, Kang occasionally directed him to obtain SCP documents and provide them to Irico.

94.    Irico also knew – or, at minimum, had reason to know – that Park had improperly obtained trade secrets from SCP.  Irico officials asked Park whether documents that he provided were SCP documents and showed particular interest in the documents related to the fusion draw machine.  Irico officials asked Park questions about SCP's technology for manufacturing LCD glass and requested documents about that technology.

95.    In September 2008, the Seoul Southern District Prosecutor's Office charged Choi and Park for their misappropriation of trade secrets from SCP.  Specifically, the prosecutors charged Choi and Park with violating Article 18 of the Unfair Competition Prevention and Trade Secret Protection Act.

96.    In October 2008, John Bayne, President of Corning Display Technologies China, sent a letter to Xing Daoqin, the Chairman of Irico Group Electronics Company Limited.  In the letter, Bayne informed Xing that Irico "appears to possess proprietary information and trade secrets belonging to Corning Incorporated ('Corning') and Samsung Corning Precision Glass Co. Ltd. ('SCP') related to the manufacture of LCD glass."  Bayne further noted that "Korean

government authorities ha[d] notified Corning and SCP that such proprietary information and trade secrets were misappropriated by at least certain Korean nationals recently or currently providing services for IRICO." Bayne observed that "Korean authorities ha[d] arrested and indicted certain individuals in connection with those activities." Bayne requested a meeting to discuss the matter.

97.     Irico denied that it misappropriated Corning's trade secrets. During meetings in December 2008 and February 2009, Irico representatives falsely told Corning representatives that Irico had developed its technology internally.

98.     Meanwhile, on January 22, 2009, the Seoul Southern District Court issued a written decision convicting both Choi and Park of violating Article 18(2) of the Unfair Competition Prevention and Trade Secret Protection Act by unlawfully obtaining and disclosing trade secrets. The court also convicted Choi of violating Article 18(1) by unlawfully breaching his fiduciary duties. True and correct copies of the Seoul Southern District Court's decision and a certified translation of it are attached as Exhibit 15.[15]

99.     In its written decision, the Seoul Southern District Court recognized that Park – an employee of Dongxu – misappropriated the trade secrets from SCP in connection with Dongxu's agreement to set up Irico's melting and forming equipment. *See* Ex. 15 (Certified Translation of Seoul Southern District Court Decision). The court expressly found that Park translated three files containing trade secrets that he obtained from Choi at Irico's office in Xianyang. *See* Ex. 15 (Certified Translation of Seoul Southern District Court Decision).

---

[15] For purposes of this Complaint, Corning has omitted the appendices and attachments to the decision.

100.   The court sentenced Choi and Park each to a deferred term of imprisonment of one year and six months.

101.   Exhibits 27 and 28 are true and correct copies of two declarations executed by Seong-Geun Park on March 6, 2009, and certified translations thereof.[16]  In the declarations, Park admitted to his role in the trade secret misappropriation and provided details demonstrating, among other things, that Irico knowingly obtained and used Corning's trade secrets.

### d.   Irico's Misappropriation of Corning's Trade Secrets Provided by FORMER CORNING EMPLOYEE 1.

102.   FORMER CORNING EMPLOYEE 1 worked as a Mathematical Modeler in Advanced Process Engineering at Corning from 2004 to 2008.  His work responsibilities included the mathematical modeling of systems related to LCD glass production.  As a result, FORMER CORNING EMPLOYEE 1 had access to Corning's proprietary information and trade secrets.

103.   In 2007, FORMER CORNING EMPLOYEE 1 accessed or printed more than 150 reports related to the manufacture of LCD glass, including dozens of restricted technical reports (Corning internal confidential technical reports that are subject to controlled access).  The reports included Corning's proprietary information and trade secrets related to, among other things, the implementation and control of the fusion forming process; glass composition development; the design of glass melting, delivery, and forming systems; the design of heating systems and components; the design and performance of isopipes; and sheet stability.

104.   In or around 2007, FORMER CORNING EMPLOYEE 1's supervisor raised concerns about his performance and internet usage.  In November 2007, Corning's intellectual

---

[16] For purposes of this Complaint, Corning has omitted the exhibits and attachments to the declarations.

PUBLIC VERSION

asset protection team flagged FORMER CORNING EMPLOYEE 1's access to restricted technical reports based on a high-usage pattern. FORMER CORNING EMPLOYEE 1 claimed that he used the restricted technical reports in connection with current and upcoming projects and printed reports to avoid slow connection speeds.

105.    During the same timeframe, FORMER CORNING EMPLOYEE 1 took three trips to China – two for personal reasons and one to attend a business conference. When FORMER CORNING EMPLOYEE 1 was discouraged from traveling to China for the business conference, he asserted that he would pay for the trip himself.

106.    In February 2008, FORMER CORNING EMPLOYEE 1 ended his employment at Corning. In an exit interview, he explained that he was seeking employment in academia but had no current job offers. FORMER CORNING EMPLOYEE 1 was reminded of and acknowledged in writing his continuing confidentiality obligations. He also returned copies of 19 reports that he had printed and maintained in his possession, including, for example, a restricted technical report that contained information related to the design of the isopipe.

107.    On information and belief, FORMER CORNING EMPLOYEE 1 moved to China after his employment with Corning ended. There, he held multiple positions with Irico and other entities. In or around 2015, FORMER CORNING EMPLOYEE 1 served as an outside director to Irico Group Corporation. FORMER CORNING EMPLOYEE 1 also served in other roles with Irico, including as Vice Chairman of Irico Display and Chief Scientist of Irico's National Engineering Research Center for Flat Panel Display Glass Technology.

108.    In May 2016, Corning received an anonymous email, signed by a self-described "Informer," asserting that Irico had "plagiariz[ed]" Corning's "TFT-LCD glass G6 technology, G6 phone cover touch screen glass technology, and G8.5 TFT LCD glass technology production

PUBLIC VERSION

in Hefei, China." Ex. 29 (5/27/2016 email). The Informer stated that FORMER CORNING

EMPLOYEE 1 was the person who stole Corning's technology. *Id.* The Informer provided

background information about FORMER CORNING EMPLOYEE 1 and stated that FORMER

CORNING EMPLOYEE 1 was "ostensibly working for China Central South University as a

professor." *Id.* However, the Informer stated that FORMER CORNING EMPLOYEE 1 was

actually a director at Irico and a technical director at "Chengdu CDGM GLASS Co., Ltd."[17] *Id.*

According to the Informer, FORMER CORNING EMPLOYEE 1 "provide[d] [C]orning

technical confidential drawings and operation manual [sic]" to Irico and CDGM Glass. *Id.* The

Informer also stated that FORMER CORNING EMPLOYEE 1 contacted a Technical Forming

Engineer at Corning Taiwan "to provide 6-10 experience[d] engineers to come to Hefei [to]

assist [in] build[ing a] G8.5 TFT-LCD glass substrate production line." *Id.* The Informer stated

that Irico and CDGM Glass paid FORMER CORNING EMPLOYEE 1 more than $10 million

and provided him with a three-bedroom house. *Id.*[18]

      **C.**     **Irico's Use of the Trade Secrets**

           **1.**     **Irico's Use of the Trade Secrets To Develop Fusion Draw Technology**

     109.     The Trade Secrets are reflected in the files and information that Irico obtained

from PICVUE EMPLOYEE 1, Park, and FORMER CORNING EMPLOYEE 1. After obtaining

the Trade Secrets, Irico used them to design, construct, and operate its fusion draw machines and

to produce LCD glass.

_____

     [17] The Informer appears to have been referencing CDGM Glass Company Ltd., a producer of optical glass located in Chengdu, China. *See* CDGM Glass, USA, *About CDGM Glass*, http://cdgmglass.com/About-Us.

     [18] "G," as used in terms such as "G5," refers to generation size.

39

PUBLIC VERSION

110.    Using the Trade Secrets, Irico was able to develop its fusion draw technology and manufacture its first piece of LCD glass at an unprecedented speed.  In December 2007, less than a year after starting construction on its first LCD-glass production line in Xianyang, Irico reportedly ignited its new glass furnace.  A few months later, in April 2008, Irico announced that its "product certification and exchanges on technical specifications ha[d] attained remarkable progress with the downstream panel manufacturers."  Ex. 21 at 2 (Irico 2007 Annual Report). Irico predicted that it would "become a major TFT-LCD electronic glass manufacturer."  Ex. 21 at 14 (Irico 2007 Annual Report).

111.    Just two years after initiating its first LCD glass project in 2006, Irico produced Generation 5 LCD glass.  *See* Ex. 50 (Irico Development Path webpage).  According to Irico, its LCD glass facility commenced trial production in May 2008, and in "September 2008, the production line was successfully put into full operation."  Ex. 22 at 13 (Irico 2008 Annual Report).  Irico became "the first enterprise in China and the fifth one in the world with the manufacturing technology and production capacity of thin film transistor liquid crystal display ('TFT-LCD') glass substrate."  Ex. 23 at 5 (Irico 2010 Annual Report).  Whereas it took Corning more than a decade to progress from making Generation 1 to Generation 5 LCD glass, the first LCD glass that Irico produced – within less than three years of trying – was Generation 5. Irico's ability to produce Generation 5 glass so quickly is consistent with its use of the Trade Secrets from the equipment design drawings obtained from PICVUE EMPLOYEE 1, which related to Generation 5 technology.

112.    In a speech at the China Optoelectronics & Display Expo in May 2008, Zhang Shaowen, an Irico officer, described Irico's efforts to develop its fusion draw technology and stated that Irico had set up a team committed to research and development of glass substrate

40

PUBLIC VERSION

technology just a few years beforehand. Shaowen stated that Irico was using its development of

the Generation 5 production line as a foundation for building Generation 6 and above production

lines. *See* Ex. 26 (speech by Zhang Shaowen). Irico subsequently reported that on January 30,

2011 – less than five years after initiating its LCD glass project – it had "successfully produced"

glass sheets on its "first attempt" at a Generation 6 production line in Hefei. Ex. 23 at 13 (Irico

2010 Annual Report).

113.    Considering how long it took Corning and its other competitors (NEG and

AvanStrate) to develop fusion draw technology, it is implausible that Irico could have started

manufacturing LCD glass using fusion draw technology – particularly at advanced Generation 5

and 6 sizes – as quickly as it did unless it used the Trade Secrets.

### 2.    Irico's Continued Use of the Trade Secrets in Its Current Fusion Draw Technology

114.    Irico continues to produce the sizes of LCD glass made possible by its unlawful

acquisition of the Trade Secrets in the 2007-2008 timeframe. Ex. 68 at 8 (translation of excerpts

from Irico 2024 Semi-Annual Report). Irico also makes its newer models of LCD glass using

the fusion draw process, even the more advanced Generation 8.5+ glass. *See id.* at 9

(recognizing that Irico produces Generation 8.5+ glass substrates using "overflow technology"

(i.e., fusion draw technology)).

115.    Irico's current fusion draw technology uses, or at least is substantially derived

from, the Trade Secrets. The Trade Secrets include equipment designs and operational know-

how related to fusion draw machines for making Generation 5 LCD glass (e.g., the files obtained

from PICVUE EMPLOYEE 1) and Generations 6-8 LCD glass (e.g., the files stolen from SCP).

Irico still produces LCD glass within those generation sizes. *See* Ex. 68 at 8 (translation of

excerpts from Irico 2024 Semi-Annual Report) (stating that Irico "produces various types of a-Si

41

PUBLIC VERSION

glass substrates for TFT-LCD technology, including G5, G6, G7.5, and G8.5+"); Ex. 52 (Irico

webpage) (advertising "liquid crystal substrate glass products rang[ing] from G6, G7.5 to

G8.5+").

116.    Irico's fusion draw technology for producing the more advanced sizes (e.g.,

Generation 8.5) also uses or is derived from the Trade Secrets. The Trade Secrets are scalable or

otherwise transferable to manufacturing higher generations of LCD glass substrate. Because the

basic technology remains the same across generation sizes, Irico can produce higher generations

of LCD glass substrate with only modest modifications to its fusion draw equipment. The Trade

Secrets thus provided Irico with the foundation and know-how to design and operate fusion draw

machines for manufacturing larger generations of LCD glass, such as Generation 8.5+ glass.

The Informer's 2016 email states that Irico used Corning's technology to develop its Generation

8.5 production line. *See* Ex. 29 (5/27/2016 email).

117.    Irico has publicly acknowledged that it used its original fusion draw technology –

which it designed and operated using the misappropriated Trade Secrets – as the foundation for

developing higher generation sizes. For example, in his 2008 speech, Zhang Shaowen stated that

Irico was "taking the construction of the Gen 5 TFT-LCD glass substrate production line as the

starting point to develop technologies and products, accumulate experience and cultivate talents

on the basis of fully utilizing the existing resource potential in order to lay a solid foundation for

building Gen 6 or above TFT-LCD glass substrate production lines." Ex. 26. In an October

2015 securities filing, Irico acknowledged that it was using its existing fusion draw technology to

develop Generation 8.5+ technology: "While industrializing 5th and 6th generation LCD

substrate glass, IRICO has also conducted research on the industrialization technology of 8.5

PUBLIC VERSION

generation LCD substrate glass using its existing production lines, accumulating valuable experience." Ex. 60 at page 26 (Irico Non-Public Offering Stock Plan, Oct. 22, 2015).

118.    In developing its current (and planned) production lines, Irico substantially benefited from misappropriating Corning's trade secrets. Starting with equipment designs and operational know-how for Generation 5 and higher technology (as opposed to Generation 1 technology, for example) allowed Irico to bypass the years and costs of research and development that it took to reach those levels and provided Irico with a significant head start in developing its current fusion draw machines. Irico had less distance to travel to scale up its technology to its current and planned Generation 8.5+ production lines.

**D.    Downstream Respondents' Use of the Trade Secrets**

119.    Respondents CHOT, CSOT, HKC, Hisense, LG, TCL, and VIZIO ("Downstream Respondents") have engaged in unfair methods of competition and unfair acts in the importation and sale of articles containing LCD glass that Irico manufactured using the Trade Secrets.[19] Based on the facts set forth below, the Downstream Respondents knew or had reason to know of Irico's misappropriation of the Trade Secrets but continued to import or sell products containing LCD glass that Irico made using the Trade Secrets.

---

[19] *See Certain Raised Garden Beds & Components Thereof*, Inv. No. 337-TA-1334, Comm'n Op. at 51 (Mar. 21, 2024) (holding that a respondent that imported, and sold in the U.S. after importation, products that another company made using the complainant's misappropriated trade secrets committed a "violation of Section 337 . . . with respect to misappropriation" of trade secrets); *Certain Balanced Armature Devices, Prods. Containing Same, & Components Thereof*, Inv. No. 337-TA-1186, Notice of Institution of Investigation at 2 (Nov. 22, 2019) (instituting investigation into downstream respondents' "importation into the United States, or in the sale of certain products . . . by reason of misappropriation of trade secrets" based on similar allegations).

PUBLIC VERSION

### 1.     Irico's Close Relationship with Its Customers

120.     As explained below, Irico maintains symbiotic relationships with customers that use its LCD glass to make display panels.  Given the close nature of these relationships, Irico's customers know or should know of significant developments affecting Irico (and vice versa).

121.     Companies that make and sell LCD panels and devices, like the Downstream Respondents, rely heavily on glass suppliers like Irico.  Glass substrate is a core component of LCD products, and no more than 10 companies in the world make it.  As Irico has acknowledged, the production of glass substrate "occupies an important strategic position in the industry chain" for making LCD devices and "is highly correlated with the downstream panel industry."  Ex. 60 at page 8 (Irico Non-Public Offering Stock Plan, Oct. 22, 2015).  "The performance, quality, and price of substrate glass largely determine the performance, quality, and price of panels, making it an indispensable key material in the flat panel display industry."  *Id.*

122.     Further, as Irico recently noted, it has established "long-term strategic supply relationships" with "well-known panel manufacturers in mainland China and Taiwan."  Ex. 68 at 8 (translation of excerpts from Irico 2024 Semi-Annual Report).  Such long-term relationships make it even more important for panel makers to keep abreast of significant developments affecting Irico, a supplier of critical components (the glass substrates) for making their display panels.  Indeed, panel makers monitor their suppliers to ensure a stable supply chain, including by using audits and other compliance measures.  *See* Ex. 88 at 51 (HKC 2022 Annual ESG Report) ("To mitigate the corporate social risk of [its] suppliers, HKC . . . organizes a multi-departmental audit team composed of professionals to conduct on-site audits based on corporate Supplier On-site Audit Checklist, issues audit reports after the audit, and requires the supplier to take corrective actions and closure measures in a timely manner."); Ex. 82 at 11, 15, 55-56, 58

PUBLIC VERSION

(CSOT 2023 Annual ESG Report) (describing how CSOT likewise uses audit rights to monitor its suppliers).

123.    On information and belief, panel makers, such as HKC, CHOT, and CSOT, in turn maintain close relationships with television companies that import and sell televisions using their display panels, such as VIZIO, TCL, and LG.  For example, in August 2024, Irico described how, "[t]hrough stable product quality and close customer service," its LCD display panel business (CHOT) "deepened cooperation with key brand accounts."  Ex. 68 at 10 (translation of excerpts from Irico 2024 Semi-Annual Report).

124.    As another example, in 2022, HKC touted its work with international brands, including LG, TCL, and Hisense, and emphasized that it would "continue to deepen the strategic cooperative relationship with high-quality customers."  Ex. 88 at 7 (HKC 2022 Annual ESG Report).  HKC described how it "actively involves itself in strategic partnerships with many famous brands in the industry for in-depth technical and commercial collaboration for the ultimate goal of sustainable development across the industry chain."  *Id.* at 50.  HKC noted that, in November 2022, it signed a "memorandum of strategic cooperation" with Hisense, "whereby the two parties will further strengthen complementary advantages and expand cooperation in the display field combining technology, product R&D and innovation, better utilizing supply chain synergy and other advantages of both sides."  *Id.*

### 2.    Irico Designs Its LCD Glass To Meet Each Customer's Specific Product Specifications

125.    Irico generally works with panel makers to ensure that its LCD glass meets their product specifications.  "The product specification list varies from one customer to another, and thus to sell one product to many customers it becomes essential to simultaneously meet or

45

PUBLIC VERSION

exceed the most exacting customer specification for each attribute."[20]  Irico, like all other glass

suppliers, thus must ensure that its glass substrates meet the specifications of each customer.

126.    During the period that it developed its fusion draw production lines using the

misappropriated Trade Secrets, Irico followed that general practice of working with its customers

and providing them with information about its products.  As the examples below illustrate, Irico

periodically updated the public of these efforts:

   a.  In August 2007, as Irico was initially developing its fusion draw technology, it
       publicly reported that "product authentication and exchanges on technological
       specifications among downstream panel manufacturers ran smoothly."  Ex. 20
       at 14 (Irico 2007 Interim Report).

   b.  In April 2008, in reporting on its impending initial production of LCD glass,
       Irico emphasized that its "product certification and exchanges on technical
       specifications have attained remarkable progress with the downstream panel
       manufacturers," which Irico described as a "milestone development."  Ex. 21
       at 2, 14 (Irico 2007 Annual Report).

   c.  In March 2009, approximately six months after putting its first production line
       in full operation, Irico reported that "[e]xchanges about product certification
       and technology specifications between [Irico] and downstream panel
       manufacturers had reached certain development stage."  Ex. 22 at 13 (Irico
       2008 Annual Report).

---

[20] Adam Ellison & Iván A. Cornejo, *Glass Substrates for Liquid Crystal Displays*, 1 Int'l
J. of Applied Glass Sci. 87, 88 (2010).

PUBLIC VERSION

    d.  In March 2011, shortly after it began producing Generation 6 glass, Irico reported that it had been "accredited by many LCD panel manufacturers for its LCD glass substrate products, and is in the process of actively seeking accreditation from other customers." Ex. 23 at 13 (Irico 2010 Annual Report).

    e.  In March 2012, Irico reported, "The accreditation of LCD glass substrate products was smoothly progressing. Currently, four downstream users have completed the accreditation. Products sales in batch have been made to two users and pre-purchase negotiations were under way with two users with sales in batch on the horizon." Ex. 24 at 11 (Irico 2011 Annual Report).

    f.  In March 2013, Irico reported that "both the product accreditation and sales efforts for [Irico's] LCD glass substrate catering downstream users achieved a breakthrough." Ex. 25 at 11 (Irico 2012 Annual Report).

127.    To this day, Irico continues to work with its customers to ensure that its LCD glass meets their specifications. In April 2024, Irico boasted that it had "deepened" its "cooperation" with customers and "continued to solidify its established strategic partnerships" with panel makers. Ex. 64 at 9, 10 (translation of Irico 2023 Annual Report). In describing how its supply of Generation 6 and Generation 8.5+ products had "steadily increased," Irico emphasized that it "also accelerated product certification." *Id.* at 10.

### 3.    Information Available to the Downstream Respondents Concerning Irico's Trade Secret Misappropriation

128.    The Downstream Respondents knew or had reason to know that Irico developed its fusion draw technology using misappropriated trade secrets. Multiple red flags alerted sophisticated industry insiders, like the Downstream Respondents, of the trade secret misappropriation. *First*, Irico's unprecedentedly fast development of the technology indicated

PUBLIC VERSION

that it had an improper head start. *Second*, Irico's lower prices and ability to undersell Corning's prices, described further below, also indicated that Irico benefited from not having to invest in the necessary research and development to develop the technology. *Third*, the similarity of Irico's LCD glass to Corning's industry-leading EAGLE XG Glass further indicated that Irico used Corning's technology.

129.    In addition, the Downstream Respondents knew or had reason to know about Irico's trade secrets misappropriation based on the multiple legal actions that Corning brought against Dongxu, Kang, Choi, and Park for the trade secret misappropriation.  The public reporting on these legal actions provided easily accessible information that Irico was the beneficiary of the trade secret misappropriation.

130.    The Seoul Southern District's January 2009 decision convicting Choi and Park of trade secret misappropriation was publicly reported in the media.  Although the news articles did not name Irico, they noted that the theft occurred in the 2007-2008 timeframe and was to benefit a Chinese company that was a latecomer in the field.  *See, e.g.*, Ex. 16 (translations of Korean news articles about the January 2009 decision).  Sophisticated industry insiders, like the Downstream Respondents, would have known that Irico was the company benefiting from the trade secret misappropriation.  Irico, after all, was the first Chinese company to produce LCD glass and publicly reported that it was developing its manufacturing technology at the same time that Corning's trade secrets were stolen.

131.    Further, as described below, Corning filed multiple legal actions against Dongxu over the trade secret misappropriation, including a lawsuit filed in Korea in 2011 that was the

PUBLIC VERSION

subject of news articles and SEC filings by Corning.[21]  In June 2013, the Daejeon District Court in Korea issued a decision holding Dongxu liable for trade secret misappropriation involving the SCP files, finding that it used Corning's stolen trade secrets to supply technology and equipment to companies like Irico.  *See* Ex. 18 at 28-29, 36-40 (Certified Translation of June 26, 2013 Decision by Daejeon District Court).  In reporting on this decision, media outlets described how Dongxu acquired the trade secrets from November 2007 to June 2008 and provided them to manufacturers in China.  *See* Ex. 19 (news articles).  Given the context, industry participants would have known that Irico was the Chinese manufacturer benefiting from the trade secrets.

132.    Based on these legal proceedings and the media attention they received, the Downstream Respondents knew or had reason to know that Dongxu and others misappropriated Corning's trade secrets to assist in developing Irico's fusion draw technology.  These proceedings – and their connection to Irico's development of fusion draw technology – would not have escaped the Downstream Respondents' attention.  The industry was highly concentrated:  only five or six companies made LCD glass at the time.  The Downstream Respondents, which use LCD glass to manufacture flat panel displays and electronic devices, would likely know of such significant developments concerning the few companies that manufacture a crucial component of their products.

### 4.    Corning's Notification to Downstream Respondents of Irico's Trade Secret Misappropriation

133.    Finally, Corning informed the Downstream Respondents of Irico's trade secret misappropriation.  In July and August 2024, Corning gave express written notice to all of the Downstream Respondents informing them that Irico manufactures its LCD glass using

---

[21] *See, e.g.*, Larry Wilson, *Corning Sues Glass Producers over Thievery of Trade Secrets*, Star-Gazette (July 24, 2011); Corning Incorporated, Form 8-K (July 18, 2011).

PUBLIC VERSION

misappropriated Corning's trade secrets and that Irico's LCD glass infringes Corning's patents.[22] True and accurate copies of these letters are attached as Exhibits 73, 81, 86, 105, 121, 132, and 139. In addition to these letters, Corning has also had discussions with various Downstream Respondents about these unfair acts.

134.    In each letter, Corning informed the Downstream Respondent of evidence that Irico manufactures LCD glass using Corning trade secrets related to the fusion draw process – specifically, trade secrets involving the design of and operational know-how for Corning's fusion draw machine. As exhibits to the letter, Corning provided copies of the above-described Korean judicial decisions recognizing that Irico was the beneficiary of the theft of Corning's trade secrets. Corning also notified the Downstream Respondent of evidence that Irico's glass infringes Corning "patents related to its fusion draw methods for making LCD glass and its EAGLE XG glass composition." As an exhibit to the letter, Corning attached an expert report specifically concluding that Irico's glass infringed the '394 patent.

135.    In each letter, Corning stated that it had information that the Downstream Respondent was selling products containing Irico's LCD glass. Corning advised it was considering filing an ITC action against "Irico and customers that use Irico's LCD glass to make display panels and electronic devices." Corning specifically noted that it was considering naming the Downstream Respondent in the ITC action. Corning, however, told each Downstream Respondent that it "would welcome an opportunity to discuss this matter with you prior to filing any complaint."

---

[22] Corning notified HKC by sending a letter to the parent company, HKC Corporation. *See* Ex. 86.

PUBLIC VERSION

136.    Since sending the letters, Corning has discussed the matter with multiple Downstream Respondents.  When a Downstream Respondent requested more information, Corning provided it.  Respondent VIZIO, for example, asked for more information about the trade secret misappropriation and about VIZIO TVs that used Irico's LCD glass.  *See* Ex. 139 at Tab 2 (8/26/2024 email).  In a call with VIZIO, Corning's counsel provided such information, including the model number and display panel of the VIZIO TV that was tested and found to use Irico glass.  After Respondent LG denied selling TVs with Irico's LCD glass, Corning provided teardown information about specific LG TVs that were tested and found to contain Irico's glass.  *See* Ex. 121, Tab 4 at 2 & Tab 3 (9/2/2024 email from LG & 10/7/2024 letter to LG).

137.    As of the filing of this Complaint, none of the Downstream Respondents has offered, agreed, or committed to stop using Irico's LCD glass in the products that they import into or sell within the United States.  Instead, on information and belief, each Downstream Respondent has continued to import, sell for importation, or sell after importation articles containing LCD glass that Irico made using Corning's misappropriated trade secrets.  As noted, Corning has tested representative televisions and display panels sold or imported by the Downstream Respondents, and found that they contain Irico's LCD glass.  As of December 2, 2024, the same models of televisions, including the television models that contained the representative display panels, continue to be advertised and available for sale to customers in the United States. *See infra* § VII.

**B.    Related Litigation**

138.    In addition to the criminal prosecutions described above, the trade secret misappropriation at issue in this Complaint has been the subject of civil litigation.  Pursuant to Commission Rule 210.12(a)(5), a brief description of this litigation is provided below.

PUBLIC VERSION

### 1.    Corning's Legal Action Against Irico

139.    On or about November 1, 2024, Corning Display Technologies (Hefei) Co., Ltd. ("Corning"), submitted a civil complaint against IRICO (Hefei) Liquid Crystal Glass Co., Ltd., Shaanxi IRICO Electronic Glass Co., Ltd., and IRICO Display Devices Co., Ltd. (collectively "IRICO Companies") to the Hefei Intermediate Court in China.  In its complaint, Corning alleges that the IRICO Companies engaged in unfair competition by misappropriating Corning's trade secrets – specifically, the trade secrets contained in the PicVue and SCP files.  Corning seeks relief based on Article 9 of the Anti-Unfair Competition Law and Article 122 of the Civil Procedure Law of the People's Republic of China.  The Hefei Intermediate Court officially filed the complaint and will hear the claim in a civil proceeding.  As of the filing of this Complaint, this lawsuit is still pending.

### 2.    Corning's Legal Actions Against Dongxu, Kang, Park, and Choi

140.    After the criminal prosecution of Park and Choi in Korea, Corning brought multiple legal actions against Dongxu, Kang, Park, and Choi in China and Korea.  Corning ultimately settled the actions against Dongxu (but not Kang, Park, or Choi) as part of a license and settlement agreement between Corning and Dongxu (but not Irico) in 2013 that was negotiated with the aid and assistance of several agencies of the Chinese government.

141.    *First*, in December 2009, Corning reported Dongxu's misappropriation of its trade secrets to the Beijing Municipal Public Security Bureau ("BPSB").  Corning cooperated in the certification of its trade secrets, a process that involved the voluntary submission of proprietary drawings and other highly sensitive materials to an independent certification agency.  On September 14, 2010, the agency issued a report in which it opined that certain aspects of the materials reflected nonpublic information while other aspects reflected public information.  Two days later, on September 16, 2010, the BPSB formally filed the case and began investigating

52

PUBLIC VERSION

Dongxu's alleged criminal activity.  The criminal investigation was still pending when Corning agreed to withdraw its complaint as part of its settlement with Dongxu in 2013.

142.    *Second*, on July 18, 2011, Corning sued Hebei Dongxu Investment Group Co., Ltd., in the Beijing No. 2 Intermediate People's Court, alleging that it misappropriated trade secrets related to the fusion draw process.  Dongxu filed an appeal contesting jurisdiction.  This appeal was still pending when Corning and Dongxu settled the action in 2013.

143.    *Third*, on July 18, 2011, Corning and SCP sued Kang, Park, and Choi in the Daejeon District Court in Korea for their misappropriation of trade secrets from SCP.  In February 2012, the Daejeon District Court issued a decision, holding that Kang, Choi, and Park engaged in trade secret misappropriation and ordering that they destroy and not acquire, use, or disclose Corning's and SCP's trade secrets.  True and correct copies of the Daejeon District Court's decision and a certified translation of it are attached as Exhibit 17.[23]

144.    In the decision, the Daejeon District Court recognized Irico's role in the trade secret misappropriation.  The court found that Dongxu had an agreement to set up Irico's melting and forming equipment.  *See* Ex. 17 at 3 (Certified Translation of February 8, 2012 Decision by Daejeon District Court).  The court observed that Kang, a vice president at Dongxu, had instructed Park, who worked for Dongxu on secondment at Irico, to obtain the trade secrets from Choi to assist in Irico's attempt to manufacture LCD glass.  *See id.* at 5-6.  The court found that, in May 2008, Park distributed three files containing trade secrets to other Dongxu employees at Irico's office.  *See id.* at 4-5.  The court further found that Park delivered a considerable amount

---

[23] For purposes of this Complaint, Corning has omitted the appendices and attachments to the decision.

PUBLIC VERSION

of the trade secrets that he received from Choi to the officers and employees at Dongxu and Irico who were involved in manufacturing LCD glass. *See* Ex. 17 at 4-6.

145.    *Fourth*, on July 18, 2011, Corning and SCP filed a lawsuit against Dongxu in the Daejeon District Court in Korea. Corning sought an order restraining Dongxu from using, disclosing, or permitting others to use misappropriated Corning LCD glass manufacturing technology. On June 26, 2013, the Daejeon District Court issued an order finding that Dongxu had engaged in trade secret misappropriation by colluding with Kang, Park, and Choi to unlawfully obtain trade secrets from SCP. The court further found that Dongxu used the trade secrets in supplying technology and equipment to companies like Irico, which allowed those companies to develop the technology to manufacture LCD glass more quickly. True and correct copies of the Daejeon District Court's decision and a certified translation of it are attached as Exhibit 18.[24]

146.    In its decision, the Daejeon District Court again recognized Irico's role in the trade secret misappropriation. As before, the court noted Dongxu's role in assisting Irico's development of its LCD glass manufacturing technology. The court noted that Park had provided trade secrets obtained from Choi to employees at Dongxu and Irico. The court recognized that Dongxu's actions enabled companies like Irico to shorten the time and costs for developing the technology and equipment necessary to manufacture LCD glass.

### 3.    Corning's Legal Actions Against Potential Suppliers to Irico and Dongxu

147.    Corning has brought four legal actions to prevent companies from fulfilling orders for parts or materials that it believed Irico or Dongxu placed based on Corning's trade secrets.

---

[24] For purposes of this Complaint, Corning has omitted the appendices and attachments to the decision.

PUBLIC VERSION

148.    *First*, in March 2010, Corning filed a petition for pre-action discovery against RHI Monofrax, Ltd. ("RHI") in the Steuben Supreme Court in New York after receiving information that Irico had submitted a request for quotation ("RFQ") based on Corning's melter design.  The court granted the petition.  After limited discovery, no further litigation ensued because RHI withdrew from the RFQ.

149.    *Second*, in September 2011, Corning filed a request for an investigation measure in France against Société Européenne de Produits Réfractaires ("SEPR"), a part of the Saint-Gobain group, after receiving information that SEPR received a refractory order from Irico that appeared to be based on Corning's trade secrets.  Corning requested access to documents sent to SEPR from Irico concerning the refractory order.  The court granted Corning's request, but held that the bailiff's report would be sequestered and released only by a decision of justice, on the condition that Corning initiated a proceeding on the merits for this purpose within one month.  The court conducted a seizure on September 27, 2011.  Three days later, on September 30, Corning sent a cease-and-desist letter to Saint-Gobain.  Saint-Gobain responded on October 7, 2011, confirming SEPR would stop the order from being shipped to Irico.  Corning's understanding is that Saint-Gobain refrained from fulfilling the order.

150.    *Third*, in 2013, Corning received information that Dongxu was attempting to purchase certain parts used in fusion draw equipment ("brackets" and "pier plates") through a German company called "Eusino" based on Corning's trade secrets.  On August 2, 2013, Corning applied for a preliminary injunction in the Cologne District Court in Germany against Alena Zhao e.K., Eusino Industrieanlagen Service ("Eusino").  On August 8, 2013, the Cologne court granted the preliminary injunction, barred Eusino from using the trade secrets or disclosing them to a third party, and ordered that Eusino relinquish the trade secrets.

PUBLIC VERSION

151.    *Fourth*, and most recently, on April 27, 2022, Corning filed a lawsuit against Saint-Gobain Corporation, Compagnie de Saint-Gobain S.A., and Saint-Gobain Advanced Ceramics (Shanghai) Co. Ltd. (collectively, "Saint-Gobain") in the W.D.N.Y.  Hebei Guangxing Semiconductor Technology Co., Ltd. ("Guangxing"), a former Dongxu subsidiary, had contracted for Saint-Gobain to make muffles for Guangxing based on Corning's trade secrets. Saint-Gobain employees had alerted Corning to the use of Corning's trade secrets after reviewing the drawings.  When Saint-Gobain informed Guangxing that it could not fulfill the remainder of the contract, Guangxing initiated arbitration against Saint-Gobain in the China International Economic and Trade Arbitration.  Corning filed the lawsuit in W.D.N.Y., alleging a violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836-1839, and seeking a permanent injunction to prevent Saint-Gobain from using Corning's trade secrets to manufacture and ship muffles to Guangxing.

152.    On April 28, 2022, the district court granted a Joint Motion for Entry of Judgment filed by Corning and Saint-Gobain, and permanently enjoined Saint-Gobain "from further manufacturing, shipping or otherwise delivering to China any muffles or parts thereof that have been ordered from China which are derived from, use, or rely on specifications or elements of Corning's confidential muffle designs."[25]

153.    Corning is unaware of any other litigation involving the trade secret misappropriation at issue in this Complaint.

---

[25] Order and Judgment, *Corning Incorporated v. Saint-Gobain Corp.*, No. 6:22-cv-06191 (W.D.N.Y. Apr. 28, 2022) (Dkt. No. 8).

PUBLIC VERSION

## VI.    UNLAWFUL AND UNFAIR ACTS – PATENT INFRINGEMENT

### A.    Identification of the Patents and Ownership by Corning

154.    Corning asserts three U.S. patents in this Investigation.  A table identifying the claims asserted against each Respondent and for domestic industry purposes is provided below. *See* Table 3.

| | Respondent | '394 | '684 | '025 |
|---|---|---|---|---|
| LCD Glass Manufacturer | Irico Display | 1, 5-6, 8-10 | 1-2, 4, 7, 10-12 | 15-20 |
| Panel Makers | CHOT | 1, 5-6, 8-10 | 1-2, 4, 7, 10-12 | 15-20 |
| | CSOT | 1, 5-6, 8-10 | 1-2, 4, 7, 10-12 | 15-20 |
| | HKC | 1, 5-6, 8-10 | 1-2, 4, 7, 10-12 | 15-20 |
| TV and Display Manufacturers | Hisense | 1, 5-6, 8-10 | 1-2, 4, 7, 10-12 | 15-20 |
| | LG | 1, 5-6, 8-10 | 1-2, 4, 7, 10-12 | 15-20 |
| | TCL | 1, 5-6, 8-10 | 1-2, 4, 7, 10-12 | 15-20 |
| | VIZIO | 1, 5-6, 8-10 | 1-2, 4, 7, 10-12 | 15-20 |
| Domestic Industry | | 1, 5-6, 8-10 | 1-2, 4, 7, 10-12 | 15-20 |

**Table 3.  Asserted Claims for Infringement and Technical Domestic Industry**

### 1.    The '394 Patent

155.    The '394 patent, entitled "Fining of Boroalumino Silicate Glasses," issued on December 14, 2010, to inventor Adam J.G. Ellison.  *See* Ex. 1 ('394 patent).  It is based on U.S. Patent Application No. 11/478,493, filed on June 28, 2006, and claims the benefit of U.S. Provisional Application No. 60/694,478, filed on June 28, 2005.  Its expiration date is October 7, 2026.  Corning owns the entire right, title, and interest in the '394 patent.  *See* Ex. 4 (certified assignment record of the '394 patent).

156.    The '394 patent has three independent claims and 13 dependent claims. Independent claims 1, 5, and 8 and dependent claims 6 and 9-10 are being asserted against Respondents in this Investigation.  This Complaint is accompanied by an original certified

PUBLIC VERSION

prosecution history of the '394 patent and one copy of each reference cited on the face of

the '394 patent or mentioned in the prosecution history. *See* Appendices A & D-F.

### 2.    The '684 Patent

157.    The '684 patent, entitled "Pull Roll Apparatus and Method for Controlling Glass

Sheet Tension," issued on January 14, 2014, to inventors Michael George Shultz, George Clinton

Shay, David John Ulrich, James Gary Anderson, Liam Ruan de Paor, Lewis Kirk Klingensmith,

and Patrick Aaron Parks. *See* Ex. 2 ('684 patent). It is based on U.S. Patent Application No.

11/978,333, filed on October 29, 2007. Its expiration date is April 17, 2029. Corning owns the

entire right, title, and interest in the '684 patent. *See* Ex. 5 (certified assignment record of

the '684 patent).

158.    The '684 patent has two independent claims and 12 dependent claims.

Independent claims 1 and 7 and dependent claims 2, 4, and 10-12 are being asserted against

Respondents in this Investigation. This Complaint is accompanied by an original certified

prosecution history of the '684 patent and one copy of each reference cited on the face of

the '684 patent or mentioned in the prosecution history. *See* Appendices B & D-F.

### 3.    The '025 Patent

159.    The '025 patent, entitled "Methods and Apparatuses for Reducing Heat Loss from

Edge Directors," issued on December 6, 2016, to inventors Ren Hua Chung, Ahdi El-Kahlout,

David Scott Franzen, Brendan William Glover, Paul Richard Grzesik, Bulent Kocatulum,

Gaozhu Peng, and Michael John Stephenson. *See* Ex. 3 ('025 patent). It is based on U.S. Patent

Application No. 14/278,582, filed on May 15, 2014. Its expiration date is July 3, 2034. Corning

owns the entire right, title, and interest in the '025 patent. *See* Ex. 6 (certified assignment record

of the '025 patent).

PUBLIC VERSION

160.     The '025 patent has three independent claims and 17 dependent claims.
Independent claim 15 and dependent claims 16-20 are being asserted against Respondents in this
Investigation.  This Complaint is accompanied by an original certified prosecution history of
the '025 patent and one copy of each reference cited on the face of the '025 patent or mentioned
in the prosecution history.  *See* Appendices C-F.

**B.     Nontechnical Description of the Patents[26]**

161.     The Asserted Patents cover the improved techniques that Corning invented for the
production of exceptionally high-quality, defect-free glass sheets for use in AMLCD technology
using the fusion draw process of glass production.  Each Asserted Patent describes an aspect of
Corning's innovative EAGLE XG Glass.  Respondents infringe the '394 patent (the
"Composition Patent"), which describes and claims improvements invented by Corning relating
to the chemical composition of glass substrates.  Respondents also infringe the '684 patent,
which describes and claims improvements in the fusion draw process using a method that
increases the stability of glass sheets after they form, and the '025 patent, which describes and
claims improvements in the fusion draw process using a method for carefully managing the
cooling of the edges of the glass sheet as it forms.

162.     The Composition Patent identified and improved upon a composition of silicate
glass that solved a critical problem – producing high-precision, nearly-defect-free glass, without
the use of potentially harmful chemicals such as arsenic or antimony.  During the glass
manufacturing process, raw materials such as silica, aluminum oxide, boric oxide, and others are
melted at very high temperatures to create molten glass.  The melting process creates gas bubbles

---

[26] These descriptions and any other nontechnical descriptions within this Complaint are
for illustrative purposes only.  Nothing contained within this Complaint is intended to express,
either implicitly or explicitly, any position regarding the proper construction or scope of any
claim of the Asserted Patents.

PUBLIC VERSION

throughout the molten glass, which must be removed prior to the forming stage.  If the gas

bubbles are not removed, they will create defects, known as inclusions, in the final glass product.

Anything more than a *de minimis* number of inclusions in a sheet of glass renders that sheet

unsuitable for high-precision applications, such as for use as the glass substrate for AMLCD

TVs.

163.    For decades, arsenic and antimony were used in glass making as "fining agents,"

chemicals that aid in removing the gas bubbles from the molten glass to prevent such inclusions.

But arsenic and antimony are prohibited in some jurisdictions because of concerns over potential

environmental and health risks, resulting in pressure from panel manufacturers to eliminate those

chemicals from glass compositions.  This created a significant, and novel, challenge for

glassmakers – to produce high-precision, defect-free glass without the use of arsenic or antimony

as fining agents.

164.    Corning solved this problem with its invention of EAGLE XG Glass, the

composition of which is captured by the Composition Patent.  EAGLE XG Glass is produced

without the use of detectable amounts of arsenic or antimony.  Removing these chemicals was a

key innovation, because it met the needs of downstream manufacturers who incorporate the

substrate glass into consumer products and who were concerned about waste products from the

manufacturing process containing arsenic or antimony.  The absence of these chemicals is part of

the glass compositions claimed in the Composition Patent.

165.    Another key innovation of the EAGLE XG composition was the simultaneous

increase in the proportion of magnesium oxide (MgO) and the adjustment of the ratio of alkaline

earth oxides (including MgO, calcium oxide (CaO), and strontium oxide (SrO)) to $Al_2O_3$ to be

greater than or equal to 1.  MgO had been used previously in glass compositions because it

60

expedites the melting of silica ($SiO_2$) which has a notoriously high melting point and which is the primary component of many commercial display glasses. Helping silica to melt faster decreases the number of bubbles that form on unmelted or undigested silica during the melting process. Before EAGLE XG, however, manufacturers typically kept the quantity of MgO low, because MgO also had the effect of increasing the temperature at which the melted glass would need to be maintained to avoid crystals forming prematurely (known as the "liquidus" temperature). Contrary to expectations, the inventors of EAGLE XG discovered that they could increase the amount of MgO in the glass composition to higher levels than previously thought feasible provided they also increased the ratio of MgO, CaO, and SrO relative to the amount of $Al_2O_3$ in the composition (specifically to greater or equal to 1.0). This combination of composition changes resulted in a mixture that formed molten glass at a temperature within the limits of the production machinery, but was also sufficiently effective at removing bubbles to facilitate creation of defect-free glass.

166.    The Asserted Patents, and the '025 patent specifically, claim a further key innovation in managing the temperature and cooling rate of the glass as it reaches the bottom of the isopipe by heating the "edge directors." As the still-forming glass passes the bottom of the isopipe, curved platinum devices known as edge directors help direct the flow of glass into sheets. Because these edge directors make direct contact with the glass as it begins to solidify, the temperature of the edge directors themselves must be carefully controlled, and kept sufficiently hot to ensure that the edge directors do not cool the glass below the temperature at which it will begin to crystalize. The '025 patent's claimed method uses a dedicated, replaceable heating cartridge to keep the edge directors sufficiently hot to prevent any undesirable cooling of the glass.

167.    Stabilizing glass sheets during the fusion draw process is another key feature of the Asserted Patents, and of the '684 patent in particular.  Once the glass has formed into sheets at the root, the sheets must be controlled in the horizontal plane as they cool.  Otherwise, they will warp.  Glass is only suitable as an AMLCD substrate if it is nearly perfectly flat.  The invention claimed by the '684 patent solves this problem by applying tension to the glass using rollers that are carefully monitored to provide even torque across the edges of the newly formed glass sheet, preventing the sheets from warping and ensuring they are suitably flat.

**C.    Foreign Counterparts to the Patents**

168.    The Asserted Patents have foreign counterparts.  Those foreign counterpart patents and applications are set forth, including their current status, in Exhibit 11.  Pursuant to Commission Rule 210.12(a)(9)(v), any foreign patent applications that have been denied, abandoned, or withdrawn are set forth in Exhibit 11.

169.    Corning owns all right, title, and interest in and to each of these foreign counterpart patents and applications.  There are no other foreign counterpart patents or applications pending, abandoned, or denied anywhere in the world.

**D.    Related Litigation and Agency Proceedings**

170.    Pursuant to Commission Rule 210.12(a)(5), Corning states that none of the Asserted Patents are or have been the subject of court or agency litigation.

171.    Litigation involving the validity of the Chinese counterpart to the '394 patent, as well as other patents in the same patent family, is pending in the Supreme People's Court of the People's Republic of China.  On February 21, 2022, Beijing Shanke Technology Co., Ltd. sought a Request for Invalidation from the China National Intellectual Property Administration ("CNIPA") with respect to patents CN101208276B, CN102603184B, and CN102603183B.  The CNIPA invalidated the patents on September 30, 2022.  Corning appealed.  After hearings, the

PUBLIC VERSION

Beijing Intellectual Property Court reversed and reinstated the patents on March 27, 2024 (with respect to the CN102603184B patent) and on March 29, 2024 (with respect to the CN101208276B and CN102603183B patents). Beijing Shanke Technology Co., Ltd. appealed to the Supreme People's Court of the People's Republic of China in April 2024.

172.     Litigation involving the Taiwanese counterpart to the '394 patent is pending in the Intellectual Property and Commercial Court in Taiwan. On July 29, 2024, Corning filed suit against Caihong Display Devices Co., Ltd. and Irico (Hefei) LCD Glass Co., Ltd. asserting infringement of, among other patents, Taiwan Invention Patent No. I387571, which is a counterpart to the '394 patent. Before filing the complaint, Corning petitioned the Court to conduct evidence preservation against the third party Innolux Corporation, which was granted by the Court. The Court then enforced the evidence preservation order on June 28, 2024, and preserved the glass substrates manufactured by Irico (Hefei) LCD Glass Co., Ltd. and sold by Caihong Display Devices Co., Ltd. to Innolux Corporation. Years earlier, on July 12, 2016, Corning filed a similar petition seeking evidence preservation that involved the same Taiwan patent against HannStar Display Co., Ltd. but with respect to glass sold by Dongxu Optoelectronics Technology Co., Ltd. The petition was granted on July 29, 2016, and enforced in August 2016.

173.     Litigation involving the Taiwanese counterpart to the '394 patent, as well as another patent in the same patent family, is pending before the Taiwan Intellectual Property Office ("TIPO"). On October 9, 2024, an individual filed two actions before the TIPO challenging the validity of Taiwan Invention Patent Nos. I387571, which is a counterpart to the '394 patent, and I396672B, another patent in the same family. As of the filing of this Complaint, Corning has not responded to these requests.

PUBLIC VERSION

174.    There have been no other court litigations involving any of the Asserted Patents or their foreign counterparts anywhere in the world, nor have there been any post-grant agency proceedings regarding the Asserted Patents at the PTO.

### E.    Licenses

175.    Pursuant to Commission Rule 210.12(a)(9)(iii), Corning states that the Asserted Patents are subject to an intracompany license agreement between Corning and its subsidiary Corning Research & Development Corporation ("CRDC").  *See* Ex. 10 (list of licensees of the Asserted Patents).  CRDC in turn sublicensed its rights to the Asserted Patents to Corning affiliates Corning Display Headquarters; Corning Display Technologies (China) Co., Ltd.; Corning Display Technologies (Chongqing) Co., Ltd.; Corning Display Technologies (Guangzhou) Co., Ltd.; Corning Display Technologies (Hefei) Co., Ltd.; Corning Display Technologies (Mianyang) Co., Ltd.; Corning Display Technologies (Wuhan) Co., Ltd.; Corning Display Technologies Materials (Chongqing) Co., Ltd.; Corning Display Technologies Taiwan Co., Ltd.; Corning Japan KK; and Corning Precision Materials Co., Ltd.  *See* Ex. 10 (list of licensees of the Asserted Patents).  There are no other licenses to the Asserted Patents.

### F.    Patent Infringement

176.    The accused Irico products are glass substrates for LCDs.  Irico manufactures these glass substrates in China and supplies them to panel makers, including Respondents CHOT, CSOT, and HKC.  Panel makers assemble the glass substrates into panels and supply them to TV and display manufacturers, including Respondents Hisense, LG, TCL, and VIZIO.

177.    As described in Exhibit 7, Declaration of Professor Steve W. Martin, Corning obtained a sample of Irico glass in the ordinary course of business.  *See* Ex. 7 (Martin Decl.) ¶ 7.  Corning tested that Irico glass sample to determine its composition.  *See* Ex. 7 (Martin Decl.) ¶¶ 11-16.  Prof. Martin, who heads the Glass and Energy Materials Group in the Department of

PUBLIC VERSION

Materials Science and Engineering at Iowa State University, independently tested the composition of the Irico glass sample and reached results similar to Corning's. *See* Ex. 7 (Martin Decl.) ¶ 15.

178.    Prof. Martin also obtained TVs purchased in the United States that were manufactured abroad by Respondents Hisense, LG, TCL, and VIZIO and tested the glass used in the panels of those imported TVs to determine their composition. *See* Ex. 7 (Martin Decl.) ¶ 8. Prof. Martin then compared the glass in these imported TVs to the reference sample of Irico glass to determine whether the composition in the imported glass was consistent with the composition fingerprint of the Irico reference glass. *See* Ex. 7 (Martin Decl.) ¶ 20. Prof. Martin found consistency with respect to at least one TV model manufactured by each of Respondents Hisense, LG, TCL, and VIZIO indicating that those TVs use glass that appears to be manufactured by Irico. *See* Ex. 7 (Martin Decl.) ¶¶ 17, 20 & Table 2. He also found that a TV manufactured by Respondent Hisense contained an LCD panel supplied by Respondent CHOT, TVs manufactured by Respondent Hisense contained LCD panels supplied by Respondent HKC, a TV manufactured by Respondent LG contained an LCD panel supplied by Respondent HKC, and a TV manufactured by Respondent TCL contained an LCD panel supplied by Respondent CSOT. *See* Ex. 7 (Martin Decl.) ¶ 8.

179.    The results of Prof. Martin's compositional analysis are summarized in his declaration (Exhibit 7 ¶¶ 17-21 & Table 2). Based on that analysis, Respondents Irico Display, CHOT, CSOT, HKC, Hisense, LG, TCL, and VIZIO are importing into the United States, selling for importation, or selling within the United States after importation, LCD glass that infringes one or more claims of the Asserted Patents, as set forth below. For these Respondents, Corning

PUBLIC VERSION

has prepared claim charts demonstrating how a representative product from each Respondent is infringing each asserted independent claim against that Respondent.

### 1. Irico Display (LCD Glass Manufacturer/Seller)

180. The accused Irico products include LCD glass that infringes certain claims of the Asserted Patents. Although produced in China, Irico Display sells this infringing glass to LCD panel manufacturers for eventual importation into the United States. *See* Ex. 54 (Irico webpage: marketing network). The LCD panels, once manufactured, are incorporated into TVs that are imported into the United States or sold within the United States after importation. According to product labeling, at least some of these TVs are manufactured or assembled in Vietnam, Mexico, and China, shipped and imported into the United States, and then sold in the United States after importation. *See* Exs. 97-100, 117-118, 130, and 137 (photos/proof of importation of Hisense, LG, TCL, and VIZIO TVs containing Irico glass).

181. According to the samples of Irico products obtained by Corning and from televisions imported into the U.S. and tested and examined by Prof. Martin, *see* Exhibits 7, 30-44, 97-100, 117-118, 130, and 137, Irico Display sells for importation articles that infringe at least the asserted claims of each the Asserted Patents as set forth below and articles that are made, produced, processed, or mined under, or by means of, a process covered by at least the method claims of the Asserted Patents as set forth below. Irico Display has had knowledge of at least some of the Asserted Patents and the infringing nature of its Accused Products since at least January 2024, when Corning and Irico representatives met to discuss Corning's patents. Since that time, Corning has also had follow-up meetings and correspondence with Irico to discuss at least one of the Asserted Patents.

182. The following table summarizes the claims asserted against Irico Display:

PUBLIC VERSION

| Patent | Asserted Claims |
|--------|-----------------|
| '394 | 1, 5-6, 8-10 |
| '684 | 1-2, 4, 7, 10-12 |
| '025 | 15-20 |

**Table 4.  Claims Asserted Against Irico Display**

a.      **The '394 Patent**

183.    The asserted claims of the '394 patent are directed to alkali-free, boroalumino silicate glasses exhibiting desirable physical and chemical properties for use as substrates in flat panel display devices, such as AMLCDs.  Irico Display sells for importation glass substrates that infringe the claims identified in Table 4, including those found in TVs that include Hisense Model Nos. 32A4K, 32A45K, 40H4030F, and 50R6G; LG Model Nos. 43UT7590PUA and 55UQ7570PUJ; TCL Model No. 32S357; and VIZIO Model No. D40f-J09.

184.    Irico Display has had knowledge of the '394 patent and the infringing nature of its Accused Products since at least January 2024, when Corning and Irico representatives met to discuss Corning's patents.  Corning has also had follow-up meetings and correspondence with Irico to discuss the '394 patent.

185.    Corning alleges that Irico Display infringes each of the Asserted Claims of the '394 patent directly, either literally or through the doctrine of equivalents.  Charts that apply claims 1, 5, and 8 of the '394 patent to representative Irico Accused Products are attached hereto as Exhibits 30, 33, 36, 39, and 42.  The products pictured or cited in these charts are exemplary of all Irico Accused Products.

b.      **The '684 Patent**

186.    The asserted claims of the '684 patent are directed to methods for using a pull roll apparatus that can control a cross-draw tension and a down-draw tension of a glass sheet while manufacturing the glass sheet.  Irico Display sells for importation glass substrates that are made,

PUBLIC VERSION

produced, processed, or mined under, or by means of, a process covered by the claims identified in Table 4, including those found in TVs that include Hisense Model Nos. 32A4K, 32A45K, 40H4030F, and 50R6G; LG Model Nos. 43UT7590PUA and 55UQ7570PUJ; TCL Model No. 32S357; and VIZIO Model No. D40f-J09.

187.    Irico Display will have had knowledge of the '684 patent and the infringing nature of its Accused Products since at least the date of service of this Complaint.

188.    Corning alleges that Irico Display infringes each of the Asserted Claims of the '684 patent directly, either literally or through the doctrine of equivalents.  Charts that apply claims 1 and 7 of the '684 patent to representative Irico Accused Products are attached hereto as Exhibits 31, 34, 37, 40, and 43.  The products pictured or cited in these charts are exemplary of all Irico Accused Products.

### c.    The '025 Patent

189.    The asserted claims of the '025 patent are directed to methods for making glass ribbons with edge directors and replaceable heating cartridges that direct heat to the edge directors and thermally shield the edge directors from a plurality of edge rollers.  Irico Display sells for importation glass substrates that are made, produced, processed, or mined under, or by means of, a process covered by the claims identified in Table 4, including those found in TVs that include Hisense Model Nos. 32A4K, 32A45K, 40H4030F, and 50R6G; LG Model Nos. 43UT7590PUA and 55UQ7570PUJ; TCL Model No. 32S357; and VIZIO Model No. D40f-J09.

190.    Irico Display will have had knowledge of the '025 patent and the infringing nature of its Accused Products since at least the date of service of this Complaint.

191.    Corning alleges that Irico Display infringes each of the Asserted Claims of the '025 patent directly, either literally or through the doctrine of equivalents.  Charts that apply claim 15 of the '025 patent to representative Irico Accused Products are attached hereto as

PUBLIC VERSION

Exhibits 32, 35, 38, 41, and 44. The products pictured or cited in these charts are exemplary of all Irico Accused Products.

## 2.    CHOT, CSOT, and HKC (Panel Makers)

### a.    CHOT

192.    The accused CHOT products include LCD panels that contain glass substrates manufactured by Irico that infringe certain claims of the Asserted Patents. As explained in Subsection VII.B, CHOT sells for importation into the United States LCD panels that incorporate glass substrates manufactured by Irico that infringe certain claims of the Asserted Patents. The CHOT LCD panels are then incorporated into TVs that are imported into the United States or sold within the United States after importation. According to product labeling, at least some of these TVs are manufactured or assembled in Mexico, shipped and imported into the United States, and then sold in the United States after importation. *See* Ex. 100 (photos/proof of importation of Hisense Model No. 50R6G containing CHOT panel).

193.    According to the samples of Irico products obtained by Corning and from a television imported into the U.S. and tested and examined by Prof. Martin, *see* Exhibits 7, 30-32, 74, and 100, CHOT sells for importation articles that infringe at least the asserted claims of each the Asserted Patents as set forth below or articles that are made, produced, processed, or mined under, or by means of, a process covered by at least the method claims of the Asserted Patents as set forth below. CHOT has had knowledge of at least one of the Asserted Patents and the infringing nature of its Accused Products since at least January 2024, when Corning and Irico (CHOT's parent entity) representatives met to discuss Corning's patents. Corning has also had follow-up meetings and correspondence with Irico to discuss at least one of the Asserted Patents.

194.    The following table summarizes the claims asserted against CHOT:

PUBLIC VERSION

| Patent | Asserted Claims |
|--------|-----------------|
| '394 | 1, 5-6, 8-10 |
| '684 | 1-2, 4, 7, 10-12 |
| '025 | 15-20 |

**Table 5.  Claims Asserted Against CHOT**

### i.    The '394 Patent

195.    The asserted claims of the '394 patent are directed to alkali-free, boroalumino silicate glasses exhibiting desirable physical and chemical properties for use as substrates in flat panel display devices, such as AMLCDs.  CHOT sells for importation LCD panels containing glass substrates that infringe the claims identified in Table 5, including Model No. CV500U2-L01 found in Hisense TV Model No. 50R6G.

196.    CHOT has had knowledge of the '394 patent and the infringing nature of its Accused Products since at least January 2024, when Corning and representatives of CHOT's parent Irico met to discuss Corning's patents.  Corning has also had follow-up meetings and correspondence with Irico to discuss the '394 patent.

197.    Corning alleges that CHOT infringes each of the Asserted Claims of the '394 patent directly, either literally or through the doctrine of equivalents.  Charts that apply claims 1, 5, and 8 of the '394 patent to a representative CHOT Accused Product are attached hereto as Exhibit 30.  The products pictured or cited in these charts are exemplary of all CHOT Accused Products.

### ii.    The '684 Patent

198.    The asserted claims of the '684 patent are directed to methods for using a pull roll apparatus that can control a cross-draw tension and a down-draw tension of a glass sheet while manufacturing the glass sheet.  CHOT sells for importation LCD panels containing glass substrates that are made, produced, processed, or mined under, or by means of, a process covered

PUBLIC VERSION

by the claims identified in Table 5, including Model No. CV500U2-L01 found in Hisense TV Model No. 50R6G.

199.    CHOT will have had knowledge of the '684 patent and the infringing nature of its Accused Products since at least the date of service of this Complaint.

200.    Corning alleges that CHOT infringes each of the Asserted Claims of the '684 patent directly, either literally or through the doctrine of equivalents.  Charts that apply claims 1 and 7 of the '684 patent to a representative CHOT Accused Product are attached hereto as Exhibit 31.  The products pictured or cited in these charts are exemplary of all CHOT Accused Products.

### iii.    The '025 Patent

201.    The asserted claims of the '025 patent are directed to methods for making glass ribbons with edge directors and replaceable heating cartridges that direct heat to the edge directors and thermally shield the edge directors from a plurality of edge rollers.  CHOT sells for importation LCD panels containing glass substrates that are made, produced, processed, or mined under, or by means of, a process covered by the claims identified in Table 5, including Model No. CV500U2-L01 found in Hisense TV Model No. 50R6G.

202.    CHOT will have had knowledge of the '025 patent and the infringing nature of its Accused Products since at least the date of service of this Complaint.

203.    Corning alleges that CHOT infringes each of the Asserted Claims of the '025 patent directly, either literally or through the doctrine of equivalents.  A chart that applies claim 15 of the '025 patent to a representative CHOT Accused Product is attached hereto as Exhibit 32. The products pictured or cited in this chart are exemplary of all CHOT Accused Products.

PUBLIC VERSION

### b.    CSOT

204.    The accused CSOT products include LCD panels that contain glass substrates manufactured by Irico that infringe certain claims of the Asserted Patents.  As explained in Subsection VII.C, CSOT sells for importation into the United States LCD panels that incorporate glass substrates manufactured by Irico that infringe certain claims of the Asserted Patents.  The CSOT LCD panels are then incorporated into TVs that are imported into the United States or sold within the United States after importation.  According to product labeling, at least some of these TVs are manufactured or assembled in Vietnam, shipped and imported into the United States, and then sold in the United States after importation.  *See* Ex. 130 (photos/proof of importation of TCL Model No. 32S357 containing CSOT panel).

205.    According to the samples of Irico products obtained by Corning and from a television imported into the U.S. and tested and examined by Prof. Martin, *see* Exhibits 7, 39-41, 83, and 130, CSOT sells for importation articles that infringe at least the asserted claims of each the Asserted Patents as set forth below or articles that are made, produced, processed, or mined under, or by means of, a process covered by at least the method claims of the Asserted Patents as set forth below.  CSOT has had knowledge of at least one of the Asserted Patents and the infringing nature of its Accused Products since at least August 2024, when Corning sent written notice to CSOT and its parent, Respondent TCL.

206.    The following table summarizes the claims asserted against CSOT:

| Patent | Asserted Claims |
|--------|-----------------|
| '394 | 1, 5-6, 8-10 |
| '684 | 1-2, 4, 7, 10-12 |
| '025 | 15-20 |

**Table 6.  Claims Asserted Against CSOT**

PUBLIC VERSION

### i.    The '394 Patent

207.    The asserted claims of the '394 patent are directed to alkali-free, boroalumino silicate glasses exhibiting desirable physical and chemical properties for use as substrates in flat panel display devices, such as AMLCDs.  CSOT sells for importation LCD panels containing glass substrates that infringe the claims identified in Table 6, including Model No. ST3151B07-1 found in TCL TV Model No. 32S357.

208.    CSOT has had knowledge of the '394 patent and the infringing nature of its Accused Products since at least August 2024, when Corning sent written notice to CSOT and its parent, Respondent TCL.

209.    Corning alleges that CSOT infringes each of the Asserted Claims of the '394 patent directly, either literally or through the doctrine of equivalents.  Charts that apply claims 1, 5, and 8 of the '394 patent to a representative CSOT Accused Product are attached hereto as Exhibit 39.  The products pictured or cited in these charts are exemplary of all CSOT Accused Products.

### ii.    The '684 Patent

210.    The asserted claims of the '684 patent are directed to methods for using a pull roll apparatus that can control a cross-draw tension and a down-draw tension of a glass sheet while manufacturing the glass sheet.  CSOT sells for importation LCD panels containing glass substrates that are made, produced, processed, or mined under, or by means of, a process covered by the claims identified in Table 6, including Model No. ST3151B07-1 found in TCL TV Model No. 32S357.

211.    CSOT will have had knowledge of the '684 patent and the infringing nature of its Accused Products since at least the date of service of this Complaint.

PUBLIC VERSION

212.    Corning alleges that CSOT infringes each of the Asserted Claims of the '684 patent directly, either literally or through the doctrine of equivalents. Charts that apply claims 1 and 7 of the '684 patent to a representative CSOT Accused Product are attached hereto as Exhibit 40. The products pictured or cited in these charts are exemplary of all CSOT Accused Products.

### iii.    The '025 Patent

213.    The asserted claims of the '025 patent are directed to methods for making glass ribbons with edge directors and replaceable heating cartridges that direct heat to the edge directors and thermally shield the edge directors from a plurality of edge rollers. CSOT sells for importation LCD panels containing glass substrates that are made, produced, processed, or mined under, or by means of, a process covered by the claims identified in Table 6, including Model No. ST3151B07-1 found in TCL TV Model No. 32S357.

214.    CSOT will have had knowledge of the '025 patent and the infringing nature of its Accused Products since at least the date of service of this Complaint.

215.    Corning alleges that CSOT infringes each of the Asserted Claims of the '025 patent directly, either literally or through the doctrine of equivalents. A chart that applies claim 15 of the '025 patent to a representative CSOT Accused Product is attached hereto as Exhibit 41. The products pictured or cited in this chart are exemplary of all CSOT Accused Products.

### c.    HKC

216.    The accused HKC products include LCD panels that contain glass substrates manufactured by Irico that infringe certain claims of the Asserted Patents. As explained in Subsection VII.D, HKC sells for importation into the United States LCD panels that incorporate glass substrates manufactured by Irico. The HKC LCD panels are then incorporated into TVs that are imported into the United States or sold within the United States after importation.

PUBLIC VERSION

According to product labeling, at least some of these TVs are manufactured or assembled in Mexico and China, shipped and imported into the United States, and then sold in the United States after importation. *See* Exs. 97-98 (photos/proof of importation of Hisense 32" TVs containing HKC panels), Ex. 117 (photos/proof of importation of LG 43" TV containing HKC panel), Exs. 89, 91, 93 (Panelook.com webpages for HKC panels).

217.    According to the samples of Irico products obtained by Corning and from televisions imported into the U.S. and tested and examined by Prof. Martin, *see* Exhibits 7, 33-38, 89, 91, 93, 97-98, and 117, HKC sells for importation articles that infringe at least the asserted claims of each the Asserted Patents as set forth below or articles that are made, produced, processed, or mined under, or by means of, a process covered by at least the method claims of the Asserted Patents as set forth below. HKC has had knowledge of at least one of the Asserted Patents and the infringing nature of its Accused Products since at least July 2024, when Corning sent written notice to HKC. HKC states on its website that it "has realized the mass production of various application fields such as TV," and that "Sigmaintell data show that in 2023, [HKC's] LCD TV panel shipments . . . ranked third . . . in the world." *See* Ex. 87 (HKC webpage).

218.    The following table summarizes the claims asserted against HKC:

| Patent | Asserted Claims |
|--------|-----------------|
| '394   | 1, 5-6, 8-10    |
| '684   | 1-2, 4, 7, 10-12 |
| '025   | 15-20           |

**Table 7. Claims Asserted Against HKC**

### i.    The '394 Patent

219.    The asserted claims of the '394 patent are directed to alkali-free, boroalumino silicate glasses exhibiting desirable physical and chemical properties for use as substrates in flat

PUBLIC VERSION

panel display devices, such as AMLCDs.  HKC sells for importation LCD panels containing glass substrates that infringe the claims identified in Table 7, including Model Nos. PT320CT01-3 and PT320CT01-1 found in Hisense TV Model Nos. 32A4K and 32A45K, and Model No. PT430GT01-5 found in LG TV Model No. 43UT7590PUA.

220.    HKC has had knowledge of the '394 patent and the infringing nature of its Accused Products since at least July 2024, when Corning sent written notice to HKC.

221.    Corning alleges that HKC infringes each of the Asserted Claims of the '394 patent directly, either literally or through the doctrine of equivalents.  Charts that apply claims 1, 5, and 8 of the '394 patent to representative HKC Accused Products are attached hereto as Exhibits 33 and 36.  The products pictured or cited in these charts are exemplary of all HKC Accused Products.

### ii.    The '684 Patent

222.    The asserted claims of the '684 patent are directed to methods for using a pull roll apparatus that can control a cross-draw tension and a down-draw tension of a glass sheet while manufacturing the glass sheet.  HKC sells for importation LCD panels containing glass substrates that are made, produced, processed, or mined under, or by means of, a process covered by the claims identified in Table 7, including Model Nos. PT320CT01-3 and PT320CT01-1 found in Hisense TV Model Nos. 32A4K and 32A45K, and Model No. PT430GT01-5 found in LG TV Model No. 43UT7590PUA.

223.    HKC will have had knowledge of the '684 patent and the infringing nature of its Accused Products since at least the date of service of this Complaint.

224.    Corning alleges that HKC infringes each of the Asserted Claims of the '684 patent directly, either literally or through the doctrine of equivalents.  Charts that apply claims 1 and 7 of the '684 patent to representative HKC Accused Products are attached hereto as Exhibits

PUBLIC VERSION

34 and 37.  The products pictured or cited in these charts are exemplary of all HKC Accused Products.

### iii.    The '025 Patent

225.    The asserted claims of the '025 patent are directed to methods for making glass ribbons with edge directors and replaceable heating cartridges that direct heat to the edge directors and thermally shield the edge directors from a plurality of edge rollers.  HKC sells for importation LCD panels containing glass substrates that are made, produced, processed, or mined under, or by means of, a process covered by the claims identified in Table 7, including Model No. PT320CT01-3 and PT320CT01-1 found in Hisense TV Model Nos. 32A4K and 32A45K, and Model No. PT430GT01 found in LG TV Model No. 43UT7590PUA.

226.    HKC will have had knowledge of the '025 patent and the infringing nature of its Accused Products since at least the date of service of this Complaint.

227.    Corning alleges that HKC infringes each of the Asserted Claims of the '025 patent directly, either literally or through the doctrine of equivalents.  Chart that apply claim 15 of the '025 patent to representative HKC Accused Products are attached hereto as Exhibits 35 and 38.  The products pictured or cited in this chart are exemplary of all HKC Accused Products.

### 3.    Hisense, LG, TCL, and VIZIO (TV and Display Manufacturers)

#### a.    Hisense

228.    The accused Hisense products include TVs that contain glass substrates manufactured by Irico that infringe certain claims of the Asserted Patents.  At least some of these TVs are manufactured or assembled in Mexico and China, shipped and imported into the United States, and then sold in the United States after importation.  *See* Exs. 97-100 (photos/proof of importation of Hisense 32", 40", and 50" TVs).

PUBLIC VERSION

229.    According to the samples of Irico products obtained by Corning and from televisions imported into the U.S. and tested and examined by Prof. Martin, *see* Exhibits 7, 30-35, 97-100, and 106-116, Hisense imports into the United States or sells within the United States after importation articles that infringe at least the asserted claims of each the Asserted Patents as set forth below or articles that are made, produced, processed, or mined under, or by means of, a process covered by at least the method claims of the Asserted Patents as set forth below. Hisense will have had knowledge of at least one of the Asserted Patents and the infringing nature of its Accused Products since at least August 2024, when Corning sent written notice to Hisense.

230.    The following table summarizes the claims asserted against Hisense:

| Patent | Asserted Claims |
|--------|-----------------|
| '394 | 1, 5-6, 8-10 |
| '684 | 1-2, 4, 7, 10-12 |
| '025 | 15-20 |

**Table 8.  Claims Asserted Against Hisense**

### i.    The '394 Patent

231.    The asserted claims of the '394 patent are directed to alkali-free, boroalumino silicate glasses exhibiting desirable physical and chemical properties for use as substrates in flat panel display devices, such as AMLCDs. Hisense imports into the United States or sells within the United States after importation articles containing glass substrates that infringe the claims identified in Table 8, including those found in Hisense Model Nos. 32A4K, 32A45K, 40H4030F, and 50R6G.

232.    Hisense will have had knowledge of the '394 patent and the infringing nature of its Accused Products since at least August 2024, when Corning sent written notice to Hisense.

233.    Corning alleges that Hisense infringes each of the Asserted Claims of the '394 patent directly, either literally or through the doctrine of equivalents. Charts that apply claims 1,

PUBLIC VERSION

5, and 8 of the '394 patent to representative Hisense Accused Products are attached hereto as Exhibits 30 and 33. The products pictured or cited in these charts are exemplary of all Hisense Accused Products.

### ii.     The '684 Patent

234.    The asserted claims of the '684 patent are directed to methods for using a pull roll apparatus that can control a cross-draw tension and a down-draw tension of a glass sheet while manufacturing the glass sheet. Hisense imports into the United States or sells within the United States after importation articles containing glass substrates that are made, produced, processed, or mined under, or by means of, a process covered by the claims identified in Table 8, including those found in Hisense Model Nos. 32A4K, 32A45K, 40H4030F, and 50R6G.

235.    Hisense will have had knowledge of the '684 patent and the infringing nature of its Accused Products since at least the date of service of this Complaint.

236.    Corning alleges that Hisense infringes each of the Asserted Claims of the '684 patent directly, either literally or through the doctrine of equivalents. Charts that apply claims 1 and 7 of the '684 patent to representative Hisense Accused Products are attached hereto as Exhibits 31 and 34. The products pictured or cited in these charts are exemplary of all Hisense Accused Products.

### iii.     The '025 Patent

237.    The asserted claims of the '025 patent are directed to methods for making glass ribbons with edge directors and replaceable heating cartridges that direct heat to the edge directors and thermally shield the edge directors from a plurality of edge rollers. Hisense imports into the United States or sells within the United States after importation articles containing glass substrates that are made, produced, processed, or mined under, or by means of, a

PUBLIC VERSION

process covered by the claims identified in Table 8, including those found in Hisense Model Nos. 32A4K, 32A45K, 40H4030F, and 50R6G.

238.    Hisense will have had knowledge of the '025 patent and the infringing nature of its Accused Products since at least the date of service of this Complaint.

239.    Corning alleges that Hisense infringes each of the Asserted Claims of the '025 patent directly, either literally or through the doctrine of equivalents.  Charts that apply claim 15 of the '025 patent to representative Hisense Accused Products are attached hereto as Exhibits 32 and 35.  The products pictured or cited in these charts are exemplary of all Hisense Accused Products.

        **b.**     **LG**

240.    The accused LG products include TVs that contain glass substrates manufactured by Irico that infringe certain claims of the Asserted Patents.  At least some of these TVs are manufactured or assembled in Mexico, shipped and imported into the United States, and then sold in the United States after importation.  *See* Exs. 117-118 (photos/proof of importation of LG TVs, Model Nos. 43UT7590PUA and 55UQ7570PUJ).

241.    According to the samples of Irico products obtained by Corning and from televisions imported into the U.S. and tested and examined by Prof. Martin, *see* Exhibits 7, 36-38, 117-118, and 122-129, LG imports into the United States or sells within the United States after importation articles that infringe at least the asserted claims of each of the Asserted Patents as set forth below or articles that are made, produced, processed, or mined under, or by means of, a process covered by at least the method claims of the Asserted Patents as set forth below.

80

PUBLIC VERSION

242.    The following table summarizes the claims asserted against LG:

| Patent | Asserted Claims |
|--------|-----------------|
| '394 | 1, 5-6, 8-10 |
| '684 | 1-2, 4, 7, 10-12 |
| '025 | 15-20 |

**Table 9.  Claims Asserted Against LG**

### i.    The '394 Patent

243.    The asserted claims of the '394 patent are directed to alkali-free, boroalumino silicate glasses exhibiting desirable physical and chemical properties for use as substrates in flat panel display devices, such as AMLCDs.  LG imports into the United States or sells within the United States after importation articles containing glass substrates that infringe the claims identified in Table 9, including those found in LG Model Nos. 43UT7590PUA and 55UQ7570PUJ.

244.    LG will have had knowledge of the '394 patent and the infringing nature of its Accused Products since at least September 2024, when Corning sent written notice to LG.

245.    Corning alleges that LG infringes each of the Asserted Claims of the '394 patent directly, either literally or through the doctrine of equivalents.  Charts that apply claims 1, 5, and 8 of the '394 patent to a representative LG Accused Product are attached hereto as Exhibit 36. The products pictured or cited in these charts are exemplary of all LG Accused Products.

### ii.    The '684 Patent

246.    The asserted claims of the '684 patent are directed to methods for using a pull roll apparatus that can control a cross-draw tension and a down-draw tension of a glass sheet while manufacturing the glass sheet.  LG imports into the United States or sells within the United States after importation articles containing glass substrates that are made, produced, processed,

PUBLIC VERSION

or mined under, or by means of, a process covered by the claims identified in Table 9, including those found in LG Model Nos. 43UT7590PUA and 55UQ7570PUJ.

247.    LG will have had knowledge of the '684 patent and the infringing nature of its Accused Products since at least the date of service of this Complaint.

248.    Corning alleges that LG infringes each of the Asserted Claims of the '684 patent directly, either literally or through the doctrine of equivalents.  Charts that apply claims 1 and 7 of the '684 patent to a representative LG Accused Product are attached hereto as Exhibit 37.  The products pictured or cited in these charts are exemplary of all LG Accused Products.

### iii.    The '025 Patent

249.    The asserted claims of the '025 patent are directed to methods for making glass ribbons with edge directors and replaceable heating cartridges that direct heat to the edge directors and thermally shield the edge directors from a plurality of edge rollers.  LG imports into the United States or sells within the United States after importation articles containing glass substrates that are made, produced, processed, or mined under, or by means of, a process covered by the claims identified in Table 9, including those found in LG Model Nos. 43UT7590PUA and 55UQ7570PUJ.

250.    LG will have had knowledge of the '025 patent and the infringing nature of its Accused Products since at least the date of service of this Complaint.

251.    Corning alleges that LG infringes each of the Asserted Claims of the '025 patent directly, either literally or through the doctrine of equivalents.  A chart that applies claim 15 of the '025 patent to a representative LG Accused Product is attached hereto as Exhibit 38.  The products pictured or cited in this chart are exemplary of all LG Accused Products.

PUBLIC VERSION

c.    TCL

252.    The accused TCL products include TVs that contain glass substrates manufactured by Irico that infringe certain claims of the Asserted Patents. At least some of these TVs are manufactured or assembled in Vietnam, shipped and imported into the United States, and then sold in the United States after importation. *See* Ex. 130 (proof of product sample importation).

253.    According to the samples of Irico products obtained by Corning and from a television imported into the U.S. and tested and examined by Prof. Martin, *see* Exhibits 7, 39-41, 130, and 133-135, TCL imports into the United States or sells within the United States after importation articles that infringe at least the asserted claims of each the Asserted Patents as set forth below or articles that are made, produced, processed, or mined under, or by means of, a process covered by at least the method claims of the Asserted Patents as set forth below. TCL will have had knowledge of at least one of the Asserted Patents and the infringing nature of its Accused Products since at least August 2024, when Corning sent written notice to TCL. TCL states on its U.S. website that "TCL is vertically integrated, which means we make our own stuff." *See* Ex. 136 (TCL "Our Story" webpage).

254.    The following table summarizes the claims asserted against TCL:

| Patent | Asserted Claims |
|--------|-----------------|
| '394 | 1, 5-6, 8-10 |
| '684 | 1-2, 4, 7, 10-12 |
| '025 | 15-20 |

Table 10.  Claims Asserted Against TCL

i.    The '394 Patent

255.    The asserted claims of the '394 patent are directed to alkali-free, boroalumino silicate glasses exhibiting desirable physical and chemical properties for use as substrates in flat

panel display devices, such as AMLCDs.  TCL imports into the United States or sells within the United States after importation articles containing glass substrates that infringe the claims identified in Table 10, including those found in TCL Model No. 32S357.

256.    TCL will have had knowledge of the '394 patent and the infringing nature of its Accused Products since at least August 2024, when Corning sent written notice to TCL.

257.    Corning alleges that TCL infringes each of the Asserted Claims of the '394 patent directly, either literally or through the doctrine of equivalents.  Charts that apply claims 1, 5, and 8 of the '394 patent to a representative TCL Accused Product are attached hereto as Exhibit 39. The products pictured or cited in these charts are exemplary of all TCL Accused Products.

### ii.    The '684 Patent

258.    The asserted claims of the '684 patent are directed to methods for using a pull roll apparatus that can control a cross-draw tension and a down-draw tension of a glass sheet while manufacturing the glass sheet.  TCL imports into the United States or sells within the United States after importation articles containing glass substrates that are made, produced, processed, or mined under, or by means of, a process covered by the claims identified in Table 10, including those found in TCL Model No. 32S357.

259.    TCL will have had knowledge of the '684 patent and the infringing nature of its Accused Products since at least the date of service of this Complaint.

260.    Corning alleges that TCL infringes each of the Asserted Claims of the '684 patent directly, either literally or through the doctrine of equivalents.  Charts that apply claims 1 and 7 of the '684 patent to a representative TCL Accused Product are attached hereto as Exhibit 40. The products pictured or cited in these charts are exemplary of all TCL Accused Products.

PUBLIC VERSION

### iii.    The '025 Patent

261.    The asserted claims of the '025 patent are directed to methods for making glass ribbons with edge directors and replaceable heating cartridges that direct heat to the edge directors and thermally shield the edge directors from a plurality of edge rollers.  TCL imports into the United States or sells within the United States after importation articles containing glass substrates that are made, produced, processed, or mined under, or by means of, a process covered by the claims identified in Table 10, including those found in TCL Model No. 32S357.

262.    TCL will have had knowledge of the '025 patent and the infringing nature of its Accused Products since at least the date of service of this Complaint.

263.    Corning alleges that TCL infringes each of the Asserted Claims of the '025 patent directly, either literally or through the doctrine of equivalents.  A chart that applies claim 15 of the '025 patent to a representative TCL Accused Product is attached hereto as Exhibit 41.  The products pictured or cited in this chart are exemplary of all TCL Accused Products.

### d.    VIZIO

264.    The accused VIZIO products include TVs that contain glass substrates manufactured by Irico that infringe certain claims of the Asserted Patents.  At least some of these TVs are manufactured or assembled in China, shipped and imported into the United States, and then sold in the United States after importation.  *See* Ex. 137 (photos/proof of importation of VIZIO TV).

265.    According to the samples of Irico products obtained by Corning and from a television imported into the U.S. and tested and examined by Prof. Martin, *see* Exhibits 7, 42-44, 137, and 140-142, VIZIO imports into the United States or sells within the United States after importation articles that infringe at least the asserted claims of each the Asserted Patents as set forth below or articles that are made, produced, processed, or mined under, or by means of, a

PUBLIC VERSION

process covered by at least the method claims of the Asserted Patents as set forth below. VIZIO

will have had knowledge of at least one of the Asserted Patents and the infringing nature of its

Accused Products since at least August 2024, when Corning sent written notice to VIZIO.

266.    The following table summarizes the claims asserted against VIZIO:

| Patent | Asserted Claims |
|--------|-----------------|
| '394   | 1, 5-6, 8-10    |
| '684   | 1-2, 4, 7, 10-12 |
| '025   | 15-20           |

**Table 11.  Claims Asserted Against VIZIO**

**i.    The '394 Patent**

267.    The asserted claims of the '394 patent are directed to alkali-free, boroalumino

silicate glasses exhibiting desirable physical and chemical properties for use as substrates in flat

panel display devices, such as AMLCDs. VIZIO imports into the United States or sells within

the United States after importation articles containing glass substrates that infringe the claims

identified in Table 11, including those found in VIZIO Model No. D40f-J09.

268.    VIZIO will have had knowledge of the '394 patent and the infringing nature of its

Accused Products since at least August 2024, when Corning sent written notice to VIZIO.

269.    Corning alleges that VIZIO infringes each of the Asserted Claims of the '394

patent directly, either literally or through the doctrine of equivalents. Charts that apply claims 1,

5, and 8 of the '394 patent to a representative VIZIO Accused Product are attached hereto as

Exhibit 42. The products pictured or cited in these charts are exemplary of all VIZIO Accused

Products.

**ii.    The '684 Patent**

270.    The asserted claims of the '684 patent are directed to methods for using a pull roll

apparatus that can control a cross-draw tension and a down-draw tension of a glass sheet while

PUBLIC VERSION

manufacturing the glass sheet. VIZIO imports into the United States or sells within the United States after importation articles containing glass substrates that are made, produced, processed, or mined under, or by means of, a process covered by the claims identified in Table 11, including those found in VIZIO Model No. D40f-J09.

271. VIZIO will have had knowledge of the '684 patent and the infringing nature of its Accused Products since at least the date of service of this Complaint.

272. Corning alleges that VIZIO infringes each of the Asserted Claims of the '684 patent directly, either literally or through the doctrine of equivalents. Charts that apply claims 1 and 7 of the '684 patent to a representative VIZIO Accused Product are attached hereto as Exhibit 43. The products pictured or cited in these charts are exemplary of all VIZIO Accused Products.

### iii.    The '025 Patent

273. The asserted claims of the '025 patent are directed to methods for making glass ribbons with edge directors and replaceable heating cartridges that direct heat to the edge directors and thermally shield the edge directors from a plurality of edge rollers. VIZIO imports into the United States or sells within the United States after importation articles containing glass substrates that are made, produced, processed, or mined under, or by means of, a process covered by the claims identified in Table 11, including those found in VIZIO Model No. D40f-J09.

274. VIZIO will have had knowledge of the '025 patent and the infringing nature of its Accused Products since at least the date of service of this Complaint.

275. Corning alleges that VIZIO infringes each of the Asserted Claims of the '025 patent directly, either literally or through the doctrine of equivalents. A chart that applies claim 15 of the '025 patent to a representative VIZIO Accused Product is attached hereto as Exhibit 44. The products pictured or cited in this chart are exemplary of all VIZIO Accused Products.

PUBLIC VERSION

## VII.    SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE

276.    Prior to filing this Complaint, Corning notified the Downstream Respondents in writing that it was considering naming them as respondents in this ITC action based on information that they were selling products containing LCD glass manufactured by Irico. Corning informed each Downstream Respondent that it would welcome the opportunity to discuss the matter with them prior to filing this Complaint.  With the exception of LG, none of the Downstream Respondents denied importing, selling for importation, or selling within the United States after importation of articles made with Irico's LCD glass.

### A.    Irico Display

277.    Exemplary instances of importation, sale, and offers for sale of Irico Display's LCD glass that infringes the Asserted Patents, and that was manufactured using Corning's misappropriated trade secrets, are set forth below.

278.    Although it produces glass in China, Irico Display sells this infringing glass to LCD panel manufacturers for eventual importation into the United States.  *See* Ex. 54 (Irico webpage:  marketing network).  The LCD panels, once manufactured, are incorporated into TVs that are imported into the United States or sold within the United States after importation. According to product labeling, at least some of these TVs are manufactured or assembled in Vietnam, Mexico, and China, shipped and imported into the United States, and then sold in the United States after importation.  *See* Exs. 97-100, 117-118, 130, and 137 (photos/proof of importation of Hisense, LG, TCL, and VIZIO TVs).  As described in paragraphs 281, 287, 292-294,  299-302, 304-305, 307, and 309 below, representative articles were purchased in the United States.  *See* Exs. 101-104, 119-120, 131, and 138 (receipts for Hisense, LG, TCL, and VIZIO TVs).

PUBLIC VERSION

279.    Supply-chain data published by Omdia, a technology market analyst, show that Irico Display sells glass substrates to various panel makers, including CHOT, CSOT, and HKC. Panel makers, in turn, use Irico glass substrates to produce panels in specific fabrication plants. The supply-chain data show that the fabrication plants that use Irico glass substrates produce panels for use in TVs, monitors, notebook and laptop computers, and tablets.  Those panels are sold to various device manufacturers, including manufacturers who sell electronic devices in the United States, such as Hisense, Lenovo, LG, TCL, TPV Technology, and VIZIO.  For example, the supply-chain data show that, as of the first quarter of 2024, BOE Technology Group ("BOE") purchases 11% of the glass substrate used to manufacture panels in BOE's B3 fabrication plant (located in Hefei, China) from Irico.  The B3 fabrication plant produces panels for use in notebook and laptop computers and tablets, and does not manufacture panels for TVs. Accordingly, the evidence indicates that Irico Display sells infringing glass substrates to LCD panel makers to be incorporated into electronic devices (including TVs, monitors, notebook and laptop computers, and tablets) for eventual importation into the United States.

**B.      CHOT**

280.    Exemplary instances of importation, sale, and offers for sale of CHOT's LCD panels that contain glass substrates that infringe certain claims of the Asserted Patents, and that were manufactured using Corning's misappropriated trade secrets, are set forth below.

281.    A representative article of the Accused Products is a 50-inch Hisense 50" LED 4K UHD Hisense Smart Roku TV (Model No. 50R6G).  The box and rear panel of the TV are labeled "Made in Mexico."  *See* Ex. 100 at 1, 3 (proof of product sample importation).  The representative article contains a CHOT panel (Model No. CV500U2-L01).  *See* Ex. 100 at 5. The representative article was purchased from Best Buy's website on August 5, 2024, and shipped by Best Buy to a customer in Massachusetts.  *See* Ex. 104 (receipt and tracking history).

PUBLIC VERSION

282.     The representative CHOT panel is advertised for sale to customers in North

America on Panelook.com and to customers in the U.S. on Alibaba.com. *See* Exs. 74 & 78

(Panelook.com and Alibaba.com webpages).

283.     According to U.S. Customs records, CHOT is importing glass substrates for

LCDs. *See* Ex. 79 (importation records for 16 shipments of "OPEN CELL" and "OPEN CELL

T-CON" from China since January 2024, indicating CHOT as the shipper, most of which are in

transit to Tijuana, Mexico).[27]

284.     The importation into the United States of LCD panels manufactured by CHOT, to

be incorporated in at least a VIZIO TV, was alleged in *Certain Liquid Crystal Devices,*

*Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-1201 ("*Liquid*

*Crystal Devices*").[28]  The complaint in that proceeding included importation records

demonstrating that CHOT imports LCD panels via the port of Long Beach, California.[29]  CHOT

subsequently entered into a license agreement with the complainant in that investigation.[30]

285.     Supply-chain data published by Omdia, a technology market analyst, show that,

as of the first quarter of 2024, CHOT purchases 6% of the glass substrate used to manufacture

panels in CHOT's CECX 1 fabrication plant (located in Xianyang, China) from Irico.  The

CECX 1 fabrication plant produces panels for use in LCD monitors and LCD TVs.  For example,

the CECX 1 fabrication plant manufactures 34-inch panels for use in LCD monitors.  The

---

[27] "Open cell" is an industry term for LCD panels without backlight units.

[28] *See Liquid Crystal Devices*, Compl. ¶¶ 3.6-3.7, 6.1-6.4 (Apr. 21, 2020).

[29] *See Liquid Crystal Devices*, Compl. Ex. 15 (Apr. 21, 2020).

[30] *See Liquid Crystal Devices*, Jt. Mot. for Termination of the Investigation Pursuant to Rule 210.21(b), on the Basis of License Agreement, Ex. A (July 27, 2020); *Liquid Crystal Devices*, Notice of a Commission Determination Not to Review an Initial Determination Terminating the Investigation in Its Entirety Based on a Settlement Agreement; Termination of the Investigation (Aug. 12, 2020).

supply-chain data show that CHOT sells 34-inch LCD monitors to the device manufacturer TPV

Technology.  TPV Technology, in turn, advertises 34-inch LCD monitors for sale to customers

in the United States, through the brand name Philips.  *See* Ex. 80 (Amazon.com webpage

advertising Philips 34-inch monitor manufactured by TPV Technology).

### C.    CSOT

286.    Exemplary instances of importation, sale, and offers for sale of CSOT's LCD

panels that contain glass substrates that infringe certain claims of the Asserted Patents, and that

were manufactured using Corning's misappropriated trade secrets, are set forth below.

287.    A representative article of the Accused Products is a 32-inch TCL 32" Class 3-

Series Full HD LED Smart Roku TV (Model No. 32S357).  The box and rear panel of the TV are

labeled "Manufactured in Vietnam."  *See* Ex. 130 at 1-2, 4 (proof of product sample

importation).  The representative article contains a CSOT panel (Model No. ST3151B07-1).  *See*

Ex. 130 at 5-6 (photos of CSOT panel in TCL Model No. 32S357).  The representative article

was purchased from Walmart.com on September 9, 2024.  *See* Ex. 131 (receipt and delivery

confirmation).

288.    The representative CSOT panel is advertised for sale to customers in North

America on Panelook.com and to customers in the U.S. on Alibaba.com.  *See* Exs. 83-84

(Panelook.com and Alibaba.com webpages).

289.    According to U.S. Customs records, CSOT is importing glass substrates for

LCDs.  *See* Ex. 85 (importation records for "OPEN CELL" panels from China).

290.    Supply-chain data published by Omdia, a technology market analyst, show that,

as of the first quarter of 2024, CSOT purchases 55% of the glass substrate used to manufacture

panels in CSOT's T1 fabrication plant (located in Shenzhen, China) from Irico.  The T1

fabrication plant produces panels for use in LCD TVs.

PUBLIC VERSION

**D.     HKC**

291.     Exemplary instances of importation, sale, and offers for sale of HKC's LCD panels that contain glass substrates that infringe certain claims of the Asserted Patents, and that were manufactured using Corning's misappropriated trade secrets, are set forth below.

292.     A representative article of the HKC Accused Products is a 32-inch Hisense 32" A4 Series Hisense Google TV (Model No. 32A4K). The box and rear panel of the TV are labeled "Made in Mexico." *See* Ex. 97 at 1-2, 4 (proof of product sample importation). This representative article contains an HKC panel (Model Nos. PT320CT01-3 and PT320CT01-1). *See* Ex. 97 at 6. The representative article was purchased from P.C. Richard & Son's website on August 8, 2024, and shipped by P.C. Richard & Son to a customer in Massachusetts. *See* Ex. 101 (receipt and tracking history).

293.     A representative article of the HKC Accused Products is a 32-inch Hisense 32" A4 Series Hisense Google TV (Model No. 32A45K). The box and rear panel of the TV are labeled "Made in China." *See* Ex. 98 at 1, 3 (proof of product sample importation). This representative article contains an HKC panel (Model Nos. PT320CT01-3 and PT320CT01-1). *See* Ex. 98 at 5. The representative article was purchased from Sam's Club's website on August 8, 2024, and shipped by Sam's Club to a customer in Massachusetts. *See* Ex. 102 (receipt and tracking history).

294.     A representative article of the HKC Accused Products containing Irico LCD glass is a 43-inch LG 43 Inch Class UHD Series 4K UHD TV with webOS 24 (Model No. 43UT7590PUA). The box and rear panel of the TV are labeled "ASSEMBLED IN MEXICO." *See* Ex. 117 at 2, 4 (proof of product sample importation). This representative article contains an HKC panel (Model No. PT430GT01-5). *See* Ex. 117 at 5. The representative article was

PUBLIC VERSION

purchased from Walmart.com on September 9, 2024, and shipped by Walmart to a customer in Massachusetts.  *See* Ex. 119 (receipt and delivery confirmation).

295.    The HKC panels found in the representative articles are advertised for sale to customers in North America on Panelook.com and to customers in the U.S. on Alibaba.com.  *See* Exs. 89-94 (Panelook.com and Alibaba.com webpages).

296.    According to U.S. Customs records, HKC is importing glass substrates for LCDs. *See* Ex. 95 (examples of importation records for LED TVs, monitors, "OPEN CELL" panels, and "TFT LCD OPEN CELL TCON" from China).

297.    Supply-chain data published by Omdia, a technology market analyst, show that, as of the first quarter of 2024, HKC purchases 7% and 3%, respectively, of the glass substrate used to manufacture panels in HKC's H1 and H2 fabrication plants (located in Chongqing and Chuzhou, China) from Irico.  The H1 and H2 fabrication plants produce panels for use in LCD monitors and LCD TVs.  For example, the H1 and H2 fabrication plants manufacture 23.8-inch panels for use in LCD monitors.  The supply-chain data show that HKC sells 23.8-inch LCD monitors to various device manufacturers, including TPV Technology.  TPV Technology, in turn, advertises 23.8-inch LCD monitors for sale to customers in the United States, through the brand name Philips.  *See* Ex. 96 (Amazon.com webpage advertising Philips 23.8-inch monitor manufactured by TPV Technology).

**E.    Hisense**

298.    Exemplary instances of importation, sale, and offers for sale of Hisense's TVs that contain glass substrates that infringe certain claims of the Asserted Patents, and that were manufactured using Corning's misappropriated trade secrets, are set forth below.

299.    A representative article of the Accused Products is a 32-inch Hisense 32" A4 Series Hisense Google TV (Model No. 32A4K).  The box and rear panel of the TV are labeled

PUBLIC VERSION

"Made in Mexico." *See* Ex. 97 at 1-2, 4 (proof of product sample importation). Hisense

advertises this TV on its U.S. website and provides links to show consumers where it can be

purchased. *See* Exs. 106-108 (Hisense webpage, product specification, and warranty). The

representative article was purchased from P.C. Richard & Son's website on August 8, 2024, and

shipped by P.C. Richard & Son to a customer in Massachusetts. *See* Ex. 101 (receipt and

delivery confirmation).

    300.    A representative article of the Accused Products is a 32-inch Hisense 32" A4

Series Hisense Google TV (Model No. 32A45K). The box and rear panel of the TV are labeled

"Made in China." *See* Ex. 98 at 1, 3 (proof of product sample importation). Hisense advertises

this TV on its U.S. website. *See* Exs. 109-110 (Hisense webpage and warranty). The

representative article was purchased from Sam's Club's website on August 8, 2024, and shipped

by Sam's Club to a customer in Massachusetts. *See* Ex. 102 (receipt and delivery confirmation).

    301.    A representative article of the Accused Products is a 40-inch Hisense 40" FHD

Hisense Roku TV (Model No. 40H4030F). The box and rear panel of the TV are labeled "Made

in Mexico." *See* Ex. 99 at 1, 3 (proof of product sample importation). Hisense advertises this

TV on its U.S. website and provides links to show consumers where it can be purchased. *See*

Exs. 111-113 (Hisense webpage, product specification, and warranty). The representative article

was purchased from Walmart.com on April 22, 2024, and shipped by Walmart.com to a

customer in Massachusetts. *See* Ex. 103 (receipt and delivery confirmation).

    302.    A representative article of the Accused Products is a 50-inch Hisense 50" LED

4K UHD Hisense Smart Roku TV (Model No. 50R6G). The box and rear panel of the TV are

labeled "Made in Mexico." *See* Ex. 100 at 1, 3 (proof of product sample importation). Hisense

advertises this TV on its U.S. website and provides links to show consumers where it can be

PUBLIC VERSION

purchased. *See* Exs. 114-116 (Hisense webpage, product specification, and warranty). The representative article was purchased from Best Buy's website on August 5, 2024, and shipped by Best Buy to a customer in Massachusetts. *See* Ex. 104 (receipt and delivery confirmation).

    **F.**    **LG**

    303.    Exemplary instances of importation, sale, and offers for sale of LG's TVs that contain glass substrates that infringe certain claims of the Asserted Patents, and that were manufactured using Corning's misappropriated trade secrets, are set forth below.

    304.    A representative article of the LG Accused Products containing Irico LCD glass is a 43-inch LG 43 Inch Class UHD Series 4K UHD TV with webOS 24 (Model No. 43UT7590PUA). The box and rear panel of the TV are labeled "ASSEMBLED IN MEXICO." *See* Ex. 117 at 2, 4 (proof of product sample importation). LG advertises this TV on its U.S. website, and provides links to show consumers where it can be purchased. *See* Exs. 122-125 (LG webpages, owner's manual, and warranty). The representative article was purchased from Walmart.com on September 9, 2024, and shipped by Walmart to a customer in Massachusetts. *See* Ex. 119 (receipt and delivery confirmation).

    305.    A representative article of the LG Accused Products containing Irico LCD glass is a 55-inch LG 55 Inch Class UQ7570 PUJ Series LED 4K UHD Smart WebOS 22 TV (Model No. 55UQ7570PUJ). The box and rear panel of the TV are labeled "ASSEMBLED IN MEXICO." *See* Ex. 118 at 2, 4 (proof of product sample importation). LG advertises this TV on its U.S. website, and provides links to show consumers where it can be purchased. *See* Exs. 126-128 (LG webpages and owner's manual). The representative article was purchased from Best Buy's website on April 22, 2024, and shipped by Best Buy to a customer in Massachusetts. *See* Ex. 120 (receipt and delivery confirmation).

PUBLIC VERSION

### G.    TCL

306.    Exemplary instances of importation, sale, and offers for sale of TCL's TVs that contain glass substrates that infringe certain claims of the Asserted Patents, and that were manufactured using Corning's misappropriated trade secrets, are set forth below.

307.    A representative article of the Accused Products is a 32-inch TCL 32" Class 3-Series Full HD LED Smart Roku TV (Model No. 32S357).  The box and rear panel of the TV are labeled "Manufactured in Vietnam."  *See* Ex. 130 at 1-2, 4 (proof of product sample importation).  TCL advertises this TV on its U.S. website and provides a link to show consumers where it can be purchased.  *See* Exs. 133-135 (TCL webpage, specifications, and warranty).  The representative article was purchased from Walmart.com on September 9, 2024.  *See* Ex. 131 (receipt and delivery confirmation).

### H.    VIZIO

308.    Exemplary instances of importation, sale, and offers for sale of VIZIO's TVs that contain glass substrates that infringe certain claims of the Asserted Patents, and that were manufactured using Corning's misappropriated trade secrets, are set forth below.

309.    A representative article of the Accused Products is a 40-inch VIZIO D-Series 40" Class (39.5" Diag) Full HD Smart TV (Model No. D40f-J09).  The box and rear panel of the TV are labeled "MADE IN CHINA."  *See* Ex. 137 at 1, 3 (proof of product sample importation).  VIZIO advertises this TV on its U.S. website and provides a link to show consumers where it can be purchased.  *See* Exs. 140-142 (VIZIO webpage, user manual, and warranty).  The representative article was purchased from Amazon.com on April 16, 2024, and shipped by Amazon.com to a customer in Iowa.  *See* Ex. 138 (receipt and delivery confirmation).

PUBLIC VERSION

## VIII.  HARMONIZED TARIFF SCHEDULE ITEM NUMBERS

310.    On information and belief, Harmonized Tariff Schedule of the United States

("HTSUS") item numbers under which the infringing products may be imported into the United

States may include at least HTSUS 8524.11.10, 8524.11.90, 8524.91.10, 8524.91.90,

8528.52.00, 8528.59.15, 8528.59.23, 8528.59.25, 8528.59.33, 8528.72.62, 8528.72.64,

8528.72.68, 8528.72.72, 8529.90.55, and 8471.30.01.  This classification is exemplary in nature

and not intended to restrict the scope of any exclusion order or other remedy ordered by the

Commission.

## IX.  THE DOMESTIC INDUSTRY

### A.  Technical Prong

311.    Corning's EAGLE XG Glass products are protected by at least one claim of each

of the Asserted Patents.  EAGLE XG is used as a substrate material for a variety of AMLCD

TVs sold in the United States, including TVs produced by manufacturers including Hisense,

VIZIO, LG, and TCL.  EAGLE XG Glass is also commonly used in monitors, laptop and

notebook computers, and tablets manufactured by many different entities.

312.    The technical details of the EAGLE XG Glass products are described in Exhibits

143-150 (Corning webpages and product information datasheets), Physical Exhibits 1-5 (videos),

Exhibit 7 (Martin Decl.) ¶¶ 17-21, and Exhibit 8 (Markham Decl.) ¶¶ 9-33.

313.    Claim charts showing how EAGLE XG Glass, as incorporated in the EAGLE XG

Glass products, practices claims 1, 5, and 8 of the '394 patent is attached as Exhibit 151.  The

products pictured or cited in these charts are exemplary of all EAGLE XG Glass products, as

used in a wide variety of TV brands, sizes, and display types, as well as in a wide variety of

monitors, laptop and notebook computers, and tablets.

PUBLIC VERSION

314.    A claim chart showing how EAGLE XG Glass, as incorporated in the EAGLE XG Glass products, practices claim 1 of the '684 patent is attached as Exhibit 152. The products pictured or cited in this chart are exemplary of all EAGLE XG Glass products, as used in a wide variety of TV brands, sizes, and display types, as well as in a wide variety of monitors, laptop and notebook computers, and tablets.

315.    A claim chart showing how EAGLE XG Glass, as incorporated in the EAGLE XG Glass products, practices claim 1 of the '025 patent is attached as Exhibit 153. The products pictured or cited in this chart are exemplary of all EAGLE XG Glass products, as used in a wide variety of TV brands, sizes, and display types, as well as in a wide variety of monitors, laptop and notebook computers, and tablets.

**B.    Economic Prong**

316.    A domestic industry exists in the United States both for purposes of Section 337(a)(1)(A) and for purposes of Sections 337(a)(1)(B), 337(a)(2), and 337(a)(3).

**1.    Section 337(a)(1)(A)**

317.    Corning has made extensive investments in the research and development of LCD glass for decades. As described above, Corning developed the fusion draw process and pioneered its development for use in making LCD glass substrates, incurring enormous expenses before reaching profitability. Since that time, Corning has continued to invest in its innovative fusion draw technology. Today, it is the largest worldwide producer of glass substrates for flat panel displays.

318.    As set forth above, Corning's flagship glass substrate is EAGLE XG. Corning engaged in extensive research and development work before it could bring EAGLE XG to market in 2006. The predecessor glass substrates to EAGLE XG used antimony or arsenic as a fining agent. Because antimony and arsenic create potentially toxic waste, there was strong

customer demand for an alternative process.  Developing EAGLE XG, which is free of these heavy metals, required considerable investment in the United States.

319.    From 2003 to 2006, inventor Adam Ellison ran hundreds of experimental melts while testing different glass compositions for EAGLE XG.  Corning incurred around $6 million in labor and facilities annually to run these melts.  Since 2006, Corning has continued to invest significantly in the United States for ongoing EAGLE XG research and development, including composition related work, attribute improvements, cost reduction programs, and process improvements for melting, forming, and finishing EAGLE XG.

320.    Corning operates a large facility in Erwin, New York, where it conducts research and development for EAGLE XG.  Corning's Sullivan Park facility (shown below) houses ███ ██████████████████████████████████████████ dozens of laboratories, offices, and testing facilities.  Corning tests new glass compositions, resolves problems that arise in the fusion draw process, and experiments with changes to different dimensions and flow rates on the isopipe.  Sullivan Park is the only facility in the United States dedicated to research and development for display glass.  Ellison performed all of his experimental melts for EAGLE XG at Sullivan Park, and a sign hangs in the facility on the research melter ("RM") that reads "Birthplace of EAGLE XG."  Confidential Exhibit 9 sets forth the details of Corning's investments in the Sullivan Park facility.

PUBLIC VERSION





321.     Corning has made significant investments in the United States that are possible only because of its development of EAGLE XG and the technology covered by the Trade Secrets. Corning operates a large facility in Erwin, New York (the "Manufacturing Facility") where it produces, manufactures, and assembles components for its fusion manufacturing systems that make EAGLE XG. The Manufacturing Facility supplies around ███ of Corning's global production requirements for its fusion manufacturing systems, including critical repairs on ███████ machines per year. The production of fusion manufacturing systems uses valuable precious metals that Corning engineers ████████████████████ parts. Many Manufacturing Facility employees are members of masonry and steel-working unions. The Manufacturing Facility also builds specialty crates and packaging to ship the completed machine

PUBLIC VERSION

components overseas.  Confidential Exhibit 9 sets forth the details of Corning's investments in the Manufacturing Facility.

322.    Corning employs U.S.-based sales, marketing, and communication staff who support its EAGLE XG line of products.  Information about those employees' salary, wages, and benefits is further set forth in Confidential Exhibit 9.

### 2.    Sections 337(a)(1)(B), 337(a)(2), and Section 337(a)(3)

323.    Corning has made, and continues to make, significant investments in plant and equipment in the United States with respect to the articles protected by the Asserted Patents. Corning's investments in the Manufacturing Facility, described in paragraph 321 above and set out in detail in Confidential Exhibit 9, constitute investments in plant and equipment in the United States with respect to articles protected by the Asserted Patents.  Those investments are significant in the context of the industry and the marketplace, including by comparison to Corning's foreign investments in comparable plant and equipment.  Corning expects that an investigation will reveal additional context reinforcing the significance of its investments in plant and capital, including by comparison to Respondents' own comparable investments.

324.    Corning has employed, and continues to employ, significant labor and capital in the United States with respect to articles protected by the Asserted Patents.  Corning's investments in the Manufacturing Facility and in the Sullivan Park facility, its employees at those facilities, and its U.S.-based sales, marketing and communication staff, described in paragraphs 320 and 321 above and set out in detail in Confidential Exhibit 9, constitute employment of labor and capital in the United States with respect to articles protected by the Asserted Patents.  That employment is significant in the context of the industry and the marketplace, including by comparison to Corning's foreign employment of labor and capital for comparable purposes.  Corning expects that an investigation will reveal additional context

PUBLIC VERSION

reinforcing the significance of its employment of labor and capital, including by comparison to Respondents' own comparable employment.

325.    Corning has invested, and continues to invest, in the exploitation of the Asserted Patents in the United States with respect to the articles protected by the Asserted Patents. Corning's investments at the Sullivan Park facility, described in paragraph 320 above and set out in detail in Confidential Exhibit 9, constitute investments in the exploitation of the Asserted Patents, including research, development, and engineering, in the United States with respect to articles protected by the Asserted Patents.  Those investments are substantial in the context of the industry and the marketplace, including by comparison to Corning's foreign investments in research, development, and engineering.  Sullivan Park's unique role in the creation and advancement of EAGLE XG further reinforces the substantiality of Corning's investments there. Corning expects that an investigation will reveal additional context reinforcing the substantiality of its investments in research, development, and engineering, including by comparison to Respondents' own comparable investments.

## X.    INJURY TO DOMESTIC INDUSTRY

326.    Respondents' misappropriation of Corning's Trade Secrets, and importation into and sale within the United States (after incorporation into downstream consumer products) of products that use the misappropriated Trade Secrets, threatens to substantially injure Corning's industry within the United States connected to its fusion-formed glass substrates.

327.    Corning's scientific advancements in the field of fusion-formed glass have provided it with significant, well-earned competitive advantages.  Corning's cutting-edge engineering and design is a cycle:  the company relies on the competitive advantage provided by its innovations to continue funding the research and development that makes future innovations and products possible.  Respondents are poised to erode that competitive advantage through their

PUBLIC VERSION

misappropriation. By doing so, they threaten Corning's ability to invest in future research, development, and engineering. They also threaten Corning's ability to invest in the plant, equipment, and labor that the Manufacturing Facility uses to make fusion draw machines.

328.    Corning only recently discovered that Irico LCD glass was being used in TVs imported into the United States. Irico has begun to substantially increase manufacturing capacity, which will increase the number of Accused Products entering the U.S. market. Because Irico does not have to recoup decades of research and development costs associated with the fusion draw process, it is able to sell its infringing LCD glass at significantly lower prices than it would if it had made those investments. Irico thereby threatens the resources on which Corning's U.S. research and development industry depends, as well as its investment in plants and equipment and in labor and capital.

329.    Pursuant to 19 U.S.C. § 1337(a)(1)(A)(i), Irico's acts of unfair competition will substantially injure Corning's domestic industry through price erosion, loss of revenue and sales, loss of market share, and harm to the goodwill Corning has built with customers by being a market leader and innovator in the display glass marketplace.

330.    Since its misappropriation of Corning's trade secrets in or around 2007 and 2008, Irico has over time ramped up its production of fusion-formed display glass for sale to makers of flat screen TVs.

331.    Irico has current and ongoing plans to substantially increase its manufacturing capacity. On information and belief, Irico currently has four Generation 6 and nine Generation 8

PUBLIC VERSION

(including Generation 8.5+) fusion draw machines but has already approved plans to add at least 17 additional new Generation 8 (including Generation 8.5+) fusion draw machines.[31]

332.    In its most recent Annual Report issued in April 2024, Irico emphasized to investors its plans for rapidly increasing capacity and taking market share from competitors.  Irico described how the "rapidly expanded industrial scale" of its LCD glass business had "elevated the Company's high-quality development to a new level" and stated that 2023 was "a breakthrough year for the rapid scaling of its glass substrate business."  It noted that "the Company further scaled up its glass substrate business" and that "[t]his solid foundation supports further industry expansion and increases market share."  In describing its future development strategy for its glass substrate business, Irico stated that its "focus will be on scaling up the [Generation 8.5+] glass substrate industry and accelerating new project development."  Ex. 64 at 9-10, 22 (translation of excerpts from Irico 2023 Annual Report).  In its recent Semi-Annual Report issued in August 2024, Irico emphasized that its "glass substrate business continued to focus on rapid capacity expansion."  Ex. 68 at 10 (translation of excerpts from Irico 2024 Semi-Annual Report).

333.    Irico's projected increased capacity will be substantial.  Corning estimates that Irico's current capacity to produce LCD glass is approximately 520 million square feet per year, and that Irico's projected expansion will increase that capacity by approximately 750 million square feet per year, reaching a total of approximately 1,270 million square feet per year.  By comparison, the entire U.S. market for LCD glass for use in televisions is between 980 and 1160

---

[31] In addition, Irico recently reported that it produces Generation 5 and Generation 7.5 glass.  *See* Ex. 68 at 8 (translation of excerpts from Irico 2024 Semi-Annual Report) ("In the glass substrate business, the Company produces various types of a-Si glass substrates for TFT-LCD technology, including G5, G6, G7.5, and G8.5+.").

PUBLIC VERSION

million square feet for year. Thus, Irico would in theory be able to supply the glass needs of the entire U.S. TV market, which is approximately 20% of the entire global market.

334.     Moreover, with its projected increased capacity, Irico plans to sell, and is already selling, more of its glass to panel makers with a larger presence in the U.S. For example, until recently, Irico made most of its sales to CSOT; but recently, it has made more sales to HKC. Sales of HKC panels have recently increased in the U.S., and are expected to increase in the U.S. more in the future.

335.     Competitive intelligence research reveals that Irico can and does undersell Corning. Based on sales data from late 2023, Irico currently undercuts Corning's prices for Generation 8 glass by roughly [████] and Generation 6 glass by roughly [████]. The gap between these prices will continue to widen as Irico achieves greater economies of scale by expanding its production. Unless Corning is able to protect its business by enforcing its intellectual property rights, Irico's increased production and lower prices will foreseeably allow it to capture a significant share of the market for U.S. display glass.

336.     These lower costs are a direct result of Irico's misappropriation and infringement. Irico's costs of building fusion draw machines and producing fusion-formed display glass are significantly lower than Corning's production costs largely because Irico has not invested in the research and development necessary to develop fusion-formed glass without the misappropriation of Corning's trade secrets and infringement of Corning's patents. Other companies have tried and failed to replicate the proprietary processes for fusion-formed glass that Corning invented. For example, Corning's competitor NEG has been producing LCD glass using a variety of methods since the 1970s. But it still took NEG at least until 2000 to successfully develop a working fusion draw machine. NEG then lagged behind Corning in

introducing new generation sizes. Even now the company has far slimmer margins and is not nearly as efficient or advanced as Corning – its glass comes out with far more defects, creating inefficiencies. Corning's developments that eliminated many of these inefficiencies and created a more profitable product were developed through years of testing and research – all from which Irico now unfairly benefits.

337.    The result of Irico's expansion and the import of the Accused Products is and will continue to be harmful to Corning. In just the next few years, Corning projects that it will lose roughly 5% of its market share for U.S. display glass. But that loss is only a small part of the threatened harm. If Irico continues unchecked in its expansion, Corning further projects that it will be forced to lower its own prices to compete with Irico's. If that occurs, the lower prices will affect Corning's margins for EAGLE XG Glass across the board.

338.    In the third quarter of 2024, Corning announced price increases for its display glass, including EAGLE XG. If those price increases hold, Corning expects its income and net margin in U.S. dollars to be stable, supporting continued investment in research, development, engineering, and manufacturing for EAGLE XG and other Display products. If, however, Irico continues with its current plans to expand capacity and imports of the Accused Products, and Corning is forced to lower its prices, Corning's ability to support continued investment will foreseeably decrease.

339.    As Irico continues to grow its production, Corning's situation will continue to worsen. The Trade Secrets can be scaled up for use in larger sizes of glass. Corning continues to use the Trade Secrets in making not only Generation 6 and Generation 8 glass, but also Generation 10 and Generation 10.5 glass. Because Irico's investments in research, development, and engineering are minimal compared to Corning's, it will remain economically viable for Irico

to invest in additional capacity past the point where Corning can match its prices while maintaining any substantial investment in research, development, and engineering at all. In addition, Irico's ability to sell at a discount compared to Corning allows Irico to invest in additional capacity with the confidence that it will be used.

340.    As set forth above, funding for research and development at Corning's Sullivan Park facility is directly tied to its sales of existing products. Corning's research and development budget for a product such as display glass is tied to sales and revenue for that product. When sales for a product have decreased sharply in the past, Corning has been left unable to fund further research and development for that product. Irico's threat to erode Corning's market share and prices and undermine Corning's customer base will foreseeably have similar direct effects on Corning's research, development, and engineering investment in the United States.

341.    Manufacturing and engineering work at the Manufacturing Facility would also be threatened by Corning's lost sales and market share. The Manufacturing Facility's production levels are directly related to the amount of display glass that Corning manufactures. Accordingly, Irico's ability to undermine Corning's sales and market share directly and substantially threatens the Manufacturing Facility, its workforce, and its spending on outside vendors located in the United States. Further, because Corning's production costs from the Manufacturing Facility will remain higher than Irico's production costs for its own machines in the long run, Corning cannot indefinitely maintain its Manufacturing Facility investments without the competitive advantage provided by its Trade Secrets.

342.    Even if Corning were to discontinue its research, development, and engineering and cease development of future glass entirely, it would still be unable to match Irico's prices in the long run while maintaining its plant, equipment, labor, and capital investments in the

Manufacturing Facility.  Corning's key competitive advantage has been not price, but quality –

quality achieved through the Trade Secrets that Irico stole.

## XI.     REQUEST FOR GENERAL EXCLUSION ORDER

343.     Corning requests a general exclusion order under 19 U.S.C. § 1337(d)(2).

Specifically, a general exclusion order "is necessary to prevent circumvention of an exclusion

order limited to products of named persons." 19 U.S.C. § 1337(d)(2)(A).

### A.     A General Exclusion Order Is Necessary To Prevent Circumvention of a Limited Exclusion Order

344.     Irico's unfair acts warrant more than a limited exclusion order.  As demonstrated

below, Irico has the incentives, opportunities, and means to circumvent a limited exclusion order.

And there are particular reasons to expect circumvention of a limited exclusion order: Irico has a

track record of engaging in unfair acts and methods of competition, and then defying the

obligations of the U.S. legal system, including federal court orders, to avoid the consequences.

345.     The high demand for LCD glass in the United States gives Irico and the Chinese

panel makers a strong incentive to find ways to circumvent a limited exclusion order.  According

to data obtained from Omdia, as of the first quarter of 2024, over 56 million panels for LCD TVs

and over 34 million panels for LCD monitors are shipped globally per quarter.  Demand and

revenues for large-area LCD products, including TVs, monitors, notebook and laptop computers,

and tablets, continue to grow.  Omdia reports that global revenue for large-area LCD products

increased 15.4% year-over-year in the first quarter of 2024.  Global shipments of LCD TVs

increased 2% year-over-year and 14.8% from the fourth quarter of 2023.  In 2024, global

shipments of LCD panels for use in TVs and in monitors are projected to increase by 6.2% and

6.0% year-over-year, respectively.  Irico has noted the strong worldwide demand for LCD glass

to investors, reporting that "global TV panel shipments reached 124.4 million units in the first

PUBLIC VERSION

half of 2024, up 1% year-on-year, with shipment area reaching 90.7 million square meters, a 7%

increase." Ex. 68 at 8 (translation of excerpts from Irico 2024 Semi-Annual Report).

346.    The U.S. market accounts for a substantial amount of the worldwide demand for

LCD glass. For example, as of 2023, the U.S. market for LCD TVs makes up approximately

20% of the entire global market for LCD TVs. North America was the largest TV consumption

market in the world in 2023. Irico has strong incentives to maintain access to the U.S. market.

In its 2023 Annual Report, Irico reported that sales of LCD glass substrates and LCD panels

"[o]verseas" accounted for over 8.5 billion RMB in revenue, dwarfing Irico's Chinese domestic

revenue of 2.5 billion RMB. Ex. 64 at 14 (translation of excerpts from Irico 2023 Annual

Report). Irico proclaimed that its "core glass substrate business . . . ranks among the top

internationally." *Id.* at 11. For its LCD panel business, Irico reported that it "strengthened its

collaboration with major global manufacturers, leading to synchronized growth in the

Company's supply share and customer market share" and that Irico's "global customer network

continued to solidify, enhancing its market influence." *Id.* at 9. Among "[k]ey measures to

achieve [its] annual business plan goals," Irico listed "maintain[ing] a robust global customer

system." *Id.* at 23.

347.    Given the high demand for LCD glass and the U.S. share of the global market,

Irico has significant financial and operational incentives to circumvent a limited exclusion order.

Irico emphasized to investors that it continues "to focus on rapid capacity expansion." Ex. 68 at

10 (translation of excerpts from Irico 2024 Semi-Annual Report). As noted above, Corning

estimates that Irico's projected expansion will increase its capacity to approximately 1,270

million square feet per year, which is more than the entire U.S. market for LCD glass for use in

televisions. With such an increase in capacity, Irico will have strong incentives to maintain

PUBLIC VERSION

access to the U.S. market to find sufficient demand to meet its increased supply of LCD glass. Glass making tanks run continuously, 24 hours per day, every day of the year, usually for several years. They cannot be easily turned on and off in response to fluctuating demand.

348.    The Downstream Respondents, especially the panel makers HKC, CHOT, and CSOT, also have an incentive to circumvent a limited exclusion order. As described above, Irico sells its glass at significantly cheaper prices than Corning – by roughly ▆▆▆ for Generation 8 glass and by roughly ▆▆▆ for Generation 6 glass. The Downstream Respondents benefit from Irico's lower prices and will want to continue incorporating Irico glass into their products to make higher profits. The Downstream Respondents that make and sell their products abroad – such as Respondents HKC, CHOT, and CSOT – therefore will have a strong incentive to find and sell to customers not covered by the limited exclusion order.

349.    The Respondents will have numerous avenues to circumvent a limited exclusion order. Irico could circumvent a limited exclusion order by redirecting its sales of LCD glass to different panel makers or for use in different downstream products. Irico has emphasized its ability to gain new customers in its reports to investors, reporting that it "vigorously pursued new customers" for its LCD glass substrate business in 2023 "resulting in continued growth in market share," and that it would continue "actively seeking new clients" in 2024. Ex. 64 at 10, 24 (translation of excerpts from Irico 2023 Annual Report). According to Omdia's supply-chain data, more than a dozen panel makers do not currently purchase LCD glass from Irico. Irico could pursue those companies as new customers to find an alternative pathway to sell its glass for importation into the United States. In turn, those new panel maker customers, or the named panel maker Respondents, could incorporate Irico's glass into new products and sell those products to a range of device manufacturers. Omdia provides data on over 30 different device

PUBLIC VERSION

manufacturers who purchase LCDs panels from panel makers for a variety of electronic devices, including TVs, monitors, notebook and laptop computers, and tablets. The wide range of potential applications for LCD glass, and the numerous manufacturers and sellers that Irico and the Downstream Respondents could turn to for an alternative pathway to sell products containing Irico glass, allow ample opportunity for circumvention of a limited exclusion order.

350. The use of Internet sales would further allow the circumvention of a limited exclusion order. For example, Panelook.com is an e-commerce website that offers various LCD panels for sale direct to consumers, including for use in TVs, monitors, notebook and laptop computers, and tablets. Ex. 75 (Panelook.com "Panel Application Index" webpage). Panelook.com describes itself as a "Global Panel Exchange Center" and advertises that consumers can purchase panels from "1000+ Panel Suppliers" including CHOT, CSOT, and HKC. Ex. 76 (Panelook.com "Why buy panel here" webpage). Panelook.com reports that the website had approximately 94,000 unique visitors from the United States in 2019, the last year for which Panelook.com shows visitor data. Ex. 77 (Panelook.com "Why sell panel here" webpage). LCD panels made by each of the named panel makers – Respondents CHOT, HKC, and CSOT – are advertised for sale to customers in North America on Panelook.com. *See* Exs. 74, 83, 89, 91, 93 (Panelook.com webpages). Other websites, such as e-commerce sites Alibaba.com and Amazon.com, also provide an avenue for selling products containing Irico glass. For example, the representative accused products for panel makers CHOT, CSOT, and HKC are each sold by multiple sellers to U.S. customers on Alibaba.com. *See* Exs. 78, 84, 90, 92, 94. Alibaba.com also includes listings for companies that sell LCD TVs that can be customized with any logo, including on the TV, box, and instruction manual. *See* Ex. 154 (examples from more than 20 suppliers on Alibaba.com).

111

 

351.    Irico glass can easily be incorporated into downstream products of unnamed respondents without detection.  There is no way of identifying the manufacturer of the LCD glass used in a display panel or electronic device simply by surface inspection.  The downstream products and manufacturers do not identify the supplier of the LCD glass used in a panel or device.  For example, none of the representative Accused Products purchased in the United States had any external indication that Irico manufactured the LCD glass used in the device.  Instead, the only practical way to determine whether a particular downstream device contains Irico's LCD glass is by breaking down the device, extracting samples of the glass, performing chemical testing on the glass samples, and comparing the composition of those glass samples to the composition of known samples of Irico's LCD glass.  *See* Ex. 7 (Martin Decl.) ¶¶ 8, 11-21.  That process is difficult, expensive, and time-consuming.

352.    It is similarly challenging to determine which products potentially contain Irico glass and are therefore worth testing in the first place.  If Irico began selling glass to new panel makers, or if Respondents HKC, CHOT, or CSOT began selling display panels made with Irico LCD glass to new device manufacturers or brands, it could take months before those sales are

PUBLIC VERSION

reflected in the supply-chain data. During that time there would be no indication that new downstream products could potentially contain Irico's glass.

353.    As a result, Irico and the Downstream Respondents can evade a limited exclusion order by selling LCD glass to downstream manufacturers who currently do not use Irico glass and therefore cannot be named as Respondents in this investigation. If Irico or a panel maker shifts its sales to a new group of downstream manufacturers, Corning will be forced to pursue costly, repetitive, and time-consuming new Investigations into those downstream entities.

354.    Irico's past conduct suggests it will pursue ways to circumvent a limited exclusion order. As shown by the facts alleged above, Irico has flagrantly and repeatedly violated Corning's intellectual property rights, including by using Corning trade secrets that were stolen by three different sources, by continuing to use those stolen trade secrets for almost two decades, and by blatantly infringing Corning's U.S. patents.

355.    Nor is this the first time that Irico has been accused of violating U.S. law. In *In re Cathode Ray Tube (CRT) Antitrust Litigation*, No. 4:07-cv-05944-JST (N.D. Cal.), Irico has been sued by classes of direct purchasers and indirect purchasers for engaging in a worldwide conspiracy to fix the prices of cathode ray tubes. In that case, the Special Master, a retired federal district judge, recommended that a default judgment be entered against Irico based on its bad faith misconduct in the litigation.[32]

356.    The Special Master stated that "Irico evinced not only contempt for this court, but also defied the basic responsibilities of a civil litigant in the United States." *Id.* at 3. He found that Irico engaged in "repeated and flagrant misrepresentations, delays and obstructions of

—————————————————

[32] *See* Special Master's R. & R. on Pls.' Mot. for Terminating Sanctions at 77-78, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 4:07-cv-05944-JST (N.D. Cal. May 14, 2024) (Dkt. No. 6382).

PUBLIC VERSION

discovery," *id.* at 76, and "violated at least five court orders," *id.* at 56. The Special Master determined that Irico's "ongoing, systematic spoliation of documents, failures to search for relevant documents, misrepresentations to the court, unnecessary and inappropriate delays and repeated violations of court orders . . . rendere[d] a fair trial in this case impossible." *Id.* at 54. In recommending terminating sanctions, the Special Master concluded that "none of the lesser sanctions would suffice to remedy the consequences of Irico's systematic and egregious spoliation, violations of court orders and dilatory and bad faith litigation tactics." *Id.* at 76.

357.    On November 15, 2024, the district court adopted the Special Master's recommendation and imposed terminating sanctions.[33] Among other findings, the district court cited "Irico's wholesale failure to comply with its discovery obligations," *id.* at 32, "egregious bad faith and willful non-compliance with court orders," and "multiple misrepresentations to the Court and to the Special Master in apparent attempts to conceal the truth," *id.* at 31. The district court determined that Irico had "engaged deliberately in deceptive practices that undermine[d] the integrity of judicial proceedings," *id.* at 32, and "purposefully and defiantly violated court orders," *id.* at 35 (cleaned up).

358.    Based on Irico's strong financial incentives to maintain access to the U.S. market and its proven disrespect for orders issued by U.S. courts and bad faith attempts to avoid legal consequences for its conduct, the Commission should expect that Irico will pursue all available opportunities to circumvent a limited exclusion order.

---

[33] *See* Order Adopting Special Master's Recommendation for Terminating Sanctions, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 4:07-cv-05944-JST (N.D. Cal. Nov. 15, 2024) (Dkt. No. 6423).

PUBLIC VERSION

### B.    Additional Relief Requested

#### 1.    Limited Exclusion Order

359.    While Corning requests a general exclusion order and believes such a remedy is necessary to afford it with complete relief and is warranted under relevant law and policy, in the event the Commission determines not to issue such a remedy, Corning requests a limited exclusion order pursuant to 19 U.S.C. § 1337(d), barring from entry into the United States glass substrates for LCDs, and display panels and electronic devices (including TVs, monitors, notebook and laptop computers, and tablets) containing the same, that (i) infringe one or more claims of Corning's Asserted Patents and that are imported into the United States, sold for importation, or sold within the United States after importation by Respondents, their affiliates, parents, subsidiaries, successors, assigns, or any person or entity in privity with the foregoing, or (ii) are made using, use, or otherwise unfairly benefit from the misappropriation of any of the Trade Secrets, and that are imported into the United States or sold by Respondents, their affiliates, parents, subsidiaries, successors, assigns, or any person or entity in privity with the foregoing.

#### 2.    Cease and Desist Order

360.    Corning also requests a cease and desist order under Section 337(f), directing each Respondent and its affiliates, parents, subsidiaries, successors, assigns, or any person or entity in privity with the foregoing, to cease and desist from importing, marketing, advertising, demonstrating, warehousing inventory for distribution, offering for sale, selling, distributing, repairing, servicing, testing, licensing, or using glass substrates for LCDs, and display panels and electronic devices (including TVs, monitors, notebook and laptop computers, and tablets) containing the same, that (i) infringe or induce infringement of, one or more claims of Corning's

PUBLIC VERSION

Asserted Patents or (ii) are made using, use, or otherwise unfairly benefit from the misappropriation of any of the Trade Secrets.

## XII.    RELIEF REQUESTED

361.    WHEREFORE, by reason of the foregoing, Complainant Corning respectfully requests that the United States International Trade Commission:

(a)    Institute an immediate investigation, pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, with respect to violations of Section 337 based upon the importation, sale for importation, or sale after importation into the United States of any glass substrates for LCDs, and display panels and electronic devices (including TVs, monitors, notebook and laptop computers, and tablets) containing the same, or manufactured using methods for manufacturing the same that (i) infringe or induce infringement of, one or more claims of Corning's Asserted Patents or (ii) are made using, use, or otherwise unfairly benefit from the misappropriation of any of the Trade Secrets.

(b)    Schedule and conduct a hearing on said unlawful acts and, following said hearing;

(c)    Determine that the proposed Respondents have violated Section 337;

(d)    Issue a general exclusion order, or in the alternative a limited exclusion order specifically directed to Respondents and their affiliates, parents, subsidiaries, successors, assigns, and any person or entity in privity with the foregoing, pursuant to 19 U.S.C. § 1337(d), barring from entry into the United States any glass substrates for LCDs, and display panels and electronic devices (including TVs, monitors, notebook and laptop computers, and tablets) containing the same, or manufactured using methods for manufacturing the same (i) that infringe, literally or under the doctrine of equivalents, one or more claims of the Asserted Patents or (ii) that are made with or using the Trade Secrets.

**PUBLIC VERSION**

(e)    Issue a cease and desist order, pursuant to 19 U.S.C. § 1337(f), directing each Respondent and its affiliates, parents, subsidiaries, successors, assigns, and any person or entity in privity with the foregoing, to cease and desist from importing, marketing, advertising, demonstrating, warehousing inventory for distribution, offering for sale, selling, distributing, repairing, servicing, testing, licensing, or using any glass substrates for LCDs, and display panels and electronic devices (including TVs, monitors, notebook and laptop computers, and tablets) containing the same, that (i) infringe or induce infringement of, one or more claims of Corning's Asserted Patents or (ii) are made using, use, or otherwise unfairly benefit from the misappropriation of any of the Trade Secrets.

(f)    Impose a bond on importation and sales of infringing products during the 60-day Presidential review period pursuant to 19 U.S.C. § 1337(j); and

(g)    Grant such other and further relief as the Commission deems just and proper based on the facts determined by this Investigation and the authority of the Commission.

Date:  December 18, 2024

Respectfully submitted,

John Thorne
Evan T. Leo
Gregory G. Rapawy
Joseph S. Hall
Thomas W. Traxler
Jacob E. Hartman
Bethan R. Jones
Hannah D.C. DePalo
Ashle J. Holman
Daren G. Zhang
Kyle C. Bailey
Shunhe Wang
Jahvonta A. Mason
KELLOGG, HANSEN, TODD, FIGEL &
     FREDERICK, P.L.L.C.
1615 M Street NW
Suite 400
Washington, DC 20036
Tel.: (202) 326-7900
Email: CORNINGITC@lists.kellogghansen.com

Christine E. Lehman
REICHMAN JORGENSEN LEHMAN &
     FELDBERG LLP
1909 K Street, NW
Suite 800
Washington, DC 20036
Tel.: (202) 894-7310
Email: CORNINGITC@lists.kellogghansen.com

*Counsel for Complainant Corning Incorporated*

## VERIFICATION OF COMPLAINT

I, Christopher S. Hudson, declare in accordance with 19 C.F.R. §§ 210.4 and 210.12(a), under penalty of perjury, that the following statements are true:

1.     I am the International Vice President and General Manager, Display Technologies of Corning Incorporated and am duly authorized to verify the foregoing Complaint on behalf of Corning Incorporated.

2.     To the best of my knowledge, information, and belief, formed after a reasonable inquiry, the allegations and other factual contentions of the Complaint have evidentiary support, or, where specifically identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery, or have been assembled by authorized employees and counsel, and I am informed that the facts stated therein are true.

3.     To the best of my knowledge, information, and belief, formed after a reasonable inquiry, the claims and other legal contentions set forth in the Complaint are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law, or by the establishment of new law.

4.     To the best of my knowledge, information, and belief, formed after a reasonable inquiry, the foregoing Complaint is not being filed for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Christopher S. Hudson

# ATTACHMENT C2

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215

(202) 326-7900

FACSIMILE:
(202) 326-7999

January 7, 2025

*Via Electronic Filing*

The Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, D.C. 20436

     Re:    *Certain Glass Substrates for Liquid Crystal Displays, Products Containing the Same, and Methods for Manufacturing the Same*, Docket No. 337-TA-3795

Dear Secretary Barton:

On December 18, 2024, we filed a Complaint on behalf of Complainant Corning Incorporated, pursuant to Section 337 of the Tariff Act of 1930, as amended, in the above-referenced action.

In response to a request from the Office of Unfair Import Investigations, Corning hereby supplements the following paragraph of the Complaint as follows, with new text shown (for purposes of this letter only) in underline:

    27.    Pursuant to Commission Rule 210.12(a)(12), the technology at issue and the products at issue are glass substrates for LCDs, ~~and~~ display panels <u>containing the same,</u> and electronic devices containing the same, ~~including~~ <u>which are</u> TVs, monitors, notebook and laptop computers, and tablets (collectively, the 'Accused Products'). The scope of this Investigation covers glass substrates for LCDs, ~~and~~ display panels <u>containing the same,</u> and electronic devices containing the same, ~~including~~ <u>which are</u> TVs, monitors, notebook and laptop computers, and tablets, and methods for manufacturing the same.

Pursuant to Rules 210.12(j) and 210.12(a)(5), Corning hereby provides the following supplemental information regarding related litigation:

On December 19, 2024, Corning filed a complaint against Caihong Display Devices Co., Ltd., Xianyang Caihong Optoelectronics Technology Co., Ltd., HKC Corporation Ltd., HKC Overseas Ltd., and TCL China Star Optoelectronics Technology Co., Ltd., in the U.S. District

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

The Honorable Lisa R. Barton
January 7, 2025
Page 2

Court for the Eastern District of Virginia. *See Corning Incorporated v. Caihong Display Devices Co., Ltd.*, No. 1:24-cv-02328 (E.D. Va.). In the complaint, Corning asserts a claim against the defendants under the Defend Trade Secrets Act, 18 U.S.C. § 1836, based on the defendants' misappropriation of Corning's trade secrets in the PicVue and SCP files. Corning also asserts patent infringement claims against the defendants under 35 U.S.C. § 271 based on their infringement of Corning's '394, '684, and '025 patents. This lawsuit is still pending.

On December 18, 2024, Corning filed a complaint against Hisense Gorenje Germany GmbH, Hisense Europe Holding GmbH, TCL Deutschland GmbH & Co. KG, TCL Deutschland Verwaltungs GmbH, TCL Operations Polska Sp. z. o. o., TCL Belgium, SA, LG Electronics Deutschland GmbH, LG Electronics European Shared Service Center B.V., and LG Electronics European Holding B.V., in the Court of First Instance of the Unified Patent Court, Local Division Mannheim, Germany. *See Corning Incorporated v. Hisense et al.*, ACT_66848/2024 UPC_CFI_819/2024. Corning asserts patent infringement claims against the defendants based on their infringement of Corning's European Patent No. 3 296 274. This lawsuit is still pending.

On December 18, 2024, Corning filed a complaint against Caihong Display Devices Co., Ltd., d/b/a Irico Display Devices Co., Ltd., Xianyang CaiHong Optoelectronics Technology Co., Ltd., HKC Corporation Ltd., HKC Overseas Ltd., and TCL China Star Optoelectronics Technology Co., Ltd., in the Court of First Instance of the Unified Patent Court, Local Division Mannheim, Germany. *See Corning Incorporated v. Irico et al.*, ACT_66849/2024 UPC_CFI_820/2024. Corning asserts patent infringement claims against the defendants based on their infringement of Corning's European Patent No. 3 296 274. This lawsuit is still pending.

Complainant confirms that it will serve copies of the supplement of the Verified Complaint upon the institution of this investigation on the proposed Respondents and all other appropriate entities consistent with 19 C.F.R. part 201 (including 19 C.F.R. § 201.16) and the Temporary Procedures.

Thank you for your attention to this matter. Please contact me should you have any questions concerning this submission.

Respectfully submitted,

/s/ *John Thorne*

John Thorne

# ATTACHMENT D

UNITED STATES INTERNATIONAL TRADE COMMISSION

Washington, D.C.

In the Matter of

**CERTAIN GLASS SUBSTRATES FOR
LIQUID CRYSTAL DISPLAYS,
PRODUCTS CONTAINING THE SAME,
AND METHODS FOR MANUFACTURING
THE SAME**

Inv. No.  337-TA-1433

**ORDER NO. 1:        PROTECTIVE ORDER**

(January 23, 2025)

WHEREAS, documents and information may be sought, produced or exhibited by and among the parties to the above captioned proceeding, which materials relate to trade secrets or other confidential research, development or commercial information, as such terms are used in the Commission's Rules, 19 C.F.R. § 210.5;

IT IS HEREBY ORDERED THAT:

1.  Confidential business information is information which concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the production, sales, shipments, purchases, transfers, identification of customers, inventories, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or other organization, or other information of commercial value, the disclosure of which is likely to have the effect of either (i) impairing the Commission's ability to obtain such information as is necessary to perform its statutory functions; or (ii) causing substantial harm to the competitive position of the person, firm, partnership, corporation, or other organization from which the information was obtained, unless the Commission is required by law to disclose such

information. The term "confidential business information" includes "proprietary information" within the meaning of section 777(b) of the Tariff Act of 1930 (19 U.S.C. § 1677f(b)).

2(a). Any information submitted, in prehearing discovery or in a pleading, motion, or response to a motion either voluntarily or pursuant to order, in this investigation, which is asserted by a supplier to contain or constitute confidential business information shall be so designated by such supplier in writing, or orally at a deposition, conference or hearing, and shall be segregated from other information being submitted. Documents shall be clearly and prominently marked on their face with the legend: "CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER," or a comparable notice. Such information, whether submitted in writing or in oral testimony, shall be treated in accordance with the terms of this protective order.

(b). The Administrative Law Judge or the Commission may determine that information alleged to be confidential is not confidential, or that its disclosure is necessary for the proper disposition of the proceeding, before, during or after the close of a hearing herein. If such a determination is made by the Administrative Law Judge or the Commission, opportunity shall be provided to the supplier of such information to argue its confidentiality prior to the time of such ruling.

3. In the absence of written permission from the supplier or an order by the Commission or the Administrative Law Judge, any confidential documents or business information submitted in accordance with the provisions of paragraph 2 above shall not be disclosed to any person other than: (i) outside counsel for parties to this investigation, including necessary secretarial and support personnel assisting such counsel; (ii) qualified persons taking testimony involving such documents or information and necessary stenographic and clerical personnel thereof; (iii)

- 2 -

technical experts and their staff who are employed for the purposes of this litigation (unless they are otherwise employed by, consultants to, or otherwise affiliated with a non-governmental party, or are employees of any domestic or foreign manufacturer, wholesaler, retailer, or distributor of the products, devices or component parts which are the subject of this investigation); (iv) the Commission, the Administrative Law Judge, the Commission staff, and personnel of any governmental agency as authorized by the Commission; (v) the Commission, its employees and Offices, and contract personnel (a) for developing or maintaining the records of this investigation or related proceedings, or (b) in internal investigations, audits, reviews, evaluations relating to the programs, personnel, and operations of the Commission including under to 5 U.S.C. Appendix 3; and (vi) U.S. government employees and contract personnel, solely for cybersecurity purposes.[1]

4. Confidential business information submitted in accordance with the provisions of paragraph 2 above shall not be made available to any person designated in paragraph 3(i)[2] and (iii) unless he or she shall have first read this order and shall have agreed, by letter filed with the Secretary of this Commission: (i) to be bound by the terms thereof; (ii) not to reveal such confidential business information to anyone other than another person designated in paragraph 3; and (iii) to utilize such confidential business information solely for purposes of this investigation. The letter shall also include the following acknowledgement:

> I, the undersigned, on behalf of _____, acknowledge that information submitted for purposes of this Investigation may be disclosed to and used:
>
> (i) by the Commission, its employees and Offices, and contract personnel (a) for developing or maintaining the records of this or a related proceeding, or (b) in

---

[1] *See* Commission Administrative Order 16-01 (Nov. 7, 2015).
[2] Necessary secretarial and support personnel assisting counsel need not sign onto the protective order themselves because they are covered by counsel's signing onto the protective order.

internal investigations, audits, reviews, and evaluations relating to the programs, personnel, and operations of the Commission including under 5 U.S.C. Appendix 3; or

(ii) by U.S. government employees and contract personnel, solely for cybersecurity purposes. I understand that all contract personnel will sign appropriate nondisclosure agreements.

5.  If the Commission or the Administrative Law Judge orders, or if the supplier and all parties to the investigation agree, that access to, or dissemination of information submitted as confidential business information shall be made to persons not included in paragraph 3 above, such matter shall only be accessible to, or disseminated to, such persons based upon the conditions pertaining to, and obligations arising from this order, and such persons shall be considered subject to it, unless the Commission or the Administrative Law Judge finds that the information is not confidential business information as defined in paragraph 1 thereof.

6.    (a). Any confidential business information submitted to the Commission or the Administrative Law Judge in connection with a motion or other proceeding within the purview of this investigation shall be submitted under seal pursuant to paragraph 2 above.  Any portion of a transcript in connection with this investigation containing any confidential business information submitted pursuant to paragraph 2 above shall be bound separately and filed under seal.  When any confidential business information submitted in accordance with paragraph 2 above is included in an authorized transcript of a deposition or exhibits thereto, arrangements shall be made with the court reporter taking the deposition to bind such confidential portions and separately label them "CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER."  Before a court reporter or translator receives any such information, he or she shall have first read this order and shall have agreed in writing to be bound by the terms thereof.  Alternatively, he or she shall sign the agreement included as Attachment A hereto.

- 4 -

Copies of each such signed agreement shall be provided to the supplier of such confidential business information and the Secretary of the Commission.

(b).    Submitters[3] are strongly encouraged to encrypt nonpublic documents that are electronically transmitted to the Commission to protect your sensitive information from unauthorized disclosure. The USITC secure drop-box system and the Electronic Document Information System (EDIS) use Federal Information Processing Standards (FIPS) 140-2 cryptographic algorithms to encrypt data in transit. Submitting your nonpublic documents by a means that does not use these encryption algorithms (such as by email) may subject your firm's nonpublic information to unauthorized disclosure during transmission. If you choose a non-encrypted method of electronic transmission, the Commission warns you that the risk of such possible unauthorized disclosure is assumed by you and not by the Commission.

7.    The restrictions upon, and obligations accruing to, persons who become subject to this order shall not apply to any information submitted in accordance with paragraph 2 above to which the person asserting the confidential status thereof agrees in writing, or the Commission or the Administrative Law Judge rules, after an opportunity for hearing, was publicly known at the time it was supplied to the receiving party or has since become publicly known through no fault of the receiving party.

8.    The Commission, the Administrative Law Judge, and the Commission investigative attorney acknowledge that any document or information submitted as confidential business information pursuant to paragraph 2 above is to be treated as such within the meaning of 5 U.S.C. § 552(b)(4) and 18 U.S.C. § 1905, subject to a contrary ruling, after hearing, by the

---

[3] "Submitters" of confidential business information are the same as "suppliers" of confidential business information as that term is used in the context of this order.  *See* Commission Administrative Order 16-01 (Nov. 7, 2015).

- 5 -

Commission or its Freedom of Information Act Officer, or the Administrative Law Judge. When such information is made part of a pleading or is offered into the evidentiary record, the data set forth in 19 C.F.R. § 201.6 must be provided except during the time that the proceeding is pending before the Administrative Law Judge. During that time, the party offering the confidential business information must, upon request, provide a statement as to the claimed basis for its confidentiality.

9. Unless a designation of confidentiality has been withdrawn, or a determination has been made by the Commission or the Administrative Law Judge that information designated as confidential, is no longer confidential, the Commission, the Administrative Law Judge, and the Commission investigative attorney shall take all necessary and proper steps to preserve the confidentiality of, and to protect each supplier's rights with respect to, any confidential business information designated by the supplier in accordance with paragraph 2 above, including, without limitation: (a) notifying the supplier promptly of (i) any inquiry or request by anyone for the substance of or access to such confidential business information, other than those authorized pursuant to this order, under the Freedom of Information Act, as amended (5 U.S.C. § 552) and (ii) any proposal to redesignate or make public any such confidential business information; and (b) providing the supplier at least seven days after receipt of such inquiry or request within which to take action before the Commission, its Freedom of Information Act Officer, or the Administrative Law Judge, or otherwise to preserve the confidentiality of and to protect its rights in, and to, such confidential business information.

10. If while an investigation is before the Administrative Law Judge, a party to this order who is to be a recipient of any business information designated as confidential and submitted in accordance with paragraph 2 disagrees with respect to such a designation, in full or in part, it

- 6 -

shall notify the supplier in writing, and they will thereupon confer as to the status of the subject information proffered within the context of this order. If prior to, or at the time of such a conference, the supplier withdraws its designation of such information as being subject to this order, but nonetheless submits such information for purposes of the investigation; such supplier shall express the withdrawal, in writing, and serve such withdrawal upon all parties and the Administrative Law Judge. If the recipient and supplier are unable to concur upon the status of the subject information submitted as confidential business information within ten days from the date of notification of such disagreement, any party to this order may raise the issue of the designation of such a status to the Administrative Law Judge who will rule upon the matter. The Administrative Law Judge may sua sponte question the designation of the confidential status of any information and, after opportunity for hearing, may remove the confidentiality designation.

11. No less than 10 days (or any other period of time designated by the Administrative Law Judge) prior to the initial disclosure to a proposed expert of any confidential information submitted in accordance with paragraph 2, the party proposing to use such expert shall submit in writing the name of such proposed expert and his or her educational and detailed employment history to the supplier. If the supplier objects to the disclosure of such confidential business information to such proposed expert as inconsistent with the language or intent of this order or on other grounds, it shall notify the recipient in writing of its objection and the grounds therefore prior to the initial disclosure. If the dispute is not resolved on an informal basis within ten days of receipt of such notice of objections, the supplier shall submit immediately each objection to the Administrative Law Judge for a ruling. If the investigation is before the Commission the matter shall be submitted to the Commission for resolution. The submission of such confidential business information to such proposed expert shall be withheld pending the ruling of the

- 7 -

Commission or the Administrative Law Judge. The terms of this paragraph shall be inapplicable to experts within the Commission or to experts from other governmental agencies who are consulted with or used by the Commission.

12. If confidential business information submitted in accordance with paragraph 2 is disclosed to any person other than in the manner authorized by this protective order, the party responsible for the disclosure must immediately bring all pertinent facts relating to such disclosure to the attention of the supplier and the Administrative Law Judge and, without prejudice to other rights and remedies of the supplier, make every effort to prevent further disclosure by it or by the person who was the recipient of such information.

13. Nothing in this order shall abridge the right of any person to seek judicial review or to pursue other appropriate judicial action with respect to any ruling made by the Commission, its Freedom of Information Act Officer, or the Administrative Law Judge concerning the issue of the status of confidential business information.

14. Upon final termination of this investigation, each recipient of confidential business information that is subject to this order shall assemble and return to the supplier all items containing such information submitted in accordance with paragraph 2 above, including all copies of such matter which may have been made. Alternatively, the parties subject to this order may, with the written consent of the supplier, destroy all items containing confidential business information and certify to the supplier (or his counsel) that such destruction has taken place. This paragraph shall not apply to the Commission, including its investigative attorney, and the Administrative Law Judge, which shall retain such material pursuant to statutory requirements and for other recordkeeping purposes, but may destroy such material (including electronic media containing such information) in its possession which it regards as surplusage.

Notwithstanding the above paragraph, confidential business information may be transmitted to a district court pursuant to Commission Rule 210.5(c).

15.   If any confidential business information which is supplied in accordance with paragraph 2 above is supplied by a nonparty to this investigation, such a nonparty shall be considered a "supplier" as that term is used in the context of this order.

16.   Each nonparty supplier shall be provided a copy of this order by the party seeking information from said supplier.

17.   The Secretary shall serve a copy of this order upon all parties.

Monica Bhattacharyya
Administrative Law Judge

Attachment A

NONDISCLOSURE AGREEMENT FOR REPORTER/STENOGRAPHER/TRANSLATOR

I, _____, do solemnly swear or affirm that I will not divulge

any information communicated to me in any confidential portion of the investigation or hearing

in the matter of *Certain_____,* Investigation No. 337-TA-___, except as permitted in the

protective order issued in this case.  I will not directly or indirectly use, or allow the use of such

information for any purpose other than that directly associated with my official duties in this

case.

Further, I will not by direct action, discussion, recommendation, or suggestion to any

person reveal the nature or content of any information communicated during any confidential

portion of the investigation or hearing in this case.

I also affirm that I do not hold any position or official relationship with any of the

participants in said investigation.

I am aware that the unauthorized use or conveyance of information as specified above is

a violation of the Federal Criminal Code and punishable by a fine of up to $10,000,

imprisonment of up to ten (10) years, or both.

Signed _____

Dated _____

Firm or affiliation _____

**CERTAIN GLASS SUBSTRATES FOR LIQUID CRYSTAL DISPLAYS, PRODUCTS CONTAINING THE SAME, AND METHODS FOR MANUFACTURING THE SAME**                    Inv. No. 337-TA-1433

## PUBLIC CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **ORDER** has been served via EDIS upon the Commission Investigative Attorney, **WHITNEY WINSTON, Esq.,** and the following parties as indicated, on **January 23, 2025**.

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC  20436

**On Behalf of Complainant Corning Incorporated:**

| | |
|---|---|
| John Thorne, Esq. | ☐ Via Hand Delivery |
| **KELLOGG, HANSEN, TODD, FIGEL &** | ☐ Via Express Delivery |
| **FREDERICK, P.L.L.C.** | ☐ Via First Class Mail |
| 1615 M Street, NW, Suite 400 | ☒ Other: Email Notification |
| Washington, DC 20036 | |
| Email:  jthorne@kelloghansen.com | |

**On Behalf of Respondents Caihong Display Devices Co., Ltd. and Xianyang CaiHong Optoelectronics Technology Co., Ltd.:**

| | |
|---|---|
| Paul F. Brinkman, P.C. | ☐ Via Hand Delivery |
| **KIRKLAND & ELLIS LLP** | ☐ Via Express Delivery |
| 1301 Pennsylvania Avenue, N.W. | ☐ Via First Class Mail |
| Washington, DC 20004 | ☒ Other: Email Notification |
| Email:  paul.brinkman@kirkland.com | |

**On Behalf of Respondent LG Electronics U.S.A., Inc. and VIZIO, Inc.:**

| | |
|---|---|
| Lisa M. Kattan, Esq. | ☐ Via Hand Delivery |
| **BAKER BOTTS L.L.P.** | ☐ Via Express Delivery |
| 700 K Street, NW | ☐ Via First Class Mail |
| Washington, DC 20001 | ☒ Other: Email Notification |
| Email:  Lisa.Kattan@BakerBotts.com | |

**CERTAIN GLASS SUBSTRATES FOR LIQUID CRYSTAL DISPLAYS, PRODUCTS CONTAINING THE SAME, AND METHODS FOR MANUFACTURING THE SAME**

Inv. No. 337-TA-1433

Certificate of Service – Page 2

**Respondents:**

Hisense USA Corporation
7310 McGinnis Ferry Road
Suwanee, GA 30024

☐ Via Hand Delivery
☐ Via Express Delivery
☒ Via First Class Mail
☐ Other: Service to Be
Completed by Complainant

HKC Corporation Ltd.
HKC Industrial Park
1 Gongye 2nd Road
Shilong Community, Shiyan Street
Baoan District, Shenzhen City
Guangdong Province, 518108, China

☐ Via Hand Delivery
☐ Via Express Delivery
☒ Via First Class Mail
☐ Other: Service to Be
Completed by Complainant

HKC Overseas Ltd.
Unit 8 28/F W50
50 Wong Chuk Hang Road
Hong Kong 999077

☐ Via Hand Delivery
☐ Via Express Delivery
☒ Via First Class Mail
☐ Other: Service to Be
Completed by Complainant

TCL China Star Optoelectronics
Technology Co., Ltd.
9-2 Tangming Avenue
Guangming New District, Shenzhen City
Guangdong Province, 518132, China

☐ Via Hand Delivery
☐ Via Express Delivery
☒ Via First Class Mail
☐ Other: Service to Be
Completed by Complainant

TTE Technology, Inc.,
d/b/a TCL North America
189 Technology Drive
Irvine, CA 92618

☐ Via Hand Delivery
☐ Via Express Delivery
☒ Via First Class Mail
☐ Other: Service to Be
Completed by Complainant

# ATTACHMENT E

UNITED STATES INTERNATIONAL TRADE COMMISSION

Washington, D.C.

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN GLASS SUBSTRATES FOR LIQUID CRYSTAL DISPLAYS, PRODUCTS CONTAINING THE SAME, AND METHODS FOR MANUFACTURING THE SAME** | Inv. No.  337-TA-1433 |

**ORDER NO. 2:**          **GROUND RULES**

(January 23, 2025)

The conduct of this investigation before the Administrative Law Judge shall be governed by the Commission Rules and the Ground Rules attached hereto.

**SO ORDERED.**

Monica Bhattacharyya
Administrative Law Judge

## GROUND RULES FOR SECTION 337 INVESTIGATIONS

These Ground Rules supplement the Commission's Rules of Practice and Procedure, 19 C.F.R. Parts 201 and 210 ("Commission Rules"), in order to aid the Administrative Law Judge in the orderly conduct of the section 337 investigation pursuant to the Administrative Procedure Act, 5 U.S.C. § 556(c).

Certain of these Ground Rules (*e.g.,* Ground Rules 5 and 6, and Appendix B) only apply to U.S. patent-based investigations pursuant to section 337(a)(1)(B). In the case of an investigation based upon unfair methods of competition and unfair acts pursuant to section 337(a)(1)(A) or a registered copyright, registered trademark, or registered mask work pursuant to section 337(a)(1)(B), (C) or (D), additional Ground Rules may govern. In addition, in a case involving an early initial determination pursuant to Commission Rule 210.10(b)(3) or a motion for temporary relief pursuant to section 337(e), additional Ground Rules may also govern.

In case of any conflict between these Ground Rules and any subsequent order issued by the Administrative Law Judge or the Commission in this Investigation, the subsequent order shall control.

## Table of Contents

1.    Address; Requirements for Filing, Service, and Copies; Time ................................................1
    1.1    Address of the Administrative Law Judge ....................................................1
    1.2    Filings and Submissions ...............................................................................1
    1.3    Service Copy Requirements .........................................................................1
    1.4    Concurrent Service ......................................................................................2
    1.5    Service on Unrepresented Parties ...............................................................2
    1.6    Computation of Time ...................................................................................2
    1.7    Request for Extension of Time .....................................................................2
    1.8    Confidential Submissions ............................................................................3
    1.9    Public Versions of Confidential Orders .......................................................3
    1.10    Style Guide; Citations ................................................................................3
    1.11    Courtesy Copies of Patents and File Histories ..........................................4
2.    Procedural Schedule ..........................................................................................................4
3.    Motions; Deadlines for Responses ....................................................................................6
    3.1    Contents; In General ...................................................................................6
    3.2    Contents; Certification ................................................................................6
    3.3    Motions for Summary Determination and Responses Thereto ....................7
    3.4    Discovery-Related Motions ..........................................................................7
    3.5    Deadline for Filing Response to Motion .....................................................8
    3.6    Request for Shortened Time to Respond to Motion ....................................8
    3.7    Reply Briefs .................................................................................................8
    3.8    No Motion Stops Discovery Except Motion to Quash Subpoena ................8
4.    Discovery ...........................................................................................................................9
    4.1    Resolution of Disputes; Coordinated Discovery ........................................9
        4.1.1    Discovery Committee ....................................................................9
    4.2    Stipulations Regarding Discovery Procedure .............................................9
    4.3    Service of Discovery Requests and Responses ............................................9
    4.4    Discovery Requests, Responses and Objections ........................................10
        4.4.1    Depositions; Notice ....................................................................10
        4.4.2    Contention Interrogatories ..........................................................10
        4.4.3    Discovery Cutoff and Completion ..............................................10
    4.5    Subpoenas ...................................................................................................11
        4.5.1    Issuance and Service ...................................................................11
        4.5.2    Motion to Quash Subpoena; Deadline ........................................11
        4.5.3    Subpoenas *Ad Testificandum* for Hearings ..............................12
    4.6    Bates Numbering ........................................................................................12
    4.7    Translations ...............................................................................................12
    4.8    Privileged Matter ......................................................................................12
        4.8.1    Claiming Privilege .....................................................................12
        4.8.2    Motions to Compel Production of Privileged Matter ..................13
        4.8.3    Timing of Privilege Claims .........................................................13
5.    Notice of Prior Art ...........................................................................................................13

6.     Claim Construction Proceedings..........................................................................14
     6.1    Terms Requiring Construction and Submission of Joint Claim ...................14
         Construction Chart.......................................................................................14
     6.2    Claim Construction Briefing ........................................................................15
     6.3    Claim Construction Hearing Procedure and Post-Hearing Claim
     Construction Chart.....................................................................................................15
     6.4    Technology Stipulation and Technology Tutorial .......................................15
7.     Expert Witnesses and Reports .........................................................................16
     7.1    Motions to Strike Expert Disclosure ...........................................................16
8.     Settlement/Mediation .......................................................................................17
9.     Pre-hearing Filings and Submissions..............................................................17
     9.1    Pre-hearing Statement ..................................................................................17
     9.2    Pre-hearing Brief ..........................................................................................17
     9.3    High Priority Objections...............................................................................18
     9.4    Motions *in Limine* .......................................................................................18
     9.5    Exhibits..........................................................................................................19
         9.5.1   Exhibit Lists....................................................................................19
         9.5.2   Numbering and Labeling of Exhibits..............................................19
         9.5.3   Inclusion on Exhibit List.................................................................20
         9.5.4   Sponsoring Witness .........................................................................20
         9.5.5   Foreign Language Exhibits ..............................................................21
         9.5.6   Authenticity.....................................................................................21
         9.5.7   Exchange of Proposed Exhibits Among Parties .............................21
         9.5.8   Service of Proposed Exhibits Upon the Administrative Law Judge...22
10.    Hearing - Evidence and Exhibits.....................................................................22
     10.1   Material To Be Received Into Evidence ......................................................22
         10.1.1  Admission of Exhibits Into Evidence ............................................22
     10.2   Witness Testimony ........................................................................................22
         10.2.1  Deposition Testimony in Lieu of Live Testimony. ........................23
         10.2.2  Witness Exhibits.............................................................................23
11.    Hearing Procedure ...........................................................................................24
     11.1   Hearing; Order of Examination ...................................................................24
     11.2   Closing Argument .........................................................................................24
     11.3   Hearing Hours...............................................................................................24
     11.4   WebEx Procedures.........................................................................................24
     11.5   Trial Decorum ..............................................................................................25
     11.6   Examination of Witnesses.............................................................................25
         11.6.1  Scope of Examination; In General ................................................25
         11.6.2  Coordination of Witnesses.............................................................26
         11.6.3  Scope of Expert Witness Testimony...............................................26
         11.6.4  Coordination of Respondents' Cross-examination ........................26
         11.6.5  Use of Translators..........................................................................26
         11.6.6  Conferring with Witness during a Break in Testimony ..................26
         11.6.7  Sequestration of Witnesses ............................................................27

     11.6.8   Submission of Updated Schedule of Estimated Time and Date of Witnesses ............................................................................................27

11.7   Time-Keeping ..............................................................................................27

11.8   Close of Hearing Procedures ...................................................................27

     11.8.1   Physical Exhibits ...........................................................................27

     11.8.2   Corrections to Transcripts ...........................................................27

12.   Submission of Final Exhibit Lists and Final Exhibits ....................................27

12.1   Final Exhibit List .......................................................................................28

12.2   Administrative Law Judge's Electronic Copy .........................................28

12.3   Physical Exhibits ........................................................................................28

12.4   Commission's Copy....................................................................................28

     12.4.1  Native Files ....................................................................................29

12.5   Exhibit Set for the Office of General Counsel........................................29

13.   Post-hearing Briefs ..............................................................................................29

13.1   Initial Post-hearing Briefs; Filing and Content ....................................29

13.2   Post-hearing Reply Briefs; Filing and Content......................................30

13.3   Citations to Evidence ................................................................................30

13.4   Citations to Pre-hearing Briefs................................................................31

13.5   Citation to Demonstrative Exhibits ........................................................31

14.   NEXT Advocates Program................................................................................31

15.   Cooperation Among Parties .............................................................................30

16.   *Ex Parte* Contacts .............................................................................................32

## JUDGE BHATTACHARYYA'S GROUND RULES[1]

1.      Address; Requirements for Filing, Service, and Copies; Time

### 1.1    Address of the Administrative Law Judge

The Administrative Law Judge's address is as follows:

> The Honorable Monica Bhattacharyya
> U.S. International Trade Commission
> 500 E Street, S.W., Room 317
> Washington, D.C. 20436

The Administrative Law Judge may be contacted through her chambers by email to Bhattacharyya337@usitc.gov.

### 1.2    Filings and Submissions

All submissions shall be filed with the Office of the Secretary of the Commission in accordance with Commission Rule 210.4(f), unless otherwise specifically provided for in these Ground Rules or by order of the Administrative Law Judge.

### 1.3    Service Copy Requirements

In accordance with the requirements of Commission Rules 210.4(i), copies of each submission shall be served on all other parties, including the Commission Investigative Staff. On the same day that the submission is filed, an electronic copy in Word or PDF format shall be sent by email to Bhattacharyya337@usitc.gov. For any motion or brief longer than five pages, the electronic service shall include a Word format version of the motion, brief and/or memorandum. Electronic copies of exhibits shall be in PDF form and shall be bookmarked to indicate each separate exhibit.

Regardless of the requirements stated in the Electronic Document Information System (EDIS) briefs, for *Markman* briefs, summary determination briefs, pre-hearing briefs, and post-hearing briefs, the parties shall serve a paper copy on the Administrative Law Judge within one business day of the filing. These paper copies should be double-sided, and they should be delivered to the address specified in Ground Rule 1.1.

---

[1] Revised September 25, 2024.

### 1.4    Concurrent Service

Service on opposing counsel may be by hand, by e-mail, or by overnight courier. Parties are encouraged to agree upon a method of service so that the parties will receive all submissions at the same time the submissions are received by the Commission.

### 1.5    Service on Unrepresented Parties

Pursuant to Commission Rules 201.16(a) and 210.7(a)(1), Complainant(s) shall complete service of any public documents in this investigation originating within the Commission (*e.g.*, orders and determinations issued by the Administrative Law Judge, or filings of the Office of Unfair Import Investigations (OUII)) upon all non-defaulted parties for whom there is no known method of electronic service. Complainants shall also complete service of any OUII discovery requests upon such parties in coordination with the Commission Investigative Attorney. **This requirement does not apply to confidential documents**, and Complainant(s) shall **not** serve the confidential version of any document originating within the Commission in this investigation upon any party.

### 1.6    Computation of Time

The first day of the ten (10) calendar days for responding to a motion received by the Administrative Law Judge shall be the first business day following the date that said motion was filed in the Office of the Secretary, and shall apply whether a motion is hand delivered, emailed, or served by overnight courier on the other parties. In addition to the requirements of Commission Rules 201.14, 201.16(d)-(f), and 210.6 for computation of time, if the last day of the period of time for making a submission falls on a day on which weather or other conditions have made the Office of the Secretary of the Commission inaccessible, the period shall run until the end of the next business day that is not one of the aforementioned days.

### 1.7    Requests for Extension of Time

Any request for extension of time must be made by written motion **two days before** the due date and good cause for such extension must be established. Motions filed after this date may not be ruled on prior to the expiration of the deadline and may be denied for failure to abide by this rule.

If a deadline requires only that a document or item be served on the parties (and not filed on EDIS or submitted to the Administrative Law Judge), and does not affect deadlines set forth in the Procedural Schedule, the parties may modify the deadline without seeking judicial approval, provided that all parties and the Commission Investigative Staff agree to the new deadline. This includes requests for an extension of time to respond to a subpoena.

### 1.8     Confidential Submissions

The confidential nature of any filing with the Office of the Secretary of the Commission or of any submission to the Administrative Law Judge shall be conspicuously noted on the top page of any filing or other submission. The parties should ensure that any confidential submission complies with Commission Rule 201.8.

If a party makes any filing with a confidential designation, a public version of that filing must be made within five (5) business days from the date of the original filing, including public versions of any exhibits attached thereto. For pre-hearing and post-hearing briefs, the parties shall have ten (10) business days to comply with this rule. For any filing made by the Office of Unfair Import Investigations, the Commission Investigative Staff shall have ten (10) business days to comply. A designation of "Public Version" shall be conspicuously noted on the top page, and all confidential labels shall be removed. If an exhibit is not capable of redaction, this must be clearly indicated on the exhibit cover sheet, and the party must attach a declaration justifying why the entire document must remain confidential. When redacting confidential business information, parties shall limit their redactions to information that meets the definition for confidential business information set forth in Commission Rule 201.6(a).

### 1.9     Public Versions of Confidential Orders

If the Administrative Law Judge issues a confidential order or initial determination, the parties must jointly submit within seven (7) days of the order a single proposed public version of that order with any proposed redactions indicated in red. If the parties submit excessive redactions, they may be required to provide declarations from individuals with personal knowledge, justifying each proposed redaction and specifically explaining why the information sought to be redacted meets the definition for confidential business information set forth in 19 C.F.R. § 201.6(a).

To the extent possible, the proposed redactions should be made electronically, in a single pdf file of the issued order or initial determination, using the "Redact Tool" within Adobe Acrobat. The parties' submissions under this rule need not be filed with the Commission Secretary but shall be submitted by e-mail to Bhattacharyya337@usitc.gov.

### 1.10     Style Guide; Citations

Unless otherwise specified, all text in any submitted paper shall use at least 12-point font. In addition, all briefs shall be double-spaced (with the exception of headings, footnotes, quotations, etc.) with one-inch margins (excluding headers for CBI and footers, such as page numbers).

Any submission with attached exhibits shall include a table of contents for the exhibits.

The official case reporter citation must be included for any published decision or order that is cited in a party's motion, brief, or pleading. Additionally, the docket number and the full date of the disposition must be included in the citation of any unreported decision or order that is referenced by the parties. Citations to unreported decisions shall include a Westlaw, LEXIS, or EDIS Document ID. A copy of any cited decision or order that is not available on Westlaw, LEXIS, or EDIS shall be provided in an appendix to the brief or pleading. Further, every party must cite to the specific page(s) of any cited decision or order that includes the holding for which the authority is cited.

### 1.11    Courtesy Copies of Patents and File Histories

Within thirty (30) days of institution of the investigation, Complainant(s) must submit via Box a word-searchable PDF copy of each patent at issue and a bookmarked, Bates-stamped PDF copy of the file history for each patent at issue. The Box folder will be created by the Office of Administrative Law Judges and associated with this investigation.

### 2.    Procedural Schedule

The Administrative Law Judge will promulgate a procedural schedule for the investigation. Modifications of the procedural schedule by any party shall be made by written motion showing good cause. The event and deadline dates in the procedural schedule will generally adhere to the following framework; however, the parties may suggest modifications when proposing dates in the Joint Proposed Procedural Schedule:

| |
|---|
| File identification of expert witnesses, including their expertise and curriculum vitae |
| Exchange list of claim terms to be construed[2] |
| Exchange proposed claim constructions |
| Initial deadline for responses to contention interrogatories on issues for which the responding party bears the burden of proof, and on public interest issues (if applicable) |
| Meet and confer to discuss and limit number of disputed claim terms |
| Initial deadline for responses to contention interrogatories on issues for which the responding party does not bear the burden of proof |
| Exchange of initial expert reports (if any) on claim construction issues |
| Exchange of rebuttal expert reports (if any) on claim construction issues |
| File joint proposed claim construction chart |
| Initial *Markman* Briefs |
| Rebuttal *Markman* Briefs |

---

[2] The parties may propose staggered deadlines for the Commission Investigative Staff for deadlines relating to exchange of claim terms, proposed claim constructions, and claim construction briefing.

- 4 -

| |
|---|
| File Joint Technology Stipulation |
| Technology Tutorial and *Markman* Hearing |
| File updated joint proposed claim construction chart |
| File notice of prior art |
| Cut-off date for supplements to contention interrogatories on issues for which the responding party bears the burden of proof, and on public interest issues (if applicable) |
| Cut-off date for supplements to contention interrogatories on issues for which the responding party does not bear the burden of proof |
| Fact discovery cutoff and completion |
| Deadline for motions to compel fact discovery |
| Exchange of initial expert reports (identify tests/surveys/data) |
| Exchange of rebuttal expert reports |
| File tentative list of witnesses a party will call to testify at the hearing, with an identification of each witness' relationship to the party |
| Expert discovery cutoff and completion |
| Deadline for motions to compel expert discovery |
| Attendance at one-day mediation session[3] |
| Submission of joint report on mediation |
| Deadline for filing summary determination motions |
| Deadline to file requests for remote witness testimony[4] |
| Deadline to file responses to requests for remote witness testimony |
| Exchange of exhibit lists among the parties |
| Exchange proposed direct exhibits, with physical exhibits available – Complainant(s) and Respondent(s) |
| Exchange proposed direct exhibits, with physical exhibits available – Staff |
| Exchange proposed rebuttal exhibits, with physical exhibits available – all parties |
| File pre-hearing statements and briefs – Complainant(s) and Respondent(s) |
| File pre-hearing statement and brief – Staff |
| File requests for receipt of evidence without a sponsoring witness |
| Deadline to file motions *in limine* |

---

[3] For any questions regarding the mediation program, the parties should refer to the Revised Users' Manual for Commission Mediation Program, available at https://www.usitc.gov/intellectual_property/mediation.htm.

[4] The deadline to file requests for remote witness testimony must be no later than 30 days prior to the date for filing pre-hearing statements and briefs.

| |
|---|
| Deadline to file high priority objections statement[5] |
| File responses to requests for receipt of evidence without a sponsoring witness |
| Submit proposed exhibits to Administrative Law Judge |
| File responses to motions *in limine* |
| File responses to high priority objections statement |
| Pre-hearing conference |
| Hearing |
| File initial post-hearing briefs and exhibit lists and submit final exhibits |
| File reply post-hearing briefs |
| Initial Determination |
| Target date for completion of investigation |

**3.**         Motions; Deadlines for Responses

     **3.1**     **Contents; In General**

     All written motions shall consist of: (1) the motion; (2) a separate memorandum of points and authorities in support of the motion;[6] (3) an appendix of declarations, affidavits, exhibits, or other attachments in support of the memorandum of points and authorities; and (4) a Certificate of Service as required by Commission Rule 201.16(c).

     All responses to motions shall include the Motion Docket Number assigned to the motion by the Commission's Office of the Secretary in either the title or the first paragraph of the response,[7] and shall consist of: (1) a memorandum of points and authorities in response to the motion; (2) an appendix of declarations, affidavits, exhibits, or other attachments in support of the memorandum of points and authorities; and (3) a Certificate of Service as required by Commission Rule 201.16(c).

     **3.2**     **Contents; Certification**

     All motions shall include a certification that the moving party has made reasonable, good-faith efforts to resolve the matter with the other parties **at least two business days**[8] prior

---

[5] To facilitate resolution, responses to motions *in limine*, and responses to high priority objection statements must be submitted by no later than ten (10) business days prior to the hearing.

[6] For procedural motions, such as motions for extensions of time, and for motions less than ten pages, a separate memorandum is not necessary.

[7] Motion Docket Numbers may be obtained online through the Commission's Electronic Document Information System (EDIS).

[8] Parties can agree to waive the "two business days" requirement.

to filing the motion, and shall state, if known, the position of the other parties on such motion. Said certification shall be placed at the beginning of the motion under a heading entitled "Ground Rule 3.2 Certification" or similar language.

### 3.3    Motions for Summary Determination and Responses Thereto

Absent leave of the Administrative Law Judge, motions for summary determination are limited to 30 pages (excluding exhibits). Responses to motions for summary determination are limited to 30 pages (excluding exhibits). To the extent there is more than one complainant and/or respondent in an investigation, complainants and/or respondents shall coordinate their efforts and submit a single brief. Exceptions to this rule will be made on a case-by-case basis.

No more than one motion for summary determination on one issue may be filed by a party without leave from the Administrative Law Judge.

### 3.4    Discovery-Related Motions

#### 3.4.1    Teleconference Requirement

Prior to filing any motion related to a discovery dispute, the party that seeks to file such a motion must discharge its obligation to meet and confer under Ground Rules 3.2 and 4.1.1. If, after discharging its obligation under that rule, the discovery dispute persists, the party intending to file the discovery-related motion shall contact the Administrative Law Judge's chambers to schedule a telephone conference with the Administrative Law Judge in an attempt to resolve the discovery dispute. Prior to contacting the Administrative Law Judge's chambers, the party should determine the availability of the other parties for a telephone conference.

**At least forty-eight (48) hours** prior to the conference call, the party intending to file the motion shall file a written explanation of the discovery dispute.[9] The written explanation shall be no more than three (3) pages. Any other party wishing to submit an explanation of that discovery dispute may also do so provided the explanation is filed at least **twenty-four (24) hours** prior to the conference call and shall be no more than three (3) pages. The written submissions shall identify the person(s) who will be speaking at the teleconference.

Leave to file a discovery-related motion will be granted, if at all, only after the intended movant has complied with the procedure provided herein.

Note that this subsection does not apply to third-party (a.k.a. non-party) discovery disputes.

---

[9] If the 48-hour deadline falls on a weekend or a holiday, the initial submission shall be due by 5:15PM on the last business day before the deadline. Discovery teleconferences will not be held on Mondays or on the day after a holiday.

### 3.4.2    Content of Discovery-Related Motions

Any discovery-related motion must have appended to it the pertinent parts of the discovery request and all objections and answers thereto. Additionally, if a party serves supplemental responses subsequent to the filing of a motion to compel, that party must file copies of the supplemental responses, or where documents are produced, a detailed accounting of what additional documents were produced. If any portion of a discovery-related motion becomes moot prior to the issuance of an order, the moving party shall file a Notice identifying which portion(s) of its motion are moot. If a party intends to withdraw its motion, it shall file a Notice of Withdrawal.

### 3.5    Deadline for Filing Response to Motion

The deadline for responding to motions shall be computed in accordance with Ground Rule 1.6.

### 3.6    Request for Shortened Time to Respond to Motion

A motion may include a request to shorten the period of time during which other parties may respond to the motion. The fact that a shortened response time is requested shall be noted in the title of the motion and the motion shall include an explanation of the grounds for such a request. A request for a shortened response time shall not be made through a separate motion. Requests for shortened response time are disfavored and should only be made for good cause.

### 3.7    Reply Briefs

Except for motions *in limine*, discovery-related motions, or as otherwise ordered, the moving party is permitted to file a reply brief within three (3) days of the deadline for filing a response to the motion, limited to no more than ten (10) pages. The reply brief shall include the Motion Docket Number assigned to the motion by the Commission's Office of the Secretary in either the title or the first paragraph of the brief and shall consist of: (1) a memorandum of points and authorities limited to issues raised in the response; and (2) an appendix of declarations, affidavits, exhibits, or other attachments in support of the memorandum of points and authorities, with a list of the contents thereof. Sur-reply briefs will not be permitted absent exceptional circumstances.

### 3.8    No Motion Stops Discovery Except Motion to Quash Subpoena

No motion stops discovery except a timely motion to quash a subpoena.

4.            Discovery

4.1    **Resolution of Disputes; Coordinated Discovery**

All parties shall make reasonable efforts to resolve among themselves disputes arising during discovery. Parties with similar interests must coordinate and consolidate depositions and all other discovery.

4.1.1    **Discovery Committee**

Commencing with the first full week after these Ground Rules are issued, a discovery conference committee (the "Discovery Committee") consisting of the lead counsel of each party and the Commission Investigative Staff shall convene at least once every two weeks during the discovery phase of this Investigation, either in person or by telephone, to resolve discovery disputes. The Discovery Committee shall confer in good faith to resolve every outstanding discovery dispute in a timely manner within the deadlines set forth in the Procedural Schedule.

No discovery teleconference pursuant to Ground Rule 3.4.1 may be requested unless the subject matter of the dispute has first been brought to the Discovery Committee and the Committee has reached an impasse in resolving the matter.

4.2    **Stipulations Regarding Discovery Procedure**

Unless otherwise directed by the Administrative Law Judge, the parties may by written stipulation provide that depositions may be taken before any person, at any time or place, upon any notice, and in any manner and when so taken may be used like other depositions. The parties may also modify other procedures governing or limitations placed upon discovery, except that stipulations extending the time for responses to discovery may, if they would interfere with the target date of the investigation or with any time set in the procedural schedule or in an order for completion of discovery, for hearing of a motion, or for the trial, be made only with the approval of the Administrative Law Judge upon a written motion showing good cause.

4.3    **Service of Discovery Requests and Responses**

Discovery requests and responses thereto shall be served upon all parties, including the Commission Investigative Staff, but shall not be served on the Administrative Law Judge unless they are pertinent to a motion. Discovery documents need not be served on the Office of the Secretary of the Commission, unless they are appended to motions.

### 4.4    Discovery Requests, Responses and Objections

#### 4.4.1    Depositions; Notice

In addition to the requirements of Commission Rule 210.28(c), unless otherwise ordered, any party desiring to take a deposition shall give notice in writing to every other party of not less than ten (10) days if the deposition is to be taken of a person located in the United States, or of not less than fifteen (15) business days if the deposition is to be taken of a person located outside the United States.

#### 4.4.2    Contention Interrogatories

Parties are expected to respond to contentions interrogatories by the date(s) set forth in the Procedural Schedule.

Conclusory statements in responses to contention interrogatories are insufficient. For example, if a party simply states: "There is also infringement under the doctrine of equivalents," the party may be prohibited from later introducing evidence regarding the details of such infringement.

Amendment or supplementation of responses to final contention interrogatories after the cut-off dates set forth in the Procedural Schedule may be made in good faith, in appropriate circumstances.   Supplemental contentions may be stricken if there is a lack of good cause or where there is significant prejudice to opposing parties.

#### 4.4.3    Discovery Related to Non-Accused Products for Which Adjudication is Sought

Absent good cause, if a respondent seeks adjudication regarding any product(s) that have not been accused, the respondent must identify such product(s) and produce all relevant written discovery by thirty (30) days prior to the close of fact discovery.

#### 4.4.4    Discovery Cutoff and Completion

All discovery requests, including without limitation requests for admissions, must be initiated in sufficient time prior to the fact discovery cutoff and completion date so that the responses will be due prior to that date within the time periods set forth above. Discovery requests by any party that would require responses after the fact discovery cutoff and completion date must be approved in advance by the Administrative Law Judge upon a showing of compelling circumstances.

### 4.5    Subpoenas

#### 4.5.1    Issuance and Service

Pursuant to Commission Rule 210.32, an application for a subpoena may be made *ex parte* to the Administrative Law Judge. The application shall be in writing with the proposed subpoena attached, and one (1) copy thereof shall be submitted in an editable format readable by Microsoft Word (*e.g.*, .doc or .docx) to the email identified in Ground Rule 1.1. A cover letter must accompany the application and should clearly indicate who to contact when the subpoena application is ready.

The application shall set forth with specificity the relevance of the information sought and the reasonableness of the scope of the inquiry. In addition, the subpoena should set forth a time limit for a motion to quash and should also state that the subpoena will be served by overnight delivery, if not sooner. The signature page for the subpoena shall not be on a separate page and must include the case caption. Any dates in a subpoena set for appearance of a deponent or production of documents should not be prior to the deadline for filing of any motions to quash. Samples of subpoenas are attached in Appendix A hereto.

A copy of the issued subpoena and the application shall be served by the applicant upon the subpoenaed party and all other parties to the investigation on the next business day, at the latest, after the subpoena is issued. One (1) copy of the issued subpoena, the application, and the proof of service to the subpoenaed party shall be supplied to the Administrative Law Judge. The application and subpoena need not be filed with or served on the Office of the Secretary of the Commission, including EDIS, unless they are appended to a motion to quash or motion for a protective order.

#### 4.5.2    Motion to Quash Subpoena; Deadline

In addition to the requirements of Commission Rule 210.32(d), any motion to limit or quash a subpoena shall be filed within ten (10) days after receipt thereof, or within such other time as the Administrative Law Judge may allow. Filing of any motion to quash an issued subpoena automatically stays such subpoena pending disposition of the motion by the Administrative Law Judge.

### 4.5.3    Subpoenas *Ad Testificandum* for Hearings

Applications for subpoenas *ad testificandum* to appear at the hearing must be submitted fourteen (14) days prior to the start of the hearing. Leave to subpoena a witness after this time will only be granted upon a written motion showing compelling circumstances.

### 4.5.4    Extension of Time

Per Ground Rule 1.7, parties may jointly agree to modify the deadlines set forth in a subpoena, and which does not affect deadlines in the Procedural Schedule, without seeking judicial approval.

## 4.6    Bates Numbering

If documents produced by any supplier in response to a document request are furnished to the requester as copies of original documents, every page of every such document shall be numbered sequentially by a unique number (commonly known as a "Bates number"). The Bates number shall appear stamped on the lower right-hand corner of the page.

## 4.7    Translations

All documents produced in response to a document request shall be the original or true complete copies of originals. If an English translation of any document produced exists, the English translation shall be produced. If any of the parties dispute the translation provided by the producing party, then the translation must be certified by a qualified and neutral translator upon whom counsel can agree.

## 4.8    Privileged Matter

In order to expedite discovery, the following procedure shall be followed with respect to those documents for which counsel claims privilege (attorney-client or work product).

### 4.8.1    Claiming Privilege

If a party objects to discovery on the basis of a claim of privilege, the party asserting the privilege shall, in the objection to the interrogatory, document request, or part thereof, identify with specificity the nature of the privilege (including work product) that is being claimed.[10] The following information shall be provided in the objection, if known or reasonably available, unless divulging such information would cause disclosure of the allegedly privileged

---

[10]  If a party asserts that the common interest privilege applies, the party should so note <u>and</u> also identify the underlying privilege (*i.e.*, attorney-client privilege or work product) that protects the discovery from disclosure.

information: (A) For oral communications: (i) the name of the person making the communication and the name(s) of persons present while the communication was made; (ii) the date and place of the communication; and (iii) the subject matter of the communication; (B) For documents: (i) the sender(s)/author(s) of the document; (ii) the recipient(s) of the document; (iii) the date of the document; and (iv) the subject matter of the document. The individuals involved in any discovery withheld on the basis of privilege shall be identified by position and entity (corporation, firm, etc.) with which they are employed or associated. If the author/sender or recipient is an attorney or foreign patent agent, he or she shall be so identified.

The above information should be provided separately for each document for which privilege/protection is asserted, unless doing so would be excessively burdensome or expensive. In such instances, the party asserting privilege/protection should particularize why providing separate designations would be excessively burdensome or expensive, and then may identify by categories the voluminous documents or communications for which privilege/protection is asserted, providing the above information for each category. A party may only designate documents as privileged/protected by category if each document (A) is within the privilege/protection claimed and (B) shares common characteristics such as sender, receiver, author, or specific subject matter.

Where only part of a document or communication is privileged/protected, the unprivileged/unprotected portion should be disclosed if otherwise discoverable and within the scope of the discovery request. Emails and attachments shall be treated as separate documents. Additionally, the parties are encouraged to confer and reach agreement regarding how to assert privilege/protection claims with respect to email "chains" or "strings."

### 4.8.2   Motions to Compel Production of Privileged Matter

Any party seeking production of allegedly privileged documents shall file an appropriate motion only after examining the privileged document list. In opposing any such motion, a party must demonstrate that each element of the applicable privilege(s) has been met. This may be done through the submission of affidavits or other appropriate evidence. Blanket assertions of privilege are insufficient. Failure to submit evidence to support privilege claims may result in waiver of the privilege.

### 4.8.3   Timing of Privilege Claims

The privileged document list shall be supplied, unless otherwise ordered or agreed upon by the parties, within ten (10) days after objections based on privilege to the underlying discovery request are due.

### 5.           Notice of Prior Art

Parties must file on or before the date set in the procedural schedule, notices of any alleged prior art consisting of the following information:

- 13 -

- For alleged prior art patents: country, number, title, date, and name of the patentee(s);
- For alleged prior art printed publications: title, date, author, and relevant page numbers;
- For alleged prior inventors: name and address of the alleged inventor, and any corroborating witnesses; and
- For alleged prior sales or offers for sale: brand name and model name or number of the article, date and location of the offer or sale, and name and address of any corroborating witnesses.

In the absence of such notice, proof of said matters may not be introduced into evidence at the hearing except upon a timely written motion showing good cause.

**6.    Claim Construction Proceedings**

**6.1    Terms Requiring Construction and Submission of Joint Claim Construction Chart**

By the date(s) ordered in the procedural schedule, each party shall serve a list of claim terms that the party contends should be construed by the Administrative Law Judge. The list shall include identification of any preamble language that the party contends is limiting, any claim term which the party contends is indefinite, and any claim term that the party construes as invoking means-plus-function or step-plus-function language under 35 U.S.C. § 112 ¶ 6 / (f).

Thereafter, each party shall serve proposed constructions for all terms the parties have exchanged by the date(s) ordered on the procedural schedule.

The parties shall meet and confer for the purpose of narrowing claim construction disputes and shall jointly file a chart of agreed and disputed constructions by the date ordered on the procedural schedule.

The joint chart shall list all agreed and disputed constructions, regardless of whether the terms are identified for the *Markman* hearing process.

In addition, the joint chart should identify up to eight (8) terms that the parties believe are amenable to resolution in the *Markman* hearing process and likely to be significant to resolving the parties' dispute. To the extent the parties identify terms for the *Markman* hearing that any party contends are indefinite based in substantial part on expert opinion, it is likely that resolution may be deferred until a complete record has been presented (*e.g.*, on summary determination or after the evidentiary hearing).

### 6.2    Claim Construction Briefing

By the date(s) ordered on the procedural schedule, and unless otherwise ordered by the Administrative Law Judge, each party shall serve an opening claim construction brief only addressing the up to eight (8) terms that the parties believe are amenable to resolution in early claim construction and likely to be significant to resolving the parties' dispute. The briefs should be organized by patent. Opening briefs are limited to 50 pages (excluding attachments). Rebuttal briefs may also be filed by the date(s) set forth in the procedural schedule and are limited to 25 pages (excluding attachments).[11]

The opening claim construction brief for each party should identify the person of ordinary skill in the art.

If the parties intend to rely on declarations from any witness to support their claim construction arguments, such witnesses shall be made available for deposition prior to the deadline for rebuttal briefs.

### 6.3    Claim Construction Hearing Procedure and Post-Hearing Claim Construction Chart

Unless otherwise ordered, the claim construction hearing will be limited to the up to eight (8) terms identified by the parties as amenable to resolution in the *Markman* hearing process and likely to be significant to resolving the parties' dispute.

Parties should present all of the arguments for each term in sequence before proceeding to the next term, except that similar terms may be grouped together if agreed upon by the parties. Each party will receive an opportunity for an initial presentation and rebuttal.

Exhibits at the claim construction hearing shall be limited to those attached to the parties' claim construction briefs, although the parties may use additional demonstrative exhibits.

Witness testimony will not be permitted at the claim construction hearing absent leave from the Administrative Law Judge. The parties may make reference to any witness declarations and/or depositions filed in connection with the claim construction briefs.

After the claim construction hearing, the parties shall submit an updated joint proposed claim construction chart, by the date set forth in the procedural schedule, setting forth their post-hearing constructions of the terms discussed at the hearing.   For completeness and the Administrative Law Judge's convenience, the updated joint chart should also include all other agreed and disputed constructions.

---

[11] The parties shall serve paper copies and Word versions of their *Markman* briefs on the Administrative Law pursuant to Ground Rule 1.3.

### 6.4    Technology Stipulation and Technology Tutorial

In advance of the *Markman* hearing, the parties shall meet and confer concerning the technology at issue in this investigation and file a joint technology stipulation, not to exceed ten pages. The stipulation may include, for example, definitions of terms, descriptions of apparatuses or materials, and explanations of scientific principles or industry practices. The stipulation may include illustrations, charts or other images. The stipulation may not include legal arguments.

On the date of the *Markman* hearing, the parties may present a technology tutorial, which shall consist of one presentation agreed upon by all parties. The tutorial shall not exceed one hour, and it shall be limited to a general overview of the technology, without addressing the asserted patents, the claim terms at issue, or the accused products.

### 7.    Expert Witnesses and Reports

On or before the dates set forth in the procedural schedule, a party shall disclose to other parties the identity of any person who is retained or employed to provide expert testimony at the hearing and shall provide to the other parties a written report prepared and signed by the witness.

Issues on which a party has the burden shall be addressed in expert reports served on the initial deadline, while non-burden issues shall be addressed in rebuttal expert reports. The parties shall confer with each other to agree on appropriate deadlines for disclosing expert opinions on rebuttal issues on which the party has the burden of production or persuasion, *e.g.*, secondary considerations of non-obviousness.   Unresolved disputes should be raised with the Administrative Law Judge before the deadlines for expert reports.

The report shall not be filed with the Office of the Secretary of the Commission. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years. The parties shall supplement these disclosures as needed in the manner provided in Commission Rule 210.27(f).

### 7.1    Motions to Strike Expert Disclosures

In the event a party's expert proffers an opinion, through report or deposition testimony, that the opposing party believes conflicts with or goes beyond the scope of contention interrogatory responses and is improper, the opposing party should promptly file a motion to strike to maintain clarity of the record. The opposing party should not wait until pre-hearing procedures, motions *in limine*, or live objections during the hearing. Moving or objecting at that delayed time will be looked upon unfavorably.

- 16 -

**8.        Settlement/Mediation**

Negotiated settlements are favored by the Commission as a matter of policy. To this end, the Commission has a mediation program described at www.usitc.gov/intellectual_property/mediation.htm. The parties shall notify the Administrative Law Judge as soon as practicable after they reach a negotiated settlement on any aspect of the proceeding.

**9.        Pre-hearing Filings and Submissions**

**9.1        Pre-hearing Statement**

Each party who desires to participate in the hearing in this Investigation must file on or before the date set forth in the procedural schedule a pre-hearing statement containing the following information:[12]

(a)    The names of all known witnesses, their addresses, whether they are fact or expert witnesses (and their area of expertise), and a brief outline of the testimony of each witness. In the case of expert witnesses, a copy of the expert's curriculum vitae shall accompany this submission.

(b)    A list of all exhibits which the parties will seek to introduce at the hearing.

(c)    A list of any stipulations on which the parties have agreed.

(d)    A proposed agenda for the pre-hearing conference.

(e)    Estimated date and approximate length for appearance of each witness. The parties shall confer on estimated dates and approximate length prior to submission of their pre-hearing statements.

(f)    Certification regarding good faith efforts to settle.

**9.2    Pre-hearing Brief**

On or before the date set forth in the procedural schedule, each party shall file a pre-hearing brief not exceeding 250 pages.[13]  To the extent there is more than one complainant

---

[12] The parties shall serve paper copies and Word versions of their pre-hearing statements on the Administrative Law Judge pursuant to Ground Rule 1.3.

[13] The parties shall serve paper copies and Word versions of their pre-hearing briefs on the Administrative Law Judge pursuant to Ground Rule 1.3.

and/or respondent in an investigation, complainants and/or respondents shall coordinate their efforts and submit a single brief. Exceptions to this rule will be made on a case-by-case basis.

The pre-hearing brief shall be prefaced with a table of contents and a table of authorities. The pre-hearing brief shall set forth a party's contentions on each of the proposed issues, including specific citations to legal authorities and record evidence, and shall conform to the general outline set forth in Appendix B hereto. With respect to the issues of infringement, validity, and the technical prong of domestic industry, the parties should present their briefing on a limitation-by-limitation basis. The parties shall meet and confer prior to filing the pre-hearing briefs in order to agree on an outline, so that each of the submitted briefs addresses the issues in the same order. If any party has issues that are not specifically named in this general outline, the parties may insert these issues where appropriate.

Any contentions not set forth in detail as required herein shall be deemed abandoned or withdrawn, except for contentions of which a party is not aware and could not be aware in the exercise of reasonable diligence at the time of filing the pre-hearing brief.

### 9.3     High Priority Objections

High priority objections may address proposed exhibits or testimony. The parties must confer before filing objections, and the statement of high priority objections shall include a certification pursuant to Ground Rule 3.2. No party shall place more than ten objections on the high priority list. The parties should not attempt to circumvent this limitation by including numerous subsections in their objections.

High priority objections and responses thereto shall include the exhibit(s) that is the subject of the objection and/or exhibit(s) that is referenced or discussed in the objection or response. Any high priority objection that does not include said exhibit(s) will not be considered.

### 9.4     Motions *in Limine*

Unless granted leave by the Administrative Law Judge, each side shall be limited to a maximum of five motions *in limine*. The parties should not attempt to circumvent this limitation by including numerous subsections in a motion *in limine*. Additionally, any motion regarding an expert must be its own motion and cannot be combined with arguments relating to other exhibits or witnesses. The parties are limited to 10 pages per motion. A separate memorandum is unnecessary for motions *in limine*.

Motions *in limine* and responses thereto shall include the exhibit(s) that is the subject of the motion and/or the exhibit(s) that is referenced or discussed in the response. Any motion *in limine* that does not include said exhibit(s) will not be considered.

### 9.5     Exhibits

#### 9.5.1 Exhibit Lists

Every exhibit list shall consist of a table enumerating all exhibits and identifying each exhibit by a descriptive title, a brief statement of the purpose for which the exhibit is being offered in evidence, the name of the sponsoring witness, and the status of receipt of the exhibit into evidence. In any exhibit list submitted prior to the offer of any exhibit into evidence, the entry in the column for the status of receipt shall be left blank. In any exhibit list submitted after the exhibit is offered into evidence or withdrawn, the entry in that column shall show the date of admission into evidence or rejection of the exhibit or shall indicate its withdrawal. Exhibit lists shall list all exhibits together in numerical order, *e.g.*, CX-0001, CX-0002, CX-0003C, CX-0004, CX-0005C, etc. The exhibit list must be formatted in a way that it is legible when viewed in hard copy.

The parties shall meet and confer before submitting any joint exhibits to agree upon a common descriptive title, statement of purpose, and sponsoring witnesses.

No exhibit list shall contain confidential information; all exhibit lists shall be public documents.

#### 9.5.2     Numbering and Labeling of Exhibits

Written exhibits shall be marked serially commencing with the four-digit number "0001" and preceded by the prefix "CX-" for Complainant's(s') exhibits, "RX-" for Respondent's(s') exhibits, "SX-" for the Commission Investigative Staff's exhibits, and "JX-" for any joint exhibits.

Each exhibit shall be marked by placing a label bearing the exhibit's number (*e.g.*, CX-0003C or RX-0005) in the upper right portion of the exhibit's first page. The pages of each exhibit must be sequentially numbered in a consistent location on the pages.

If there is more than one respondent in the Investigation, Respondents shall coordinate their numbering to avoid duplication in numbering. Additionally, the parties shall coordinate exhibits to avoid unnecessary duplication (*e.g.*, patents; file wrappers).

#### 9.5.2.1     Confidential Exhibits

If an exhibit (or any portion of the exhibit) contains confidential business information, a "C" shall be placed after the exhibit number. For certain lengthy exhibits of which only portions are confidential, the parties may be asked to submit a public version of the exhibit.

On any exhibit list submitted, exhibits which contain confidential business information shall be denoted by placing a "C" after the exhibit number in the listing.

### 9.5.2.2    Physical Exhibits

Physical exhibits shall be numbered in a separate series commencing the four-digit number "0001" preceded by the prefixes "CPX-", "RPX-", "SPX-" and "JPX-", for Complainant, Respondent, the Commission Investigative Staff, and joint exhibits, respectively. Confidential exhibits shall be denoted with the letter "C" as in the case of documentary exhibits.

### 9.5.2.3    Demonstrative Exhibits

 Demonstrative exhibits shall be numbered in a separate series commencing with the four-digit number "0001" preceded by the prefixes "CDX-", "RDX-", and "SDX-", for Complainant, Respondent(s), and the Commission Investigative Staff, respectively. Confidential demonstrative exhibits shall be denoted with the letter "C". Demonstrative exhibits shall contain citations to the substantive evidence on which they are based.

### 9.5.2.4  One Document Per Exhibit

Except for good cause shown, each exhibit shall consist of no more than one document. Exceptions to this "one document per exhibit" rule include instances when it would be appropriate to group certain documents together as one exhibit, such as a group of invoices or related e-mails.

### 9.5.3    Inclusion on Exhibit List.

### 9.5.3.1    Exhibits Used for Impeachment

Exhibits used solely for impeachment must be included on the exhibit list.

### 9.5.3.2    Documents Not Included on Exhibit List

A party may not introduce a document at the hearing that was not included on the exhibit list exchanged on the date provided for in the Procedural Schedule, except for good cause.

### 9.5.4    Sponsoring Witness

Except as set forth below, each exhibit that is offered into evidence shall have a "sponsoring witness." One of the purposes of having a sponsoring witness associated with an exhibit is to establish a foundation for the exhibit and to prevent exhibits from coming into the record without context.

If a party believes evidence to be appropriate for receipt in evidence without a sponsoring witness, that party may present with each such exhibit on or before the due date set forth in the procedural schedule: (1) an affidavit or declaration that the declarant prepared or someone under

- 20 -

the declarant's direction prepared the exhibit; (2) a request that the exhibit be received in evidence without a witness at the hearing; and (3) a statement of grounds for receiving the exhibit in evidence without a witness at the hearing. Any party who wishes to cross-examine the declarant may object in writing within three (3) days of service of the affidavit or declaration and request, specifying whom the party intends to examine. Upon good cause shown, the exhibit shall be received in evidence without a witness subject to the right of objection on other grounds.

### 9.5.5   Foreign Language Exhibits

No foreign language exhibits will be received into evidence unless a translation thereof is provided at the time set for the exchange of exhibits. The translation shall be included as part of the foreign language exhibit.

### 9.5.6   Authenticity

All documents that appear to be regular on their face shall be deemed authentic, unless it is shown by particularized evidence that the document is a forgery or is not what it purports to be.

### 9.5.7   Exchange of Proposed Exhibits Among Parties

Copies of documentary proposed exhibits, along with a proposed exhibit list shall be served on the opposing parties (including the Commission Investigative Staff) on the date ordered in the procedural schedule. Once the parties have exchanged their proposed exhibit lists, they shall eliminate any duplicative exhibits or renumber such exhibits as joint exhibits and update their exhibit lists before they are submitted to the Administrative Law Judge by the due date in the procedural schedule. Proposed physical exhibits need not be served, but shall be identified in the proposed exhibit list and made available for inspection by the other parties on the date established for the submission and service of proposed exhibits. Proposed exhibits shall not be filed with the Office of the Secretary of the Commission.

#### 9.5.7.1   Exchange of Demonstrative Exhibits

Demonstrative exhibits to be used in direct examination must be exchanged by 9:00 p.m. the evening before the day on which the demonstrative exhibit will be used. Demonstrative exhibits may, however, be created by a witness during examination through, for example, asking the witness to draw a picture or annotate an exhibit. Such exhibits need not be exchanged in advance.

Paper copies of demonstrative exhibits to be used in direct examination shall be provided to the Administrative Law Judge before the witness examination commences.  An electronic copy of all demonstratives used shall be submitted via Box within one business day of their use.

### 9.5.8    Service of Proposed Exhibits Upon the Administrative Law Judge

On the date that is set forth in the procedural schedule, the Administrative Law Judge shall receive an electronic PDF version of all proposed exhibits, along with a proposed exhibit list. The electronic version of proposed exhibits shall be submitted via a Box folder created by the Office of Administrative Law Judges and associated with this investigation.

## 10.    Hearing - Evidence and Exhibits

### 10.1    Material To Be Received Into Evidence

Only factual material and expert opinion shall be received into evidence. Legal argument shall be presented in the briefs.

#### 10.1.1    Identification of Exhibits for Admission Into Evidence

Exhibits that will be admitted into evidence through a witness's testimony must be identified on the record at the hearing. For expert witnesses who rely on a large number of exhibits, the witness does not need to individually identify each exhibit but may describe the exhibits generally with reference to a demonstrative listing the exhibits. A list of exhibits that will be offered for admission should be prepared after the witness is done testifying.

The parties should also prepare lists of exhibits for admission without a sponsoring witness and lists of exhibits for admission through deposition designations.

#### 10.1.2    Objections and Admission of Exhibits Into Evidence

The parties should meet and confer and attempt to resolve any objections to the exhibits identified for admission. Once the objections have been resolved, the party requesting that the exhibits be admitted into evidence should present the list to the Administrative Law Judge, with a copy emailed to Bhattacharyya337@usitc.gov. The list will be identified on the record and it will be confirmed that neither the opposing party nor the Commission Investigative Staff has any unresolved objections. After that, the Administrative Law Judge will admit the exhibits into evidence. The party offering the exhibits shall provide a copy of the list of admitted exhibits to the court reporter.

If parties need to submit additional exhibits after the hearing has concluded, they should do so via motion.

### 10.2    Witness Testimony

Unless leave is otherwise granted, all direct testimony must be given by a live witness.

- 22 -

### 10.2.1  Deposition Testimony in Lieu of Live Testimony

Absent an agreement among the parties, deposition testimony can only be admitted as evidence if it falls within one of the exceptions set forth in Commission Rule 210.28(h).

### 10.2.1.1  Exchange of Deposition Transcripts

If a party intends to seek admission of a designated deposition transcript at the hearing, the designations must be served on the other parties on the appropriate deadline for exchanging proposed exhibits (for direct or rebuttal exhibits).

### 10.2.1.2  Counter-Designation of Deposition Testimony

Other parties may counter-designate any designated deposition transcript pursuant to Commission Rule 210.28(h)(4), but any such counter-designations shall be limited to parts of the transcript that ought in fairness to be considered with the part that has been designated. The parties should meet and confer to determine an appropriate date to serve counter-designations (and, if applicable, any rebuttal counter-designations) before the deadline for pre-hearing briefs.

### 10.2.2  Witness Exhibits

Prior to commencing the examination or cross-examination of a witness, counsel shall provide the witness and other counsel with all exhibits to be used in the examination of the witness. The parties may stipulate as to the manner in which exhibits are provided to other counsel and the witness (*e.g.*, physical binders or electronic files).

Prior to commencing the examination or cross-examination of a witness, counsel shall provide the exhibits for each witness to the Administrative Law Judge electronically via Box. The exhibits shall be organized in folders by witness name and each folder shall include a table of exhibits listing the exhibit number and an informative title.

### 10.2.3  Requests for Remote Witness Testimony

Live, in-person testimony is the norm, and remote testimony is generally disfavored. However, in some circumstances, good cause may exist for a witness to testify remotely. If a party seeks to have any witness testify remotely, the party must file a request for leave to permit the witness to testify remotely by the date specified in the procedural schedule. The request should include information about each witness and their expected testimony. The request must establish that good cause exists to allow the witness to testify remotely under the circumstances. Good cause will be evaluated on a case-by-case basis. Some relevant factors may include the witness's location, the witness's relation to the parties, the scope of potential testimony, and the reasons why remote testimony is requested. Good cause will not exist merely because all parties agree the witness should be permitted testify remotely, and the parties should therefore make a

- 23 -

persuasive showing of good cause for any witness they request to testify remotely. If a party opposes any request, the party should file a brief setting forth the basis for its opposition by the date set forth in the procedural schedule.

**11.        Hearing Procedure**

**11.1    Hearing; Order of Examination**

The order of examination at the hearing is as follows (subject to alteration pursuant to joint request by the parties or other changes in the discretion of the Administrative Law Judge):

(1)    Brief Opening Statements
      (a)    Complainant (limited to 1 hour)
      (b)    Respondent (limited to 1 hour)
      (c)    Commission Investigative Staff (limited to thirty minutes)

(2)    Complainant's Case-in-Chief.

(3)    Respondent's Case-in-Chief: In the event there is more than one respondent, the order of presentation will be determined at the pre-hearing conference. Respondents, where possible, should avoid unnecessary duplication of effort.

(4)    Commission Investigative Staff's Case-in-Chief.

(5)    Complainant's Rebuttal

(6)    Respondent's Rebuttal

**11.2    Closing Argument**

There are no closing arguments.

**11.3    Hearing Hours**

Normal hearing hours are 9:30 a.m. to 5:00 p.m. with a one-hour luncheon recess beginning each day at approximately 12:45 p.m. There will be one fifteen-minute break in the morning and one fifteen-minute break in the afternoon.

**11.4    WebEx Procedures**

To aid in the identification of hearing participants, any person attending a hearing or conference conducted via WebEx must edit their participant name in WebEx to conform to the following format:

[C/R/S] [party affiliation] Attendee Name

For example, if Sally Smith attends on behalf of complainant ACME Corp., her display name would read: "[C][Acme] Sally Smith." If the participant is signed on to the Protective Order (or otherwise covered by it), he or she must include a "[PO]" in his or her display name (e.g., "[PO] [R] John Brown").

The examinations of witnesses shall be divided into separate public and confidential portions. Protecting confidential business information ("CBI") is of paramount importance. Complainant(s) and Respondent(s) must appoint monitors to ensure that unauthorized persons are not present during CBI sessions. As in a conventional courtroom, if anyone believes that an unauthorized individual is in attendance (for example, based on a review of the list of participants on the video platform), he or she should draw attention to that fact by making a statement on the record or contacting the Administrative Law Judge's chambers via email.

Counsel and witnesses must be in separate locations. During confidential sessions, witnesses should be in a private location (i.e., a room with a closed door) and may not be accompanied by unauthorized individuals.

Each testifying witness shall have his or her camera and microphone turned on continuously for the entire duration of the witness's testimony. Each questioning attorney shall have his or camera and microphone turned on during his or her period of questioning. One attorney for each party may have his or her microphone turned on during each witnesses' testimony to aid in making objections or making any necessary statements and should turn his or her camera on when speaking. All other participants/attendees shall turn off their cameras and mute their microphones.

## 11.5    Trial Decorum

All audible sounds from mobile phones, tablets, and computers shall be silenced in the courtroom during the hearing. All telephone calls must be taken outside of the courtroom. No food, gum, or beverages other than bottled water will be permitted in the courtroom during trial.

No photo taking, video recording, or audio recording is permitted in online hearings or in the courtroom except by a court reporter authorized by the Commission.

## 11.6    Examination of Witnesses

### 11.6.1  Scope of Examination; In General

Except as noted below, direct examination of non-hostile witnesses shall not be conducted by leading questions, however, the Commission Investigative Staff may ask leading questions at any time.

- 25 -

Except in extraordinary circumstances, examination of witnesses shall be limited to direct, cross, Staff questioning, redirect, and recross. Cross examination shall be limited to the scope of direct examination; examination by the Staff shall not be limited in scope; redirect examination shall be limited to the scope of cross and Staff examination; and recross examination shall be limited to the scope of redirect and Staff examination.

A party may call a witness on an opposing party's witness list, however, that witness must be identified by name on the party's own witness list. In the event both Complainants and Respondents wish to call the same witness, the witness shall testify only once, and the parties shall meet and confer regarding when to call the witness.

### 11.6.2  Coordination of Witnesses

The parties are expected to coordinate examination of witnesses so as to allot appropriate time for examination of each of the witnesses within the total time allotted for the trial.

### 11.6.3  Scope of Expert Witness Testimony

An expert's testimony at the trial shall be limited in accordance with the scope of his or her expert report(s), deposition testimony, or within the discretion of the Administrative Law Judge.

### 11.6.4  Coordination of Respondents' Cross-examination

Respondents shall coordinate cross-examination through one attorney as far as practicable to avoid duplication. If that is not possible, counsel who intends to cross-examine must be present in the trial room during the entire preceding cross-examination of the witness so as not to engage in repetitive questioning.

### 11.6.5  Use of Translators

If a translator will be used at trial, the parties are responsible for obtaining one qualified, neutral translator upon whom counsel can agree. It is suggested that the translator be chosen from a list of approved translators, such as may be kept by various federal district courts or federal agencies. Translators will be sworn in.

### 11.6.6  Conferring with Witness during a Break in Testimony

Counsel shall not confer with a witness during a break in the witness's testimony on the witness's substantive testimony.

### 11.6.7    Sequestration of Witnesses

Fact witnesses shall be sequestered prior to offering testimony at the hearing. Each party will be permitted one exception to the sequestration rule for an officer or employee who has been designated as the party's representative. The parties may agree to waive sequestration or to request additional exceptions. Such requests should be made at the pre-hearing conference.

### 11.6.8    Submission of Updated Schedule of Estimated Time and Date of Witnesses

By 8:30 a.m. on each day in which the court is in session, the parties should submit an updated schedule of estimated time and date of hearing witnesses. This list should be provided to the email address identified in Ground Rule 1.1.

### 11.7    Time-Keeping

The parties are responsible for keeping track of the time that each party has used.

### 11.8    Close of Hearing Procedures

### 11.8.1  Physical Exhibits

All physical exhibits left at the Commission should be identified on a "List of Physical Exhibits." The list should include the exhibit number and a description of the exhibit. If the party intends to leave a photograph in lieu of a physical exhibit, the party should so state on the list. Physical exhibits will not be returned to the parties until the conclusion of the investigation, including all appeals.

### 11.8.2  Corrections to Transcripts

If a transcript needs to be corrected after the conclusion of the hearing, the party requesting the change shall do so through a motion. Once an order issues adopting the proposed correction, it is incumbent upon the party requesting the change to send a copy of the order to the court reporting service so that the corrections can be made.

## 12.    Submission of Final Exhibit Lists and Final Exhibits

On the same day that initial post-hearing briefs are due, the parties shall each submit the following: [1] the final exhibit lists; and [2] an electronic version of the final set of exhibits to the Administrative Law Judge for use in drafting the final initial determination.[14] Physical exhibits

---

[14]  Demonstrative exhibits should be included.

shall be delivered to the Administrative Law Judge within one business day after initial post-hearing briefs are filed.

On the date that reply post-hearing briefs are due, the parties shall submit a Commission set of exhibits, with rejected exhibits submitted under separate cover and so marked.

Each side is only responsible for submitting its own exhibits.[15] Source code (both paper and electronic copies) should be submitted in a manner jointly agreed upon by the parties.

### 12.1    Final Exhibit List

Each party must submit a final exhibit list prepared in accordance with Ground Rule 9.5.1 reflecting the status of all exhibits, including those admitted or rejected during the hearing. Withdrawn exhibits do not need to be on the exhibit list.

The parties should submit three versions of the final exhibit list: (1) a list identifying all confidential exhibits: (2) a list identifying all public exhibits; and (3) a master list with all exhibits (both confidential and public). Each side is only responsible for submitting its own exhibit list, except that Complainant(s) is also responsible for submitting the three versions of the joint exhibit lists.

Each party should also submit a list of rejected exhibits. Only one version of this list is required.

### 12.2    Administrative Law Judge's Electronic Copy

The parties should provide an electronic copy of the exhibits. This electronic copy shall be uploaded using the Box platform and need not be separated or broken up in the manner described below for the Commission's set of exhibits.

Native files (such as Excel, videos) may be included with the electronic copy of exhibits submitted to the Administrative Law Judge.

### 12.3    Physical Exhibits

Physical exhibits shall be labeled with appropriate exhibit numbers and delivered to the address specified in Ground Rule 1.1.

### 12.4    Commission's Copy

---

[15]  Complainant(s) are responsible for submitting joint exhibits.

The Commission set of exhibits shall be submitted in electronic format. The format for these exhibits is set forth at: http://www.usitc.gov/docket_services/documents/EDIS3UserGuide-CDSubmission.pdf.

There are twenty-four standard exhibit categories: CX, CDX, CPX, RX, RDX, RPX, JX, JDX, JPX, SX, SDX, SPX, CX-[four-digit number]C, CDX-[four-digit number]C, CPX-[four-digit number]C, RX-[four-digit number]C, RDX-[four-digit number]C, RPX-[four-digit number]C, JX-[four-digit number]C, JDX-[four-digit number]C, JPX-[four-digit number]C, SX-[four-digit number]C, SDX-[four-digit number]C, and SPX-[four-digit number]C.

The Commission set of exhibits shall be uploaded using the Box platform with separate folders for each type of exhibit, *e.g.,* CX (Public), CX (Confidential), etc. The exhibits must be PDF files (version 1.5 or higher) and any file larger than 25MB shall be broken up into separate files. A Table of Contents file in PDF format which lists the names of all files in each folder should be created and included in each folder. Rejected exhibits should be provided in separate folders.

Any exhibits that are not included with the Commission exhibits and on the final exhibit list at the conclusion of the hearing will not be considered as part of the record to be certified to the Commission when the final initial determination issues.

### 12.4.1    Native Files

Native files (such as Excel, videos) should be printed to PDF and placed in the appropriate folder. If the native file cannot be printed to PDF in a legible manner, a placeholder should be placed in the appropriate folder indicating that the exhibit is a native file. In addition to the PDF files, parties may submit the native files in separate folders that are explicitly identified, *e.g.,* CX (Native).

### 12.5    Exhibit Set for the Office of General Counsel

No later than seven (7) days after the submission of post-hearing reply briefs, the parties shall contact the Office of General Counsel regarding submission of exhibits to that office.

## 13.    Post-hearing Briefs

### 13.1    Initial Post-hearing Briefs; Filing and Content

On or before the date set forth in the procedural schedule, each party shall file a post-hearing brief. The post-hearing brief shall discuss the issues and evidence tried within the framework of the general issues determined by the Commission's Notice of Investigation and

those issues that are included in the pre-hearing brief and any permitted amendments thereto. All other issues shall be deemed waived.

The parties are expected to follow the outline used in pre-hearing briefs in the post-hearing brief, <u>except that</u> the parties should remove references to any issue that the parties agree is no longer in dispute.

A reasonable page limit or word limit will be imposed for all post-hearing briefs, which will be determined on a case-by-case basis. Parties are required to use double-spacing (with the exception of headings, footnotes, quotations, etc.), at least 12-point font, and one-inch margins (excluding headers for CBI and footers, such as page numbers). If the parties have any questions regarding the acceptable formatting requirements for post-hearing briefs, they should contact the Administrative Law Judge's chambers.

To the extent there is more than one complainant and/or respondent in an investigation, complainants and/or respondents shall coordinate their efforts and submit a single brief. Exceptions to this rule will be made on a case-by-case basis. This rule shall also apply to post-hearing reply briefs.[16]

### 13.2    Post-hearing Reply Briefs; Filing and Content

On or before the date set forth in the procedural schedule, each party shall file a post-hearing reply brief. The post-hearing reply brief shall discuss the issues and evidence discussed in the initial post-hearing briefs of each opposing party.

A reasonable page or word limit will be imposed on all post-hearing reply briefs, which will be determined on a case-by-case basis. The rules relating to post-hearing briefs detailed in Ground Rule 13.1 also apply to reply briefs.[17]

### 13.3    Citations to Evidence

When citing to witness testimony, the party must include a parenthetical identifying the witness whose testimony is being cited. For example, if a party is citing to the trial testimony of their witness, Dr. Smith, the party should include the citation: Tr. (Smith) at 123:1-124:14. This rule also applies if the cited exhibit is testimony received during a deposition.

---

[16] The parties shall serve paper copies and Word versions of their initial post-hearing briefs on the Administrative Law Judge pursuant to Ground Rule 1.3.

[17] The parties shall serve paper copies and Word versions of their post-hearing reply briefs on the Administrative Law Judge pursuant to Ground Rule 1.3.

### 13.4    Citations to Pre-hearing Briefs

It is preferable to cite to the evidentiary record rather than pre-hearing briefs. Parties may not incorporate any portion of their pre-hearing briefs into their post-hearing briefs by reference.

### 13.5    Citation to Demonstrative Exhibits

If a party cites to a demonstrative exhibit in its post-hearing brief, it must include a parenthetical identifying the substantive evidence on which the demonstrative is based, *e.g.*, RDX-0001 (summarizing RX-0001). If the demonstrative was prepared during examination of the witness, the party should so state.

### 14.    NEXT Advocates Program

In accordance with the NEXT Advocates Program initiated by the Commission's Office of Administrative Law Judges,[18] the parties are encouraged to provide opportunities for less-experienced attorneys (*i.e.*, those that have given three or fewer substantive oral arguments or witness examinations in any federal tribunal apart from the present investigation) to participate in substantive oral presentations during the course of the investigation and/or to examine witnesses at the evidentiary hearing.

To support such participation, the following opportunities will be provided to parties that permit a less-experienced attorney to provide substantive portion of a presentation or witness examination:

- An additional 15 minutes of trial time will be provided to a party that permits a less-experienced attorney to examine a witness at the hearing (limited to two such time extensions for the complainant group, and two for the respondent group, at a single hearing). The additional time will be added to the hearing day. Parties who wish to participate in this arrangement should provide notice to the ALJ and the other parties before the prehearing conference.

- Oral argument will generally be permitted on summary determination motions, upon request and subject to approval in a particular investigation, where at least one party commits to permitting a less-experienced attorney to argue a substantive portion of the motion. Parties who wish to participate in this arrangement should

---

[18] *See* NEXT Advocates Program Announcement,
https://www.usitc.gov/next_advocates_nurturing_excellence_in_trial_advocates.htm.

provide notice to the ALJ and the other parties by no later than 3 business days after briefing is complete on the motion.

The notices discussed above should include a certification by lead counsel that one or more less-experienced attorneys will be examining a witness at the hearing and/or will be arguing a substantive portion of a summary determination motion. Such certification need not identify the less-experienced attorneys or the witnesses who will be examined. Such submissions should be sent to Bhattacharyya337@usitc.gov and need not be filed.

As set forth in the NEXT Advocates program announcement, more-experienced attorneys will be permitted to assist less-experienced attorneys, if necessary, and to clarify any statements on the record before conclusion of the session, if necessary.

In addition, less-experienced attorneys are encouraged to participate in the United States Patent and Trademark Office Legal Experience and Advancement Program (LEAP),[19] which includes training on preparing for oral argument.

The parties are further encouraged to provide any other proposals to encourage participation of less-experienced attorneys and will be requested to provide any such proposals at the beginning of the investigation. Proposals are also welcome at any other time and may be submitted to Bhattacharyya337@usitc.gov.

## 15.          Cooperation Among Parties

Due to the time limitations imposed by section 337, counsel shall attempt to resolve, by stipulation or negotiated agreement, any procedural problems encountered, including those relating to discovery and submission of evidence. To assure the proper cooperative spirit in this investigation, continuing good faith communications between counsel for the parties is essential and expected.

## 16.          *Ex Parte* Contacts

There shall be no *ex parte* contacts with the Administrative Law Judge. Any questions of a technical or procedural nature shall be directed to the Administrative Law Judge's chambers.

---

[19] *See* Legal Experience and Advancement Program (LEAP) | USPTO: https://www.uspto.gov/patents/ptab/leap

# APPENDIX A

## UNITED STATES INTERNATIONAL TRADE COMMISSION
### Washington, D.C.

In the Matter of

**Certain . . .**

Investigation No. 337-TA-___

### SUBPOENA DUCES TECUM

**TO:**   NAME
         ADDRESS

**TAKE NOTICE**: By authority of section 337 of the Tariff Act of 1930, as amended (19

U.S.C. § 1337), 5 U.S.C. § 556(c)(2), and pursuant to 19 C.F.R. § 210.32 of the Rules of Practice

and Procedure of the United States International Trade Commission, and upon an application for

subpoena made by ["Complainant(s)" / "Respondent(s)"/ etc., followed by name of

company]_____,

**YOU ARE HEREBY ORDERED** to produce at _____, on_____

, or at such other time and place agreed upon, all of the documents and things in your possession,

custody or control which are listed and described in Attachment A hereto. Such production will

be for the purpose of inspection and copying, as desired.

If production of any document listed and described in Attachment A hereto is withheld on

the basis of a claim of privilege, each withheld document shall be separately identified in a

privileged document list. The privileged document list must identify each document separately,

specifying for each document at least: (1) the date; (2) author(s)/sender(s); (3) recipient(s),

including copy recipients; and (4) general subject matter of the document. The sender(s) and

recipient(s) shall be identified by position and entity (corporation or firm, etc.) with which they

are employed or associated. If the sender or the recipient is an attorney or a foreign patent agent, he or she shall be so identified. The type of privilege claimed must also be stated, together with a certification that all elements of the claimed privilege have been met and have not been waived with respect to each document.

If any of the documents or things listed and described in Attachment A hereto are considered "confidential business information," as that term is defined in the Protective Order attached hereto, such documents or things shall be produced subject to the terms and provisions of the Protective Order.

Any motion to limit or quash this subpoena shall be filed within **ten (10) days** after the receipt hereof. At the time of filing of any motion concerning this subpoena, a copy shall be sent by email to Bhattacharyya337@usitc.gov.

IN WITNESS WHEREOF the undersigned of the United States International Trade Commission has hereunto set her hand and caused the seal of said United States International Trade Commission to be affixed at Washington, D.C. on this ___ day of _____, 2023.

_____

Monica Bhattacharyya
Administrative Law Judge
United States International Trade Commission

# UNITED STATES INTERNATIONAL TRADE COMMISSION

## Washington, D.C.

In the Matter of

**Certain . . .**

Investigation No. 337-TA-___

## SUBPOENA AD TESTIFICANDUM

**TO:**   NAME
         ADDRESS

      **TAKE NOTICE**: By authority of section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337), 5 U.S.C. § 556(c)(2), and pursuant to 19 C.F.R. § 210.32 of the Rules of Practice and Procedure of the United States International Trade Commission, and upon an application for subpoena made by ["Complainant(s)" / "Respondent(s)" / etc., followed by name of company].

      **YOU ARE HEREBY ORDERED** to present yourself for purposes of your deposition upon oral examination on_____, at_____, or at such other time and place agreed on, concerning the subject matter set forth in Attachment A hereto.

      This deposition will be taken before a Notary Public or other person authorized to administer oaths and will continue from day to day until completed.

      If any of your testimony is considered "confidential business information," as that term is defined in the Protective Order attached hereto, such testimony shall be so designated and treated according to the terms and provisions of the Protective Order.

      Any motion to limit or quash this subpoena shall be filed within **ten (10) days** after the

receipt hereof. At the time of filing of any motion concerning this subpoena, a copy shall be sent

by email to Bhattacharyya337@usitc.gov.

        IN WITNESS WHEREOF the undersigned of the United States
International Trade Commission has hereunto set her hand and
caused the seal of said United States International Trade
Commission to be affixed at Washington, D.C. on this ___ day of
_____, 2023.


_____
Monica Bhattacharyya
Administrative Law Judge
United States International Trade Commission

# APPENDIX B

## GENERAL OUTLINE FOR ALL BRIEFS

I.   INTRODUCTION

     A.   Procedural History

     B.   The Parties

     C.   Overview of the Technology

     D.   The Patents at Issue

     E.   The Products at Issue

II.  JURISDICTION

III. PATENT "A"

     A.   Claim Construction

     A.   Infringement

          1.   Claim 1

          2.   Claim 2

     B.   Domestic Industry – "Technical Prong"

     C.   Validity

        Anticipation Under 35 U.S.C. § 102(a)

        Obviousness Under 35 U.S.C. § 103(a)

     A.   Unenforceability

     B.   Other Defenses

IV.  PATENT "B" ...

V.   DOMESTIC INDUSTRY - ECONOMIC PRONG

     Significant Investment in Plant and Equipment

     Significant Employment of Labor or Capital

VI.  REMEDY AND BONDING

CERTAIN GLASS SUBSTRATES FOR LIQUID CRYSTAL          Inv. No. 337-TA-1433
DISPLAYS, PRODUCTS CONTAINING THE SAME, AND
METHODS FOR MANUFACTURING THE SAME

<u>PUBLIC CERTIFICATE OF SERVICE</u>

I, Lisa R. Barton, hereby certify that the attached **ORDER** has been served via EDIS
upon the Commission Investigative Attorney, **WHITNEY WINSTON, Esq.,** and the following
parties as indicated, on **January 23, 2025**.

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC  20436

<u>On Behalf of Complainant Corning Incorporated:</u>

John Thorne, Esq.                                      ☐ Via Hand Delivery
**KELLOGG, HANSEN, TODD, FIGEL &**                     ☐ Via Express Delivery
**FREDERICK, P.L.L.C.**                                ☐ Via First Class Mail
1615 M Street, NW, Suite 400                           ☒ Other: Email Notification
Washington, DC 20036
Email:  jthorne@kellogghansen.com

<u>On Behalf of Respondents Caihong Display Devices Co., Ltd.</u>
<u>and Xianyang CaiHong Optoelectronics Technology Co., Ltd.:</u>

Paul F. Brinkman, P.C.                                 ☐ Via Hand Delivery
**KIRKLAND & ELLIS LLP**                               ☐ Via Express Delivery
1301 Pennsylvania Avenue, N.W.                         ☐ Via First Class Mail
Washington, DC 20004                                   ☒ Other: Email Notification
Email:  paul.brinkman@kirkland.com

<u>On Behalf of Respondent LG Electronics U.S.A., Inc. and</u>
<u>VIZIO, Inc.:</u>

Lisa M. Kattan, Esq.                                   ☐ Via Hand Delivery
**BAKER BOTTS L.L.P.**                                 ☐ Via Express Delivery
700 K Street, NW                                       ☐ Via First Class Mail
Washington, DC 20001                                   ☒ Other: Email Notification
Email:  Lisa.Kattan@BakerBotts.com

CERTAIN GLASS SUBSTRATES FOR LIQUID CRYSTAL          Inv. No. 337-TA-1433
DISPLAYS, PRODUCTS CONTAINING THE SAME, AND
METHODS FOR MANUFACTURING THE SAME

Certificate of Service – Page 2

**Respondents:**

Hisense USA Corporation
7310 McGinnis Ferry Road
Suwanee, GA 30024

☐ Via Hand Delivery
☐ Via Express Delivery
☒ Via First Class Mail
☐ Other: Service to Be
Completed by Complainant

HKC Corporation Ltd.
HKC Industrial Park
1 Gongye 2nd Road
Shilong Community, Shiyan Street
Baoan District, Shenzhen City
Guangdong Province, 518108, China

☐ Via Hand Delivery
☐ Via Express Delivery
☒ Via First Class Mail
☐ Other: Service to Be
Completed by Complainant

HKC Overseas Ltd.
Unit 8 28/F W50
50 Wong Chuk Hang Road
Hong Kong 999077

☐ Via Hand Delivery
☐ Via Express Delivery
☒ Via First Class Mail
☐ Other: Service to Be
Completed by Complainant

TCL China Star Optoelectronics
Technology Co., Ltd.
9-2 Tangming Avenue
Guangming New District, Shenzhen City
Guangdong Province, 518132, China

☐ Via Hand Delivery
☐ Via Express Delivery
☒ Via First Class Mail
☐ Other: Service to Be
Completed by Complainant

TTE Technology, Inc.,
d/b/a TCL North America
189 Technology Drive
Irvine, CA 92618

☐ Via Hand Delivery
☐ Via Express Delivery
☒ Via First Class Mail
☐ Other: Service to Be
Completed by Complainant